# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re*: | No. 1:08–48275 (ESS) |
| HILAL K. HOMAIDAN, f/k/a Helal K. Homaidan, | Chapter 7 |
| Debtor. | |
| HILAL K. HOMAIDAN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 1:17–ap–1085 (ESS) |
| SLM CORPORATION, SALLIE MAE, INC. NAVIENT SOLUTIONS, LLC and NAVIENT CREDIT FINANCE CORPORATION, | |
| Defendants. | |

## <u>MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS</u>

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................... 3

I.    PLAINTIFF OBTAINS STUDENT LOANS TO ATTEND EMERSON COLLEGE .............. 3

II.   HOMAIDAN FILES FOR CHAPTER 7 BANKRUPTCY .................................. 4

III.  HOMAIDAN REOPENS HIS BANKRUPTCY CASE TO SEEK A
      DISCHARGEABILITY DETERMINATION FOR HIS STUDENT LOANS ........................ 5

STANDARDS OF REVIEW .................................................................................... 6

I.    MOTION TO COMPEL ARBITRATION .................................................... 6

II.   MOTION TO DISMISS ........................................................................ 7

III.  MOTION TO STRIKE ......................................................................... 8

ARGUMENT ...................................................................................................... 8

I.    GIVEN THE PLAIN LANGUAGE OF HOMAIDAN'S PROMISSORY NOTES AND THE
      BROAD SCOPE OF THE FEDERAL ARBITRATION ACT, THE COURT SHOULD
      COMPEL ARBITRATION OF THIS MATTER .................................................. 8

      A.    The Supreme Court has consistently confirmed the broad scope of
            the Federal Arbitration Act .................................................... 10

      B.    Absent a contrary Congressional command, federal statutory
            claims must be arbitrated .................................................... 10

            1.    Homaidan's arbitration agreements are valid, irrevocable,
                  and enforceable and encompass the claims alleged in his
                  Complaint ..................................................................... 11

            2.    No contrary Congressional command precludes arbitration
                  of discharge violation claims ............................................ 12

                  a.    The Bankruptcy Code is silent on the arbitrability of
                        discharge violation claims ........................................ 14

                  b.    The Supreme Court has abandoned the inherent
                        conflict inquiry ..................................................... 14

                  c.    Even assuming that the inquiry is still valid, no
                        inherent conflict exists between the Federal
                        Arbitration Act and the Bankruptcy Code ..................... 18

                  d.    Even if applicable, the Court shouldn't exercise its
                        discretion to refuse to compel arbitration here .............. 20

            3.    The Court should dismiss or, in the alternative, stay this
                  action ........................................................................ 23

TABLE OF CONTENTS
(CONTINUED)

PAGE

II.    HOMAIDAN'S STUDENT LOANS CONSTITUTE OBLIGATIONS TO REPAY FUNDS RECEIVED AS EDUCATIONAL BENEFITS ............................................................. 23

III.    HOMAIDAN'S STUDENT LOANS ARE EXCEPTED FROM DISCHARGE UNDER SECTION 523(A)(8)(A)(II) OF THE BANKRUPTCY CODE ....................................... 25

    A.    Consistent with the plain language of the statute, the majority of judicial decisions nationwide holds that a private student loan is an "obligation to repay funds received as an educational benefit" that is presumptively non-dischargeable under § 523(a)(8)(A)(ii) ...... 25

    B.    The minority line of cases holding otherwise is wrongly decided and should not be followed .................................................................... 29

        1.    The minority position misapplies canons of statutory interpretation ............................................................................. 30

            a.    Including student loans within the § 523(a)(8)(A)(ii) discharge exception doesn't render any other provision superfluous ....................................................... 30

            b.    Minority courts misapply the canon of noscitur a sociis by constricting its focus too narrowly .................. 33

            c.    Selective partial recitation of purported "legislative history" is an illusory justification for ignoring the statute's plain meaning .................................................... 36

IV.    HOMAIDAN'S CLAIM FOR DAMAGES BASED ON NONEXISTENT VIOLATIONS OF THE DISCHARGE INJUNCTION IS A DEFECTIVE CONTEMPT OF COURT CLAIM ..... 39

    A.    Homaidan must enforce the discharge injunction through a contempt proceeding ......................................................................... 40

    B.    The Court's general Discharge Order is not sufficiently specific to support a finding of contempt under these circumstances .................. 41

V.    HOMAIDAN WAIVED THE RIGHT TO PARTICIPATE IN A CLASS ACTION ................ 44

VI.    THE COURT LACKS JURISDICTION TO ENTERTAIN A NATIONWIDE CLASS FOR ALLEGED DISCHARGE VIOLATIONS .................................................................. 45

VII.    THE COURT SHOULD STRIKE HOMAIDAN'S IRRELEVANT ALLEGATIONS ABOUT A NONEXISTENT FRAUD CLAIM ........................................................... 50

    A.    Homaidan's impertinent allegations confuse the matters for trial ..... 50

    B.    Homaidan's fraud claims fall below federal pleading standards ........ 51

CONCLUSION ............................................................................................... 52

# TABLE OF CONTENTS
(CONTINUED)

PAGE

CERTIFICATE OF SERVICE ............................................................................................ 54

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Alderwoods Grp., Inc. v. Garcia,*
   682 F.3d 958 (11th Cir. 2012) ............................................................. 40, 45, 46, 47

*Alford v. Dean Witter Reynolds, Inc.,*
   975 F.2d 1161 (5th Cir. 1992) ...................................................................... 12, 22

*American Express Co v. Italian Colors Restaurant,*
   570 U.S. __, 133 S. Ct. 2304 (2013).....................................10, 11, 12, 14, 15, 43, 44

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................................... 3, 7

*ASUS Computer Int'l v. InterDigital, Inc.,*
   No. 15-CV-01716-BLF, 2015 WL 5186462 (N.D. Cal. Sept. 4, 2015) ..................... 6

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333 (2011) ......................................................................................... 9, 10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
   475 U.S. 643 (1986) ............................................................................................. 10

*Barrett v. Avco Fin. Srvs. Mgmt. Co.,*
   292 B.R. 1 (D. Mass. 2003) ............................................................................. 45, 47

*Matter of Baum,*
   606 F.2d 592 (5th Cir. 1979) ............................................................................... 41

*In re Beck,*
   283 B.R. 163 (Bankr. E.D. Penn. 2002) ............................................................... 48

*BedRoc Ltd., LLC v. United States,*
   541 U.S. 176 (2004) ....................................................................................... 29, 42

*In re Beesley,*
   No. 12–2444–CMB, 2013 WL 5134404 (Bankr. W.D. Pa. Sept. 13,
   2013)............................................................................................................... 24, 27

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) .............................................................................................. 7

*In re Belton*,
No. 15–cv–1934–VB, 2015 WL 6163083 (S.D.N.Y. Oct. 14, 2015) ................ 19, 21

*Bensadoun v. Jobe–Riat*,
316 F.3d 171 (2nd Cir. 2003) ................................................................... 6

*Bessette v. Avco Fin. Servs., Inc.*,
279 B.R. 442 (D.R.I. 2002) ...................................................................... 47

*Bessette v. Avco Fin. Srvs., Inc.*,
230 F.3d 439 (1st Cir. 2000) ................................................................... 40

*In re Brown*,
539 B.R. 853 (Bankr. S.D. Ca. 2015) .......................................... 26, 30, 34

*In re Burks*,
244 F.3d 1245 (11th Cir. 2001) .............................................................. 35

*Cabble v. Rollieson*,
No. 04–CV–9413, 2006 WL 464078 (S.D.N.Y. Feb. 27, 2006) ................ 7

*In re Carow*,
No. 10–7011, 2011 WL 802847 (Bankr. D.N.D. Mar. 2, 2011) ....... 25, 26

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .................................................................... 6

*In re Chief Executive Officers Clubs, Inc.*,
359 B.R. 527 (Bankr. S.D.N.Y. 2007) ................................................... 40

*In re Christoff*,
527 B.R. 624 (B.A.P. 9th Cir. 2015) ...................................................... 28

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) (Rehnquist, J.) ................................................. 36, 37

*In re Cline*,
282 B.R. 686 (W.D. Wash. 2002) ........................................................... 48

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012) .............................................. 9, 12, 13, 14, 15, 16, 17

*Conroy v. Aniskoff*,
507 U.S. 511 (1993) (Scalia, J., concurring) ........................................ 36

*In re Corbin*,
506 B.R. 287 (Bankr. W.D. Wash. 2014) ...................................... 24, 27, 30, 34

*Cox v. Zale Del., Inc.*,
  239 F.3d 910 (7th Cir. 2001) (Posner, J.)............................................ 40, 44, 45, 48

*In re Decena*,
  549 B.R. 11 (Bankr. E.D.N.Y. 2016), *vacated sub nom. Citizens
  Bank v. Decena*, 562 B.R. 202 (E.D.N.Y. 2016)...................................... 28

*In re Desormes*,
  569 F. App'x 42 (2d Cir. 2014) (unpublished)....................................... 26

*Dickey v. Bullard*,
  No. 07–0632, 2007 WL 1202449 (W.D. La. Apr. 20, 2007) ................................. 48

*Dittenhafer v. Citigroup*,
  No. C 10–1779 PJH, 2010 WL 3063127 (N.D. Cal. Aug.2, 2010) ........................ 22

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
  822 F.2d 1242 (2d Cir. 1987)................................................... 50

*In re Eber*,
  687 F.3d 1123 (9th Cir. 2012) ................................................. 13

*Ehlinger & Assocs. v. La. Architects Ass'n*,
  No. 96–2413, 1996 WL 603928 (E.D. La. Oct. 22, 1996)...................................... 48

*In re Elec. Mach. Enter., Inc.*,
  479 F.3d 791 (11th Cir. 2007) ............................................... 13

*In re Essangui*,
  No. 16–201–MMH, 2017 WL 4358755 (Bankr. D. Md. Oct. 2, 2017) .................. 28

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ......................................................... 36

*Farrow v. Fujitsu America, Inc.*,
  37 F. Supp. 3d 1115 (N.D. Cal. 2014) ................................................ 22

*In re Fina*,
  550 F. App'x 150 (4th Cir. 2014).......................................... 40

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ......................................................... 10

*In re Forson*,
  549 B.R. 866 (Bankr. S.D. Ohio 2016) ............................................. 47

*Garfield v. Ocwen Loan Servicing,*
    811 F.3d 86 (2d Cir. 2016) ................................................................. 40

*In re Gervin,*
    300 F. App'x 293 (5th Cir. 2008) ....................................................... 43

*Gilmer v. Interstate/Johnson Lane Corp.,*
    500 U.S. 20 (1991) ............................................. 9, 11, 12, 13, 16, 17, 19

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel.*
    *Wilson,*
    559 U.S. 280 (2010) .......................................................................... 34

*Gray v. Petroseed Co., Inc.,*
    985 F. Supp. 625 (D.S.C. 1996) ......................................................... 48

*GT Sec., Inc. v. Klastech GmbH, Ca*se
    No. 13–cv–3090–JCS, 2014 WL 2928013 (N.D. Cal. June 27, 2014) .................... 6

*H.K. Porter Co. v. Nat'l Friction Products Corp.,*
    568 F.2d 24 (7th Cir. 1977) ............................................................... 41

*In re Haemmerle,*
    529 B.R. 17 (Bankr. E.D.N.Y. 2015) .................................................. 40

*In re Hamilton Allied Corp.,*
    87 B.R. 43 (Bankr. S.D. Ohio 1988) ................................................... 48

*Henson v. Santander Consumer USA Inc.,*
    582 U.S. __, 137 S. Ct. 1718 (2017) .................................................... 17

*Ind. Univ. v. Canganelli,*
    149 Ill. App. 3d 852 (1986) ............................................................... 19

*Int'l Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade*
    *Ass'n,*
    389 U.S. 64 (1967) ........................................................................... 42

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994) ......................................................................... 45

*Jones v. CitiMortg., Inc.,*
    No. 15–14853, 2016 WL 6610208 (11th Cir. Nov. 9, 2016) ................... 47

*In re Joubert,*
    411 F.3d 452 (3d Cir. 2005) .............................................................. 40

*Kaneff v. Delaware Title Loans, Inc.*,
  587 F.3d 616 (3rd Cir.2009) ................................................................... 6

*In re Kashikar*,
  567 B.R. 160 (B.A.P. 9th Cir. 2017) ...................................................... 28

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995) .................................................................. 41

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
  543 U.S. 50 (2004) (Scalia, J., dissenting) ........................................... 36

*In re Logsdon*,
  32 F. App'x 427 (9th Cir. 2002) ............................................................ 43

*In re Maas*,
  497 B.R. 863 (Bankr. W.D. Mich. 2013) ............................................... 34

*MBNA American Bank, N.A. v. Hill*,
  436 F.3d 104 (2d Cir. 2006) .................................................... 18, 19, 21

*In re McKenzie-Gilyard*,
  388 B.R. 474 (Bankr. E.D.N.Y. 2007) ................................................... 40

*In re McLean*,
  794 F.3d 1313 (11th Cir. 2015) ............................................... 45, 46, 47

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  402 F.Supp.2d 434 (S.D.N.Y.2005) ......................................................... 7

*In re Meyer*,
  No. 15–13193, 2016 WL 3251622 (Bankr. N.D. Ohio June 6, 2016) ................... 28

*In re Micko*,
  356 B.R. 210 (Bankr. D. Ariz. 2006) ............................................. 27, 30

*In re Mintz*,
  434 F.3d 222 (3d Cir. 2006) .................................................................. 13

*In re Montano*,
  488 B.R. 695 (Bankr. D.N.M. 2013) ...................................................... 48

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ............................................................................. 9, 10

*In re Motichko*,
  395 B.R. 25 (Bankr. N.D. Ohio 2008) ................................................... 47

*In re Murphy,*
    282 F.3d 868 (5th Cir. 2002) ................................................................ 34

*N.L.R.B. v. Health Care & Retirement Corp. of Am.,*
    511 U.S. 571 (1994) (Kennedy, J.) ........................................................ 37

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury
    Litig.,*
    314 F.R.D. 580 (N.D. Ill. 2016) ............................................................ 44

*Matter of Nat'l Gypsum Co.,*
    118 F.3d 1056 (5th Cir. 1997) ................................................... 40, 44, 45

*In re Nelson,*
    234 B.R. 528 (Bankr. M.D. Fla. 1999) ................................................. 48

*In re Nicholas,*
    457 B.R. 202 (Bankr. E.D.N.Y. 2011) .................................................. 40

*In re Nunez,*
    527 B.R. 410 (Bankr. D. Or. 2015) ........................................................ 28

*Penn Mut. Life Ins. Co. v. Lederer,*
    252 U.S. 523 (1920) .............................................................................. 37

*Pereira v. First N. Am. Nat'l Bank,*
    223 B.R. 28 (N.D. Ga. 1998) ................................................................. 48

*Perry v. NorthCentral Univ., Inc.,*
    No. CV-10-8229-PCT-PGR, 2011 WL 4356499 (D. Ariz. Sept. 19,
    2011) ........................................................................................................ 6

*Preston v. Ferrer,*
    552 U.S. 346 (2008) ....................................................................... 16, 17

*Ramdharry v. Gurer,*
    No. CV–89–42620, 1995 WL 41353 (Conn. Super. Ct. Jan. 25, 1995) ................ 19

*In re Renshaw,*
    222 F.3d 82 (2d Cir. 2000) .................................................................... 24

*Rent-A-Center, West, Inc. v. Jackson,*
    561 U.S. 63 (2010) .................................................................................. 9

*In re Robinson,*
    342 F. App'x 235 (8th Cir. 2009) .......................................................... 43

*In re Roy*,
  No. 09–1406, 2010 WL 1523996 (Bankr. D.N.J. Apr. 15, 2010) ........................... 27

*In re Rumer*,
  469 B.R. 553 (Bankr. M.D. Pa. 2012) .................................................. 34

*In re Rust*,
  510 B.R. 562 (Bankr. E.D. Ky. 2014) ........................................... 27, 30, 34

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
  563 U.S. 401 (2011) ............................................................ 34, 35

*In re Schott*,
  282 B.R. 1 (B.A.P. 10th Cir. 2002) ...................................................... 39

*In re Schultz*,
  No. 16–ap–3042, 2016 WL 8808073 (Bankr. D. Minn. Dec. 13, 2016) ................. 28

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) (Scalia, J.) ................................................... 37

*Shearson/Am. Express, Inc. v. McMahon*,
  482 U.S. 220 (1987) ....................................................... 10, 11, 12, 13, 14

*Shields v. Frontier Tech., LLC.*,
  No. CV 11-1159-PHX-SRB, 2011 WL 13070409 (D. Ariz. Nov. 30,
  2011) ........................................................................ 6

*In re Shores of Panama Inc.*,
  387 B.R. 864 (Bankr. N.D. Fla. 2008) .................................................. 20

*In re Singleton*,
  284 B.R. 322 (D.R.I. 2002) ............................................................ 48

*Hodge ex rel. Skiff v. Hodge*,
  66 F. Supp. 2d 342 (N.D.N.Y. 1999) ................................................... 48

*In re Skipworth*,
  No. 09–80149–JAC–7, 2010 WL 1417964 (Bankr. N.D. Ala. Apr. 1,
  2010) ........................................................................ 27

*Sparling v. Hoffman Const. Co.*,
  864 F.2d 635 (9th Cir. 1988) ...................................................... 22

*Matter of Swenson*,
  No. 16–10016, 2016 WL 4480719 (Bankr. W.D. Wis. Aug. 23, 2016) ................. 28

*In re Szenes,*
    515 B.R. 1 (Bankr. E.D.N.Y. 2014) ....................................................... 40

*In re Thorpe Insulation Co.,*
    671 F.3d 1011 (9th Cir. 2012) ............................................................... 13

*Toledo Scale Co. v. Computing Scale Co.,*
    261 U.S. 399 (1923) ................................................................................ 45

*In re Touchstone Home Health LLC,*
    —B.R.—, 2017 WL 3669541 (Bankr. D. Colo. Aug. 21, 2017) .............. 19

*Transam. Fin. Serv. v. Danney,*
    No. 99–228–P–H, 1999 WL 33117201 (D. Me. Dec. 23, 1999) ............. 48

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.,*
    789 F.3d 29 (2d Cir. 2015) ..................................................................... 40

*In re Underwood,*
    299 B.R. 471 (Bankr. S.D. Ohio 2003) .................................................. 18

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................................ 29

*Waffenschmidt v. MacKay,*
    763 F.2d 711 (5th Cir. 1985) ................................................................. 45

*Walls v. Wells Fargo Bank, N.A.,*
    276 F.3d 502 (9th Cir. 2002) ................................................................. 40

*Williams v. Sears, Roebuck & Co.,*
    244 B.R. 858 (S.D. Ga. 2000) ................................................................ 48

*Williams v. United States,*
    402 F.2d 47 (10th Cir. 1967) ................................................................. 41

*In re Williams,*
    564 B.R. 770 (Bankr. S.D. Fla. 2017) ............................................. 19, 21

*In re Wills,*
    No. 08–80404–FJO–07, 2010 WL 1688221 (S.D. Ind. Apr. 23, 2010) ................. 31

*Wis. Pub. Intervenor v. Mortier,*
    501 U.S. 597 (1991) ................................................................................ 36

*Xcentric Ventures, LLC v. Arden,*
    No. C 10–80058 SI, 2011 WL 806629 (N.D. Cal. Mar. 2, 2011) ............ 48

*Yates v. United States*,
574 U.S. __, 135 S. Ct. 1074 (2015) ......................................................... 33

**STATUTES**

7 U.S.C.
§ 26(n)(2) ......................................................................................... 15

11 U.S.C.
§ 523(a)(8) ................................................................................... *passim*
§ 524(a)(2), (3) ..................................................................... 8, 40, 44
§ 727 ................................................................................................. 4

9 U.S.C.
§ 2 .................................................................................... 8, 9, 10
§ 3 ................................................................................................. 22

12 U.S.C.
§ 5518(b) ........................................................................................ 16

15 U.S.C.
§ 1226(a)(2) ................................................................................... 15
§§ 1679 *et seq*.............................................................................. 15

26 U.S.C.
§ 221 (d)(l) ...................................................................................... 25

28 U.S.C.
§ 157(a) ............................................................................................ 18

29 U.S.C.
§§ 621 *et seq*............................................................................... 16

**OTHER AUTHORITIES**

Fed. R. Civ. P.
9 ....................................................................................................... 50
12(f) ................................................................................................. 49
12(b)(1) ............................................................................................. 6
23 ............................................................................................. 14, 44
7009 ................................................................................................. 50

## MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS

Defendants Navient Solutions, LLC ("NSL"), Navient Credit Finance Corporation ("NCFC"), and Sallie Mae, Inc. ("Sallie Mae") through the undersigned counsel, hereby submit this Memorandum in Support of their Motion to Compel Arbitration or, in the Alternative, to Dismiss (the "Motion to Compel or Dismiss" or the "Motion") the adversary proceeding Complaint filed by plaintiff Hilal K. Homaidan, Dkt. No. 1.  In support, NSL, NCFC, and Sallie Mae state as follows:

### INTRODUCTION

To fund his attendance at Emerson College, plaintiff Hilal K. Homaidan obtained a series of private student loans.  Now—ten years after he graduated and more than six years after he received a discharge—Homaidan alleges, based on a novel interpretation of the Bankruptcy Code, that he discharged his liability for *two* of those student loans (which he repaid in full six years ago).  From this position, Homaidan bootstraps the argument that communications from NSL, NCFC, and Sallie Mae about those loans constituted discharge violations for which he is entitled to damages and sanctions.  What's more, Homaidan seeks to assert these claims on behalf of a nationwide class of debtors.

Homaidan's Complaint, however, suffers from significant—indeed, irreparable—substantive and procedural flaws.  As an initial matter, the arbitration agreements that Homaidan executed when obtaining his Tuition Answer Loans are valid, binding, and enforceable.  They also unquestionably encompass the allegations

made in his Complaint. For that reason, the Court should compel arbitration of this matter and dismiss Homaidan's Complaint with prejudice.

Homaidan's claims fare no better on the merits. First, his Tuition Answer Loans constitute "obligation[s] to repay finds received as [] educational benefits[,]" and are therefore excepted from discharge under § 523(a)(8)(A)(ii) of the Bankruptcy Code.[1] Second, as the Second Circuit and this Court have often found, claims for discharge violations are in the nature of contempt. No private right of action exists by which to assert them. Third, a prerequisite for contempt liability is a clear court order that delineates the prohibited conduct. The Discharge Order here is anything but. Rather than identifying the student-loan debts for which Homaidan is (allegedly) no longer liable, the Discharge Order states that most student-loan debts are *not* discharged in bankruptcy. As a result, none of NSL, NCFC, or Sallie Mae can be liable for discharge violations because a court of competent jurisdiction (or arbitrator) has not yet determined that Homaidan's Tuition Answer Loans are dischargeable.

Fourth, even if Homaidan's claims had legs, he couldn't assert them on a nationwide class basis, as he has contractually waived the right to do so. And even if

---

[1] NSL, NCFC, and Sallie Mae expressly reserve all rights, claims, arguments, and defenses with respect to certification of a class, venue, recovery of attorneys' fees, and all other defenses, rights, arguments, and claims not set forth herein. This reservation includes, but is not limited to, the defense that Homaidan's student loans are excepted from discharge as qualified education loans under § 523(a)(8)(B), which NSL, NCFC, and Sallie Mae will assert at the appropriate time if necessary and after sufficient time to conduct discovery.

he hadn't, the Court still couldn't entertain a nationwide class for alleged discharge violations: it lacks Article III jurisdiction to enforce other courts' discharge orders.

Finally, Homaidan includes in his Complaint unspecific allegations of fraud committed by unspecified parties against unspecified borrowers through unspecified means. Yet, Homaidan doesn't assert a cause of action for fraud. The Court should therefore strike these immaterial, impertinent, and scandalous claims, which confuse the matters for trial, fail to meet federal pleading standards, and prejudice NSL, NCFC, and Sallie Mae.

## FACTUAL BACKGROUND[2]

### I.   PLAINTIFF OBTAINS STUDENT LOANS TO ATTEND EMERSON COLLEGE

Homaidan attended Emerson College from 2003 through spring 2007, when he graduated. Dkt. No. 1 ¶¶ 36–37. To fund his education, Homaidan obtained a series of student loans, including two Tuition Answer Loans in the total principal sum of $11,580 for the 2006–2007 academic year. *Id.* ¶ 40; Ex. A at 2–3; Ex. B at 2–3.

In the promissory notes that he executed to obtain his Tuition Answer Loans, Homaidan made a number of certifications and representations about his need for the funds. First, Homaidan certified that his loans are "qualified education loan[s]" and that he must "immediately repay any funds . . . which cannot reasonably be

---

[2] Consistent with the well-established standards for a motion to dismiss, the facts herein are taken—solely for purposes of this motion—from Homaidan's Complaint, Homaidan's bankruptcy schedules, and other documents of which this Court can take judicial notice. The Court need not—and should not—however, accept legal conclusions that are couched as factual allegations in Homaidan's Complaint. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

attributed to meeting [his] educational expenses related to attendance at" Emerson College. Ex. A at 8; Ex. B at 8. Second, Homaidan agreed that his ceasing to attend Emerson College was a condition on which his loans can be cancelled. Ex. A at 6; Ex. B at 6.

Third, Homaidan described his anticipated use of the funds requested. Specifically, he provided the following expected uses of proceeds from his Tuition Answer Loans, all of which relate to educational benefits:

- For his August 30, 2006 loan, $4,800 would be paid "directly to [Emerson College]" for "Tuition, Fees, Room, [and] Board" and $1,000 would be for "educational expenses not paid directly to the institution[,]"Ex. A at 3;

- For his September 19, 2006 loan, $4,000 would be paid "directly to [Emerson College]" for "Tuition, Fees, Room, [and] Board[,]" and $2,000 would be for "educational expenses not paid directly to the institution[,]"Ex. B at 3;

Finally, Homaidan certified in his promissory notes that the information he provided was "true, complete and correct to the best of [his] knowledge and belief and [was] made in good faith[.]" Ex. A at 8; Ex. B at 8. In addition, both of Homaidan's Tuition Answer Loan promissory notes contain broad arbitration agreements. Ex. A at 9–10; Ex. B at 9–10.

## II.    HOMAIDAN FILES FOR CHAPTER 7 BANKRUPTCY

On December 4, 2008 Homaidan filed a voluntary chapter 7 bankruptcy petition in this Court. Dkt. No. 1 ¶ 44; No. 1:08–48275–ess (Bankr. E.D.N.Y.). Among his other student loans, Homaidan scheduled his Tuition Answer Loans in the amounts of $7,983.19 and $8,190.11, respectively. No. 1:08–48275–ess, Dkt. No. 11 at 7 (Bankr. E.D.N.Y. Dec. 19, 2008); *see also* No. 1:08–48275–ess, Dkt. No. 19 at 8

(Bankr. E.D.N.Y. Mar. 9, 2009) (amended schedules).  He did not describe either of these student-loan debts as contingent, unliquidated, or disputed.  No. 1:08–48275–ess, Dkt. No. 11 at 7 (Bankr. E.D.N.Y. Dec. 19, 2008); *see also* No. 1:08–48275–ess, Dkt. No. 19 at 8 (Bankr. E.D.N.Y. Mar. 9, 2009) (amended schedules).

On April 9, 2009 the Court issued an order discharging Homaidan from liability on some of his prepetition debts under § 727 of the Bankruptcy Code.  Dkt. No. 1 ¶ 45; No. 1:08–48275–ess, Dkt. No. 21 (Bankr. E.D.N.Y. Apr. 9, 2009) (the "Discharge Order").  The Discharge Order did not specify *which* debts Homaidan no longer had to pay, though.  Instead, it noted that "[s]ome . . . common types of debts . . . are <u>not</u> discharged in a chapter 7 bankruptcy case[,]" including "[d]ebts for most student loans[.]"  No. 1:08–48275–ess, Dkt. No. 21 at 2 (Bankr. E.D.N.Y. Apr. 9, 2009 (emphasis in original).  The Court closed Homaidan's chapter 7 bankruptcy case on March 5, 2010.  Docket Entry, No. 1:08–48275–ess (Bankr. E.D.N.Y. Mar. 5, 2010).

At no time during his bankruptcy case or after it closed did Homaidan assert (contrary to the representations in the promissory notes) the belief that his Tuition Answer Loans were subject to discharge, and in fact were discharged, in bankruptcy.  To the contrary: Homaidan continued paying on his student loans following the close of his bankruptcy case, and paid off his Tuition Answer Loans *in full* more than six years ago.  Dkt. No. 1 ¶ 51.

## III. HOMAIDAN REOPENS HIS BANKRUPTCY CASE TO SEEK A DISCHARGEABILITY DETERMINATION FOR HIS STUDENT LOANS

On April 14, 2017, more than seven years after it closed, Homaidan asked the Court to reopen his bankruptcy case so that he could seek a dischargeability

determination for his Tuition Answer Loans. No. 1:08–48275–ess, Dkt. No. 28 (Bankr. E.D.N.Y. Apr. 14, 2017). The Court did so on May 26, 2017, No. 1:08–48275–ess, Dkt. Nos. 31, 33 (Bankr. E.D.N.Y. May 26 and June 9, 2017), and Homaidan filed his adversary proceeding Complaint about one month later, Dkt. No. 1.

Homaidan now asserts that his Tuition Answer Loans are dischargeable—and in fact were discharged—in bankruptcy. *Id.* ¶¶ 41, 78. Specifically, Homaidan claims that his Tuition Answer Loans "are not non-dischargeable student loans or qualified education loans" because they "were not made solely for the 'cost of attendance'" at Emerson College during the 2006–2007 academic year. *Id.* ¶¶ 41, 78. From that assertion, Homaidan next alleges that communications he received about his Tuition Answer Loans after the Court issued the Discharge Order were improper. *Id.* ¶¶ 48–52, 82. Finally, Homaidan seeks to assert these claims on behalf of a nationwide class of student-loan borrowers who "filed for bankruptcy in any of [the] district courts of the United Sates and were issued Discharge Orders since April 20, 2005[.]"[3] *Id.* ¶¶ 62–76.

## STANDARDS OF REVIEW

### I.    MOTION TO COMPEL ARBITRATION

Courts generally treat motions to compel arbitration as motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), as incorporated by Bankruptcy Rule 7012. *See, e.g.*, *ASUS Computer Int'l v. InterDigital, Inc.,* No. 15–

---

[3] This date appears to be a scrivener's error, as BAPCPA's effective date was October 17, 2005.

cv–01716–BLF, 2015 WL 5186462, at *2 (N.D. Cal. Sept. 4, 2015) (citing *GT Sec., Inc. v. Klastech GmbH, C*ase No. 13–cv–3090–JCS, 2014 WL 2928013, at *17 (N.D. Cal. June 27, 2014)).  This standard is akin to a summary judgment standard. *See, e.g., Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2nd Cir. 2003) ("In the context of motions to compel arbitration under the Federal Arbitration Act . . . , the court applies a standard similar to that applicable for a motion for summary judgment."); *Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616, 620 (3rd Cir.2009) (the same); *Perry v. NorthCentral Univ., Inc.*, No. 10–cv–8229–PCT–PGR, 2011 WL 4356499, at *3 (D. Ariz. Sept. 19, 2011) (the same).  As such, the court may consider matters outside of the pleadings. *Shields v. Frontier Tech., LLC,* No. 11–cv–1159–PHX–SRB, 2011 WL 13070409, at *4 (D. Ariz. Nov. 30, 2011).

## II.    MOTION TO DISMISS

When considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in favor of the nonmoving party. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). That standard, however, does not require a court to accept as true legal conclusions that the plaintiff couches as factual allegations. *Ashcroft*, 556 U.S. at 678.  *See also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016) (collecting authorities).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* Rather, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III.    MOTION TO STRIKE

A court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "'Immaterial' matter is that which has no essential or important relationship to the claim for relief, and 'impertinent' material consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 402 F.Supp.2d 434, 437 (S.D.N.Y. 2005) (Scheindlin, J.). "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Cabble v. Rollieson,* No. 04–CV–9413, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006) (Maas, J.).

## ARGUMENT

## I.    GIVEN THE PLAIN LANGUAGE OF HOMAIDAN'S PROMISSORY NOTES AND THE BROAD SCOPE OF THE FEDERAL ARBITRATION ACT, THE COURT SHOULD COMPEL ARBITRATION OF THIS MATTER

Both of Homaidan's Tuition Answer Loan promissory notes contain broad arbitration agreements.  They provide that a party may compel arbitration of any "claim, dispute, or controversy . . . that arises from or relates in any way to" the promissory notes, including "disputes alleging fraud or misrepresentation, breach of contract, or violation of statute[,]" as well as "disputes involving requests for injunctions or other equitable relief."  Ex. A at 9; Ex. B at 9.

Section 2 of the Federal Arbitration Act imbues Homaidan's arbitration agreements with a presumption of validity, irrevocability, and enforceability—except where grounds for revoking the contract itself exist (which Homaidan has not alleged).[4] 9 U.S.C. § 2. Sections 3 and 4 of the Federal Arbitration Act, in turn, provide that where parties have entered into a valid and binding agreement, a party aggrieved by the failure or refusal of another to arbitrate may move for an order directing that arbitration proceed in the manner provided for in the agreement. *Id.* §§ 3, 4.

Here, Homaidan alleges that NSL, NCFC, and Sallie Mae have violated the discharge injunction codified in § 524 of the Bankruptcy Code. *See* Dkt. No. 1 ¶¶ 80–83. He also alleges that NSL, NCFC, and Sallie Mae engaged in "abusive, deceptive and illegal collection efforts" related to misrepresentations of the nature of his student-loan debt. *See, e.g.*, *id.* ¶¶ 48–52. These claims indisputably fall within the scope of Homaidan's arbitration agreements, and NSL, NCFC, and Sallie Mae have elected to arbitrate them. *See* Dkt. No. 16 at 2. The Court should therefore compel arbitration of this matter and dismiss Homaidan's Complaint or, in the alternative, stay all proceedings pending arbitration.

---

[4] In resolving whether the parties agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, Homaidan had—but did not exercise—the contractual right to reject the arbitration agreements within 60 days of the first disbursement of his Loan proceeds. Ex. A at 9; Ex. B at 9.

### A.    The Supreme Court has consistently confirmed the broad scope of the Federal Arbitration Act.

Time and again, the Supreme Court has confirmed the strong policy favoring arbitration under the Federal Arbitration Act. *See CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46, 352 (2011); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67–73 (2010); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

The Federal Arbitration Act embodies both the "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Concepcion*, 563 U.S. at 339 (citations and internal quotation marks omitted). For that reason, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses*, 460 U.S. at 24–25, and arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quotation marks omitted).

### B.    Absent a clear Congressional command, federal statutory claims must be arbitrated.

Congress enacted the Federal Arbitration Act "to reverse centuries of judicial hostility to arbitration agreements." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 225–26 (1987) (internal quotation marks, alteration, and citation omitted). In so doing, Congress placed arbitration agreements "upon the same footing as other contracts," *id.*, making them "valid, irrevocable, and enforceable" as a matter of

federal law, "save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2.

Consistent with this aim, courts must "'rigorously enforce' arbitration agreements according to their terms." *American Express Co v. Italian Colors Restaurant*, 570 U.S. __, 133 S. Ct. 2304, 2309–2310 (2013) (citation omitted). The requirement is resolute, and "holds true for claims that allege a violation of a federal statute." *Id.*; *see also Gilmer,* 500 U.S. at 24–25 ("[S]tatutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA.") and *McMahon*, 482 U.S. at 226 (The "duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights.").

1.  **Homaidan's arbitration agreements are valid, irrevocable, and enforceable and encompass the claims alleged in his Complaint.**

Homaidan's arbitration agreements are broad.  They authorize either party to "elect to arbitrate—and require the other party to arbitrate—any . . . dispute or controversy . . . that arises from or relates in any way to" Homaidan's promissory notes.[5]  [Loan 9 at 9; Loan 10 at 9.]  This scope includes "disputes involving fraud or misrepresentation, breach of contract, negligence, or violation of statute, regulation,

---

[5] Among other entities, the agreements apply to "any subsequent holder of [the promissory notes]; Sallie Mae, Inc.; any Sallie Mae affiliate or subsidiary . . . any predecessors, successors and assigns of these entities . . . [and] any party named as a co-defendant [in a claim asserted by Homaidan], such as . . . loan servicers[.]" Ex. A at 9; Ex. B at 9.

or common law[,]" as well as "disputes involving requests for injunctions or other equitable relief."  Ex. A at 9; Ex. B at 9.]

Here, Homaidan seeks (1) a determination that he discharged his obligations to repay the funds obtained through his Tuition Answer Loans and (2) damages and sanctions for alleged violations of the discharge injunction.  Dkt. No. 1 ¶¶ 77–84.  He also requests "injunctive relief prohibiting [NSL, NCFC, and Sallie Mae] from continuing to seek collection on [his] . . . discharged debts[.]"  *Id.* ¶ 84(2).  (The latter request is an especially odd one, given that Homaidan has repaid his loans in full more than six years ago and the last communication from NSL, NCFC, or Sallie Mae he alleges having received was in July 2011.  *Id.* ¶¶ 50–51.)  Without question, these claims fall within the scope of Homaidan's arbitration agreements.  And Homaidan has not contested in his Complaint the validity, irrevocability, or enforceability of his arbitration agreements, so the Court should enforce them as written.

## 2.    No clear Congressional command precludes arbitration of discharge violation claims.

Consistent with the purposes of the Federal Arbitration Act, courts are required to "'rigorously enforce' arbitration agreements according to their terms." *Italian Colors*, 133 S. Ct. at 2309–10 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).  This obligation applies with equal force to statutory claims. *Id.*; *see also Gilmer,* 500 U.S. at 24–25.  An exception exists, however, where the statutory claim asserted derives from a competing federal statute that expresses a congressional command to override the Federal Arbitration Act's mandate.  *Italian Colors*, 133 S. Ct. at 2309 (quoting *CompuCredit*, 556 U.S. at 98).  Stated differently,

courts must enforce the arbitration of statutory claims "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *see also Gilmer*, 500 U.S. at 24–26.

Given that national policy favors enforcement of arbitration agreements, "the burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *McMahon,* 482 U.S. at 227. Although it need not invoke a magic incantation, the Supreme Court instructs that Congress must have stated such intent with "clarity." *See CompuCredit*, 565 U.S. at 103. The Federal Arbitration Act does not yield absent such clear language—even where another statute is intended to "further important social policies," *Gilmer*, 500 U.S. at 27–28; have a "deterrent function," *id.*; cover "public interest[s]," *McMahon*, 482 U.S. at 240; or address "factual and legal complexities," *id.* at 232.

The Supreme Court previously identified two inquiries for courts to make when evaluating whether a statute expresses a contrary congressional command that creates an exception to the Federal Arbitration Act. *Shearson*, 482 U.S. at 227. First, whether that contrary congressional command is "'deducible from [the statute's] text or legislative history[.]'" *Id.* (quoting *Mitsubishi Motors*, 473 U.S. at 628) (first alteration in original). And second, whether "an inherent conflict between arbitration and the statute's underlying purpose" exists. *Id.*

a. *The Bankruptcy Code is silent on the arbitrability of discharge violation claims.*

The Bankruptcy Code is completely silent on whether discharge violation claims are exempt from the Federal Arbitration Act. Neither its text nor its history evince *any* suggestion that Congress intended to exempt bankruptcy matters from the Federal Arbitration Act. *See, e.g.*, *In re Eber*, 687 F.3d 1123, 1129 (9th Cir. 2012); *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1020 (9th Cir. 2012); *In re Elec. Mach. Enter., Inc.*, 479 F.3d 791, 796 (11th Cir. 2007); *In re Mintz*, 434 F.3d 222, 231 (3d Cir. 2006).

This silence speaks volumes—especially when viewed through the lens of history. The Federal Arbitration Act has remained in force since 1925. Congress has enacted a number of bankruptcy statutes since then, including a complete repeal and replace of the bankruptcy system in 1978, but none have addressed arbitration. It is thus evident that no contrary Congressional command pulls discharge-violation claims from the reach of the Federal Arbitration Act. The Court should therefore enforce the parties' agreements and compel arbitration of this matter.

b. *The Supreme Court has abandoned the inherent conflict inquiry.*

The Supreme Court identified the inherent conflict inquiry in *Shearson* as a final question that a court can consider when determining whether a statute contains a clear congressional command that displaces the Federal Arbitration Act. 482 U.S. at 227. Now, however, more recent Supreme Court guidance instructs that a clear congressional command can be found in the text or history of a statute only. In other

words, it has effectively abandoned the inherent conflict inquiry. *See Italian Colors*, 133 S. Ct. at 2309–10 and *CompuCredit*, 565 U.S. at 104.

In *Italian Colors*, for example, the Supreme Court was asked whether the Federal Arbitration Act allows courts to invalidate arbitration agreements that do not permit class arbitration of antitrust claims. 133 S. Ct. at 2308. In holding that it does not, the Court focused on the text and history of the Sherman and Clayton Acts. Neither act "make[s] [any] mention of class actions[,]" the Court wrote. *Id.* at 2309. And both, it noted, "were enacted decades before the advent of Federal Rule of Civil Procedure 23[.]" *Id.* The Court also reasoned that "congressional approval of Rule 23 [does not] establish an entitlement to class proceedings for the vindication of statutory rights"—especially where parties enjoy the substantive right to include arbitration provisions in their private agreements. *Id.* at 2309–10. Notably, even though the parties' briefs raised the issue, the Supreme Court did *not* consider any alleged inherent conflict in *Italian Colors*.

Similarly, in *CompuCredit* the Supreme Court considered whether the "Credit Repair Organizations Act (CROA), 15 U.S.C. §§ 1679 *et seq.*, precludes enforcement of an arbitration agreement in a lawsuit alleging violations of that Act." 565 U.S. at 96. The Court again focused its attention on the act's text and history alone when determining whether Congress intended for it to displace the Federal Arbitration Act. *Id.* at 98–104. Indeed, the Supreme Court explicitly held that, "[b]ecause the [Credit Repair Organizations Act] is silent on whether claims under the Act can proceed in

an arbitrable forum[,]" the Federal Arbitration Act required the arbitration agreement at issue to be enforced according to its terms.[6] *Id.* at 104.

These decisions align with the myriad cases in which the Supreme Court has found that federal statutes did *not* displace the Federal Arbitration Act—and also with the three instances in which the Court believed that Congress *did* intend to displace it. *See CompuCredit*, 565 U.S. at 103–04 (stating that, "[w]hen [Congress] has restricted the use of arbitration in other contexts, it has done so with clarity" and identifying the Commodity Exchange Act, 7 U.S.C. § 26(n)(2), the Motor Vehicle Franchise Contract Arbitration Fairness Act of 2002, 15 U.S.C. § 1226(a)(2), and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5518(b), as examples of such clarity).

On that point, the three statutes identified by the Supreme Court in *CompuCredit* evince a clear Congressional intent to displace the Federal Arbitration Act. The Commodity Exchange Act provides that "[n]o predispute arbitration agreement shall be valid or enforceable[] if the agreement requires arbitration of a dispute arising under [section 36(n)(2).]" The Motor Vehicle Franchise Contract Arbitration Fairness Act provides that, "[n]otwithstanding any other provision of law,

---

[6] Justice Sotomayor expressed in a concurrence her understanding that the majority opinion did not "hold that Congress must speak . . . explicitly in order to convey its intent to preclude arbitration of statutory claims[,]" but that "proof of Congress's intent may also be discovered in the history or purpose of the statute in question." 565 U.S. at 108 (Sotomayor, J., concurring). The six-justice majority did not accept that position. Justice Kagan initially agreed with Justice Sotomayor's position about the viability of the inherent conflict inquiry—she joined Justice Sotomayor's *CompuCredit* concurrence—but appears to have abandoned it one year later in her *Italian Colors* dissent. *See* 133 S. Ct. at 2313–20 (Kagan, J., dissenting).

whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy[.]"  And the Dodd-Frank Act authorized the Consumer Financial Protection Bureau to study mandatory pre-dispute arbitration agreements in contracts for consumer financial products or services.  *Id.* at 103–04.  The Bankruptcy Code does not include any analogous language; it is entirely silent as to arbitration.

Further, it appears that the Supreme Court itself has cited the inherent conflict inquiry only twice in the thirty years following *Shearson*.  *See Preston v. Ferrer*, 552 U.S. 346, 356 (2008) (holding that the Federal Arbitration Act superseded the California Talent Agency Act, Cal. Lab. Code §§ 1700 *et seq.*) and *Gilmer*, 500 U.S. at 26 (holding that claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, can be subjected to compulsory arbitration).

The inherent conflict inquiry was relegated to a single sentence in *Preston*, though, and the matter was ultimately resolved solely by reference to the text of the statute at issue.  552 U.S. at 356 ("This prescription demonstrates that there is no inherent conflict between the [California Talent Agency Act] and arbitration as a dispute resolution mechanism.").  It received more attention in *Gilmer*, but that is the only Supreme Court case after *Shearson* to have engaged the inherent conflict inquiry to any substantive analytical degree.  *See, e.g., CompuCredit*, 565 U.S. at 108 (Sotomayor, J., concurring).  And the Supreme Court has been on an increasingly

textualist trend ever since.  *See, e.g., Henson v. Santander Consumer USA Inc.*, 582 U.S. __, 137 S. Ct. 1718, 1725 (2017) ("And while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done[.]").  Indeed, it does not appear that the Supreme Court has ever refused to compel arbitration on inherent conflict grounds.

For these reasons, the Court should compel arbitration of this matter.  *See, e.g., MBNA American Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006) (finding "no indication from the statute that any dispute relating to an automatic stay should categorically be exempt from resolution by arbitration.") and *Fallick v. Kehr*, 369 F.2d 899, 901 (2d Cir. 1966) ("[T]here is no policy evidenced by the Bankruptcy Act or precedent prohibiting an arbitrator from determining the effect of a discharge in bankruptcy.").

    c.    ***Even assuming that the inquiry is still valid, no inherent conflict exists between the Federal Arbitration Act and the Bankruptcy Code.***

Even assuming that the inherent conflict inquiry remains viable despite indications to the contrary from the Supreme Court, no such conflict exists between the Federal Arbitration Act and the Bankruptcy Code.  As the Supreme Court has explained, to find an "inherent conflict" between the Federal Arbitration Act and a federal statute, the two must be "irreconcilable" such that the statutory right may not be effectively vindicated through arbitration.

Here, however, there is nothing peculiar about Homaidan's discharge-violation that render them capable of resolution by bankruptcy courts alone and therefore

unsuitable for arbitration.  First, bankruptcy courts hear bankruptcy matters only by reference from the district courts—Congress did not grant them original or exclusive jurisdiction over any issue.  See 28 U.S.C. § 157(a).  What's more, that reference is not absolute, but can be withdrawn on the motion of a party or of the Court's own accord.  *Id.* § 157(d).  Second, except for actual bankruptcy cases, Congress's grant of jurisdiction to district courts over bankruptcy matters is, with certain exceptions not relevant here, non-exclusive.  *Id.* § 1334(b).  Congress even acknowledged in this grant of jurisdiction that certain circumstances may favor an adjudicator other than a federal court.  *Id.* § 1334(c).

Third, other adjudicatory bodies can, and often do, resolve bankruptcy matters.  *See, e.g., In re Underwood*, 299 B.R. 471, 477 (Bankr. S.D. Ohio 2003) (finding state court to be a proper forum for resolving, inter alia, a dischargeability dispute concerning student loan debt); *Ramdharry v. Gurer*, No. 89–cv–42620, 1995 WL 41353, at *2–3 (Conn. Super. Ct. Jan. 25, 1995) (finding a judgment to be void because it violated the Bankruptcy Code's discharge injunction); *Ind. Univ. v. Canganelli*, 149 Ill. App. 3d 852, 856 (1986) (determining that a state court was competent to make student-loan dischargeability determination).  And fourth, even more to the point, bankruptcy matters—including the dischargeability of debts—are arbitrated all the time.  *See, e.g., Hill*, 436 F.3d at 108–11; *In re Touchstone Home Health LLC*, — B.R.—, 2017 WL 3669541, *11–22 (Bankr. D. Colo. Aug. 21, 2017); *In re Williams*, 564 B.R. 770, 775–84 (Bankr. S.D. Fla. 2017); *In re Belton*, No. 15–cv–1934–VB, 2015 WL 6163083, at *10 (S.D.N.Y. Oct. 14, 2015) (Briccetti, J.).

As the Supreme Court has itself explained, precedent "demonstrate[s] that even claims arising under a statute designed to further important social policies may be arbitrated because 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum,' the statute serves its functions." *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 90 (2000) (quoting *Mitsubishi*, 473 U.S. at 637) (alteration in *Green Tree*). Like the Sherman Act, the Exchange Act, the Securities Act, RICO, ADEA, CROA, TILA, ECOA, or any of the other important federal statutes the Supreme Court has held were appropriate for arbitration, there is no reason to believe that arbitration of Homaidan's dischargeability claims would inherently conflict with the purposes of the Bankruptcy Code. *See Gilmer*, 500 U.S. at 28; *see also See In re Shores of Panama Inc.*, 387 B.R. 864, 866–867 (Bankr. N.D. Fla. 2008) (holding that bankruptcy policy of centralization did not create an inherent conflict with arbitration, especially because another "important policy of bankruptcy" is the "preservation of creditors' nonbankruptcy rights to the extent possible while carrying out the purposes of the Bankruptcy Code"). To the contrary, Homaidan's arbitration agreements authorize the arbitrator to award the exact relief that the Court is being asked to award. Ex. A at 10 (authorizing the arbitrator to award, among other things, damages, declaratory relief, and injunctive relief); Ex. B at 10 (the same).

> ### d. *Even if applicable, the Court shouldn't exercise its discretion to refuse to compel arbitration here.*

Even if the Court were to find here that the inherent conflict inquiry remained viable and that an inherent conflict existed between the Federal Arbitration Act and

the purposes of the Bankruptcy Code, its analysis does not stop there. Rather, the Court must then go on to determine whether to exercise its discretion to refuse to compel arbitration. For the reasons that follow, it should not.

First, Homaidan's bankruptcy case closed more than six years ago and was only reopened for him to seek a determination of whether he discharged his obligation to repay his student loans. Second, only two debts owed to two creditors—which Homaidan repaid in full more than six years ago—are at issue. And any recovery that Homaidan obtains will flow to him alone. The concern over centralization of disputes that some courts cite when refusing to compel arbitration thus has no application here. Nor does concern over protecting debtors and creditors from piecemeal litigation: whatever the outcome, resolving Homaidan's claims against NSL, NCFC, and Sallie Mae won't have any bearing on other parties.

Third, the Court here lacks the degree of institutional history and oversight that courts sometimes cite as justification for refusing to compel arbitration. For example, in *In re EPD Investment Co., LLC*, the bankruptcy court "had supervised the debtors' cases for nearly three years, during which the Trustee filed more than 100 other adversary proceedings with the bankruptcy court" which raised similar issues but which were not subject to arbitration. 821 F.3d 1146, 1150 (9th Cir. 2016).

Finally, Homaidan purports to represent a nationwide class of debtors. Courts generally find that this posture favors arbitration. *See Hill*, 436 F.3d at 109 (finding that arbitration of class claims would not jeopardize the Bankruptcy Code's objectives); *Williams*, 564 B.R. at 781–83 (finding that class allegations favored

arbitration of claims); *Belton*, 2015 WL 6163083 at *8 (finding that arbitration of class claims would not jeopardize the Bankruptcy Code's objectives).

Faced with similar circumstances, other courts have rejected parties' attempts to avoid arbitration. For example, the *Belton* court noted that even the fact that a plaintiff "alleges a violation of an important, even fundamental, Bankruptcy Code provision, is not enough to exempt such a claim from arbitration." 2015 WL 6163083, at *7. The court went on to explain that arbitration of alleged discharge violations "would not interfere with or affect the distribution of the estate, [and] would not affect an ongoing reorganization." *Id.* (internal quotations and citations omitted). It also rejected the argument that arbitration would jeopardize the goal of avoiding piecemeal litigation, as sending the proceedings to arbitration "will not create any more duplicative proceedings than already exist[ed]." *Id.* at *9.

Similarly, in *Hill,* the Second Circuit held that arbitration of automatic stay violations would not conflict with the objectives of the Bankruptcy Code because the debtor's estate had been fully administered.[7] 436 F.3d at 109–110. As with the automatic stay claims at issue in *Hill*, the discharge violation claims at issue here are not within the exclusive jurisdiction of the bankruptcy courts, and there is no indication that Congress intended to categorically exempt them from arbitration. *Id.* at 110.

---

[7] The U.S. Bankruptcy Court for the Southern District of New York is split on the question of whether discharge violation claims should be arbitrated. *See In re Anderson*, 550 B.R. 228 (S.D.N.Y. 2016) (Roman, J.) (denying leave to file interlocutory appeal of decision, *inter alia*, denying motion to compel arbitration). The matter is now before the U.S. Court of Appeals for the Second Circuit.

This Court should reach the same conclusion as have numerous other courts, including the Second Circuit in *Hill* and the U.S. Bankruptcy Court for the Southern District of New York in *Belton*. Simply, the factual circumstances of this case do not warrant rejecting the parties' bargained-for arbitration agreements.

### 3. The Court should dismiss or, in the alternative, stay this action.

Because arbitration of the dischargeability of Homaidan's student loans must be compelled for the reasons set forth above, the Court should dismiss Plaintiff's Complaint. While § 3 of the Federal Arbitration Act provides that a court "shall on application of one of the parties stay the trial of the action until . . . arbitration has been had in accordance with the terms of the agreement," courts have determined that this rule was not intended to limit dismissal of a case when all claims at issue are subject to arbitration. *See Sparling v. Hoffman Const. Co.,* 864 F.2d 635, 638 (9th Cir. 1988); *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir. 1992) (collecting cases); *Farrow v. Fujitsu America, Inc.,* 37 F. Supp. 3d 1115, 1118–19 (N.D. Cal. 2014); *Dittenhafer v. Citigroup,* No. C 10–1779 PJH, 2010 WL 3063127, at *7 (N.D. Cal. Aug. 2, 2010). Here, as set forth above, all of Homaidan's claims are subject to arbitration. The Court should therefore dismiss his Complaint in its entirety. In the alternative, the Court should stay this action pending arbitration.

## II. HOMAIDAN'S STUDENT LOANS CONSTITUTE OBLIGATIONS TO REPAY FUNDS RECEIVED AS EDUCATIONAL BENEFITS

Even assuming that the Court has the discretion to refuse to compel arbitration and exercises that discretion here, it should still dismiss Homaidan's claims. That is because his Tuition Answer Loans constitute obligations to repay

funds received as educational benefits, and are therefore excepted from discharge under § 523(a)(8)(A)(ii) of the Bankruptcy Code.

Through his student loans, Homaidan received funds that allowed him to attend and graduate from Emerson College.  Dkt. No. 1 ¶ 36, 40; *see also generally* Exs. A, B.  Indeed, in his promissory notes, Homaidan certified that: (1) his loans are "qualified education loan[s]"; (2) he must "immediately repay any funds . . . which cannot reasonably be attributed to meeting [his] educational expenses related to attendance at" Emerson College; and (3) his ceasing to attend Emerson College was a condition on which his loans can be cancelled.  Ex. A at 6, 8; Ex. B at 6, 8.

Even more to the point, Homaidan identified in his promissory notes the anticipated uses of the proceeds of his Tuition Answer Loans.  Of the $11,800 that he requested through those notes, Homaidan would pay $8,800 "directly to" Emerson College for "Tuition, Fees, Room, [and] Board[.]"  Ex. A at 3; Ex. B at 3.  He would use the remaining $3,000 for "educational expenses not paid directly" to the school.  Ex. A at 3; Ex. B at 3.

Homaidan certified in both of his promissory notes that the representations he made about his Tuition Answer Loans and the uses of his loan proceeds were "true, complete and correct to the best of [his] knowledge and belief and [was] made in good faith[.]"  Ex. A at 8; Ex. B at 8.

Notably, Homaidan doesn't allege anywhere in his Complaint that he used the proceeds of his Tuition Answer Loans for anything *other* than educational expenses.  Thus, by enabling him to attend and graduate from Emerson College and to support

his personal decision to improve his life through higher education, Homaidan's Tuition Answer Loans conferred "educational benefits" on him. They are therefore excepted from discharge under § 523(a)(8)(A)(ii) of the Bankruptcy Code. The Court should dismiss Homaidan's Complaint with prejudice as a result.

## III. HOMAIDAN'S STUDENT LOANS ARE EXCEPTED FROM DISCHARGE UNDER SECTION 523(a)(8)(A)(ii) OF THE BANKRUPTCY CODE

### A. Consistent with the plain language of the statute, the majority of judicial decisions nationwide holds that a private student loan is an "obligation to repay funds received as an educational benefit" that is presumptively non-dischargeable under § 523(a)(8)(A)(ii).

To ensure "that students [could not] take advantage of the bankruptcy system by incurring large amounts of student debt [and] obtain a discharge of the debt on the eve of lucrative careers," Congress added § 523(a)(8) to the Bankruptcy Code in the late 1970s to exempt student-loan debt from discharge in bankruptcy (unless doing so would cause the debtor undue hardship). *See* Kyle L. Grant, *Student Loans in Bankruptcy and the "Undue Hardship" Exception: Who Should Foot the Bill?*, 2011 Brigham Young U. L. Rev. 819, 827 (2011). *See also In re Renshaw*, 222 F.3d 82, 86–87 (2d Cir. 2000). Since then, Congress's every action on the subject has been to comprehensively expand the scope of *non-dischargeability* of student loans—most recently in 2005 as part of the BAPCPA amendments. *Renshaw*, 222 F.3d at 87–88. *See, e.g., In re Corbin*, 506 B.R. 287, 296–98 (Bankr. W.D. Wash. 2014); *In re Beesley*, No. 12–2444–CMB, 2013 WL 5134404, *4 (Bankr. W.D. Pa. Sept. 13, 2013) (collecting authorities); *In re Carow*, No. 10–7011, 2011 WL 802847, *4–5 (Bankr. D.N.D. Mar. 2, 2011) (noting that "Congress has expanded the scope of § 523(a)(8) through successive amendments").

Three types of educational debts are now exempt from discharge under § 523(a)(8):

- "An educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution[,]" 11 U.S.C. § 523(a)(8)(A)(i).;

- "[O]bligation[s] to repay funds received as an educational benefit, scholarship or stipend[,]" *id.* § 523(a)(8)(A)(ii); and

- "[Q]ualified educational loan[s]" as defined in 26 U.S.C. § 221 (d)(l), *id.* § 523(a)(8)(B).[8]

Faced with dischargeability claims similar to Homaidan's, most courts nationwide have found that private educational loans are not dischargeable in bankruptcy. Indeed, in the only circuit court opinion to have considered the issue, the Second Circuit held that a debt for a private bar-study loan was excepted from discharge under § 523(a)(8)(A)(ii). *In re Desormes*, 569 F. App'x 42, 43 (2d Cir. 2014) (unpublished).

As another example, in *Carow* a debtor obtained four private loans related to her attendance at two colleges. 2011 WL 802847 at *1–2. The debtor certified—as Homaidan did here—that the proceeds of her loans would be used for educational purposes and that she would "repay any funds . . . received which cannot reasonably be attributed to meeting [her] educational expenses related to attendance at" college. *Id.* at *2. *Compare, e.g.*, Ex. A at 8; Ex. B at 8. The debtor argued that she discharged these loans in bankruptcy, but the court rejected that position. The court found that

---

[8] *See supra* at footnote 1.

the debtor "failed to establish that the debt to [the private lender] is not an obligation to repay funds received as an 'educational benefit.'"  2011 WL 802847 at *4.

Similarly, the court in *In re Edwards* found that "[t]here [was] no dispute" that Tuition Answer Loans—the same loan program at issue here—used to obtain a bachelor's degree were excepted from discharge under § 523(a)(8)(A)(i), (ii).  561 B.R. 848, 855 n.11 (Bankr. D. Kan. 2016).  Likewise, the court in *In re Rizor* found that private loans used to fund a debtor's attendance at veterinary school "easily fit within the description of § 523(a)(8)(A)(ii)."  553 B.R. 144, 150 (Bankr. D. Alaska 2016).

The decision in *In re Shaw* is particularly instructive.  No. 13–3251, 2015 WL 1000213, *1 (Bankr. S.D. Tex. Mar. 3, 2015).  There, a debtor consolidated two student loans into a single $104,405.98 loan before she filed her chapter 7 case.  The debtor neither objected to the lender's proof of claim nor filed an adversary proceeding to determine whether the debt could be discharged.  After the lender obtained a post-discharge default judgment on the consolidated loan in state court, the debtor reopened her bankruptcy case to seek a determination whether that debt was dischargeable.  *Id.*  The court rejected the debtor's arguments and found that the lender's consolidated loan was exempt from discharge "under section 523(a)(8)(A)(ii) as it is an obligation to repay funds received as an educational benefit."  *Id.* at *2.

These opinions are not anomalous.  The majority of courts across the country have concluded that a private student loan qualifies as an "obligation to repay funds received as an educational benefit" under § 523(a)(8)(A)(ii).  *See, e.g.*, *In re Brown*, 539 B.R. 853, 859 (Bankr. S.D. Ca. 2015) ("The court . . . concludes that §

523(a)(8)(A)(ii) should be interpreted broadly to include a bar examination loan under the definition of 'educational benefit.'"); *Corbin*, 506 B.R. at 296 ("Section 523(a)(8) was amended in 2005 by Congress to make a broader range of student loan debt non-dischargeable, regardless of the nature of the lender.  Section 523(a)(8)(A)(ii) was added [to the Bankruptcy Code], covering loans made by nongovernmental and profit-making organizations, and making non-dischargeable 'an obligation to repay funds received as an educational benefit, scholarship or stipend.'"); *In re Rust*, 510 B.R. 562, 567, 571–72 (Bankr. E.D. Ky. 2014) (noting that "a loan qualifies as an 'educational benefit'" and collecting authorities that held similarly); *Beesley*, 2013 WL 5134404 at *4  (describing authorities that have interpreted "funds received as an educational benefit" to include loans."); *In re Roy*, No. 09–1406, 2010 WL 1523996, *1 (Bankr. D.N.J. Apr. 15, 2010) (finding that loan extended for tutoring provided an educational benefit and was not dischargeable under § 523(a)(8)(A)(ii)); *In re Skipworth*, No. 09–80149–JAC–7, 2010 WL 1417964, at *2 (Bankr. N.D. Ala. Apr. 1, 2010) ("The Court thus finds that the debtor's obligation to Citibank is clearly 'an obligation to repay funds received as an educational benefit' for purposes of § 523(a)(8)(A)(ii) in that Citibank loaned funds to the debtor to assist the debtor with his educational expenses, i.e. the debtor's bar review course."); *In re Micko*, 356 B.R. 210, 212–17 (Bankr. D. Ariz. 2006).

Because Homaidan certified that the proceeds of his Tuition Answer Loans would be used for educational expenses and because he does not—and cannot—allege

that he used those funds for anything but educational purposes, nothing in his Complaint allows him to avoid the same result here.

### B.    The minority line of cases holding otherwise is wrongly decided and should not be followed.

Although the weight of authority holds that private student loans are excepted from discharge under § 523(a)(8)(A)(ii), decisions are not unanimous and a minority position does exist.    *See, e.g., In re Campbell*, 547 B.R. 49 (Bankr. E.D.N.Y. 2016) (Craig, J.).[9]    The minority rationale (which is the quintessence of Homaidan's Complaint) misapplies the three principles of statutory interpretation that it invokes: (1) the canon against superfluities; (2) the canon of *noscitur a sociis*; and (3) reliance on legislative history.    The minority line of cases is wrongly decided and this Court should not follow its errant path.

---

[9]    *Campbell* is not binding on this Court.    Neither are any of the other minority decisions.    *See, e.g., In re Essangui*, No. 16–201–MMH, 2017 WL 4358755, *1 (Bankr. D. Md. Oct. 2, 2017); *In re Kashikar*, 567 B.R. 160, 166 (B.A.P. 9th Cir. 2017) (block quoting *In re Christoff*, 527 B.R. 624, 632 (B.A.P. 9th Cir. 2015) to conclude that medical school debt was not excepted from discharge); *In re Schultz*, No. 16–ap–3042, 2016 WL 8808073 (Bankr. D. Minn. Dec. 13, 2016) (interlocutory oral ruling that is a legal nullity because the case settled); *In re Decena*, 549 B.R. 11 (Bankr. E.D.N.Y. 2016) (Grossman, J.), *vacated sub nom. Citizens Bank v. Decena*, 562 B.R. 202 (E.D.N.Y. 2016) (Spatt, J.); *Matter of Swenson*, No. 16–10016, 2016 WL 4480719 (Bankr. W.D. Wis. Aug. 23, 2016); *In re Meyer*, No. 15–13193, 2016 WL 3251622 (Bankr. N.D. Ohio June 6, 2016); *In re Nunez*, 527 B.R. 410 (Bankr. D. Or. 2015) (which misinterpreted § 523(a)(8) by finding that a debt that otherwise satisfies § 523(a)(8)(A)(ii) must also satisfy § 523(a)(8)(A)(i) to qualify for a discharge exemption).

1.   **The minority position misapplies canons of statutory interpretation.**

Any exercise in statutory interpretation begins with the language of the statute itself. *See, e.g.*, *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Because the text of § 523(a)(8)(A)(ii) is clear and unambiguous, the minority cases didn't need to resort to—and shouldn't have resorted to—any canons of interpretation. *Id.* (collecting authorities); *see also United States v. Stevens*, 559 U.S. 460, 474 (2010); *Corbin*, 506 B.R. at 296 (characterizing the wording of § 523(a)(8)(A)(ii) as "plain language"); *Rust*, 510 B.R. at 572 (the same); *Brown*, 539 B.R. at 858 (the same). Simply, § 523(a)(8)(A)(ii) applies to *all* obligations to repay funds received as educational benefits regardless of whether the lender is a governmental, non-profit, or for-profit entity and regardless of the form of the obligation to repay. *See, e.g.*, *Micko*, 356 B.R. at 216. However, the minority cases decided to overlook the Bankruptcy Code's plain language and go in a different direction. For the following reasons, the minority cases got it wrong.

a.   *Including student loans within the § 523(a)(8)(A)(ii) discharge exception doesn't render any other provision superfluous.*

The minority cases reason that if § 523(a)(8)(A)(ii) applied to loans, it would "swallow" the other subsections of § 523(a)(8). That position is not only incorrect, it is also hyperbolic. Correctly construing § 523(a)(8)(A)(ii) to encompass private student loans does not render any other portion of the statute superfluous.

While there may be some overlap under certain scenarios, § 523(a)(8)(A)(ii)'s application to private student loans catches instances of non-dischargeability that the

other subparts of § 523(a)(8) miss.   Unlike the other subsections, § 523(a)(8)(A)(ii)
requires funds to be received—a requirement that defeats any argument that it is a
"catch-all" provision.   For example, both (1) a private bar-study loan and (2) a debt
owed to a co-signer for paying off a defaulted government-backed education loan
would be excepted from discharge under § 523(a)(8)(A)(ii) but not § 523(a)(8)(A)(i) or
(B).

The case of *In re Wills* provides a concrete illustration.   *In re Wills*, No. 08–
80404–FJO–07, 2010 WL 1688221 (S.D. Ind. Apr. 23, 2010).   There, a grandfather
took out an educational loan for his grandson to attend a Title-IV technical school.
*Id.* at *1.   The grandson withdrew from school and did not graduate.   When the
grandfather tried to discharge the educational loan in bankruptcy, the court ruled
that he could not do so absent a showing of undue hardship.   *Id.* at *4–7.   The court
held that the loan, which covered tuition at a Title-IV school but which did not confer
an educational benefit on the borrower, fell under the discharge exception of §
523(a)(8)(B) but not § 523(a)(8)(A)(ii).   *See id.* at *7.

Put another way, § 523(a)(8)(A)(ii) and (B) together reinforce the broad scope
of the discharge exception for student loans by making clear that: (1) loans incurred
for the purpose of attendance at qualified educational institutions are exempt from
discharge without regard to how or whether the funds were "received" as an
"educational benefit"; (2) "funds received as educational benefits" may be provided in
numerous forms; and (3) "educational benefits" may be received other than at
qualified educational institutions.

In any case, the Supreme Court has rejected the argument that any interpretation creating potential overlap between discharge exceptions is improper. To the contrary, the Supreme Court has stated that some overlap in § 523 is "inevitable." In *Husky*, for example, the Supreme Court held that interpreting "actual fraud" in § 523(a)(2)(A) to encompass "forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation" did not render duplicative the use of "actual fraud" in § 523(a)(4) and (6). Among other things, the Court wrote that it saw "no reason to craft an artificial definition of 'actual fraud' merely to avoid narrow redundancies in § 523 that appear unavoidable." *Id.* at 1588 (finding that the same act could be non-dischargeable under multiple subsections of § 523(a) and providing hypothetical examples).

Consistent with *Husky*, the three subsections of 523(a)(8) provide partially overlapping coverage where, under some circumstances, a particular student debt may be exempt from discharge under multiple subsections. But that "inevitab[ility]" does not render any portion of § 523(a)(8) "redundant" where all subparts of the statute serve different functions. *Id.* at 1588. The Supreme Court has instructed that potential redundancy is not the specter that the minority cases claim. Rather, in the interest of comprehensive coverage, "recognition of the desirability of redundancy to protect against human limitations pervades the law." John M. Golden, *Redundancy: When Law Repeats Itself*, 94 Tex. L. Rev. 629, 633 (2016). Recent scholarship further notes that legislators *do not* draft statutes with the rule against superfluities in mind, but "intentionally err on the side of redundancy to 'capture the

universe'" because "the *political interests* of [their] audience[s] often demand redundancy." Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation From the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stanford L. Rev. 901, 934 (May 2013) (emphasis in original). It is easy to see that intent manifested in § 523(a)(8). The minority cases were wrong to find otherwise.

### b.   Minority courts misapply the canon of noscitur a sociis by constricting its focus too narrowly.

*Noscitur a sociis* is a canon of statutory interpretation instructing that "a word is known by the company it keeps[.]" *Yates v. United States*, 574 U.S. __, 135 S. Ct. 1074, 1085 (2015). The minority cases misapply *noscitur a sociis* to conclude that the use of "obligation to repay funds received as an educational benefit" in § 523(a)(8)(A)(ii) should have a meaning similar to "scholarship or stipend"—i.e., that it means only items in the nature of conditional grants. The minority cases further take the canon to an absurd extreme by holding that the phrase "obligation to repay funds received as an educational benefit, scholarship or stipend" can refer only to items that are *not* generally required to be repaid.[10] *See, e.g.*, *Campbell*, 547 B.R. at 55. For at least three reasons, neither the statutory text nor Supreme Court precedent allows that construction.

---

[10]   This flawed reading of the statute also implicitly, and without any textual support, introduces considerations regarding the motives of the entity to whom educational debts are owed by restricting exemption from discharge to scholarships, stipends, and grants.

First, as used in § 523(a)(8)(A)(ii), an "obligation to repay funds received as an educational benefit" does not keep company with "scholarship or stipend" alone. The minority cases cherry-pick language from one subsection (§ 523(a)(8)(A)(ii)) while neglecting to consider the context in which it appears: sandwiched between two other subsections (§ 523(a)(8)(A)(i) and (B)) that unquestionably apply to student loans and that are located in a statute that *was enacted specifically to address student loans*. The Supreme Court has reversed decisions that misapplied *noscitur a sociis* in such a manner. *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 409 (2011) (reversing statutory interpretation that "applied the *noscitur a sociis* canon only to the immediately surrounding words, to the exclusion of the rest of the statute"). It has also found a list of three items insufficient to support an inference of Congressional intent. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010) ("A list of three items . . . is too short to be particularly illuminating.").

Second, courts have consistently found that a loan used for educational purposes confers an educational benefit on the borrower. *See*, *e.g.*, *Corbin*, 506 B.R. at 296; *Brown*, 539 B.R. at 858; *Rust*, 510 B.R. at 567 ("[A] majority of courts determine whether a loan qualifies as an 'educational benefit' by focusing on *the stated purpose for the loan when it was obtained*, rather than on how the loan proceeds were actually used.") (emphasis in original); *Maas*, 497 B.R. at 869 (the same); *see also In re Murphy*, 282 F.3d 868, 871 (5th Cir. 2002) ("[N]o court has suggested that the word 'benefit' should reduce the scope of covered loans."). When a

loan has an educational purpose, it *is* similar to a scholarship or stipend: it assists the borrower with meeting the costs of education. This interpretation thus comports with longstanding caselaw, which considers a debtor's purpose in incurring an obligation to be determinative under § 523. *See, e.g., Murphy*, 282 F.3d at 870; *In re Maas*, 497 B.R. 863, 869–70 (Bankr. W.D. Mich. 2013) (collecting authorities); *In re Rumer*, 469 B.R. 553, 562 (Bankr. M.D. Pa. 2012) (the same). Moreover, loans, scholarships, and stipends must all be repaid in various ways. With a loan, repayment is monetary. Scholarships and stipends are usually repaid by academic means—e.g., maintaining a certain grade-point average or providing teaching assistance—but repayment can be monetary if the customary terms of repayment are breached. *Cf. In re Burks*, 244 F.3d 1245, 1246–47 (11th Cir. 2001) (collecting examples of educational loans that are primarily repaid through non-monetary means, but must be repaid by monetary means if the borrower breaches a condition of repayment).

Finally, that Congress did not use the word "loan" in § 523(a)(8)(A)(ii) is of no moment. *See Schindler Elevator Corp*, 563 U.S. at 409. The term that Congress did use—an "obligation to repay funds received"—is by definition a loan. Indeed, what else is a loan if not an "obligation to repay funds"? Logically, combining the words "obligation" and "repay" *could not fail to include loans*. It is also consistent with Congress's ever-broadening scope of the § 523(a)(8) exemption, as an "obligation to repay funds as an educational benefit" is more *expansive* than the term "loan," not more *restrictive*.

Given the context in which it occurs—a subpart of § 523 that was enacted to specifically address student loans—an "obligation to repay funds as an educational benefit" must include loans.  The text confirms this: § 523(a)(8)(B) refers to "*other* educational loans." (Emphasis added.)  This language indicates that the previous subsection, 523(a)(8)(A), *must also* cover educational loans.  Nothing in the statute excludes educational loans from subsection 523(a)(8)(A)(ii)—Congress's language in subsection (B) shows just the opposite.

        c.      ***Selective partial recitation of purported "legislative history" is an illusory justification for ignoring the statute's plain meaning.***

The Supreme Court has repeatedly cautioned that legislative history is an unreliable indicator of legislative intent.  *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) and *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 617 (1991).  Justice Scalia memorably described combing through legislative history for support as "the equivalent of entering a crowded cocktail party and looking over the heads of guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring).  That "selective recognition" principle applies here, where the primary piece of "legislative history" that the minority cases invoke is a lone statement from the U.S. Attorney for the Eastern District of Texas—not a member of Congress—from a superseded version of the statute at issue.  *Cf. Chrysler Corp.*, 441 U.S. at 311 ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history.").  Specifically, the minority cases quote the attorney's hearing testimony for the point that the 1990 amendments to § 523(a)(8) added "educational funds received in the form of benefits (such as VA

benefits), scholarships (such as medical service corps scholarships) and stipends." 547 B.R. at 56.

The minority cases' resort to legislative history thus "lends itself to a kind of ventriloquism" by making "words appear to come from Congress's mouth which were spoken or written by others[.]" *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 73 (2004) (Scalia, J., dissenting). Indeed, by citing (a) a single remark (b) made by a non-legislator (c) regarding a prior version of the statute (d) passed fifteen years before (e) the current, substantially different version, the minority cases accomplish the seemingly Herculean feat of uniting in agreement Justices Brandeis, Rehnquist, Scalia, and Kennedy: all four have authored notable opinions for the Supreme Court rejecting such a use of legislative history. *See, e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 403–05 (2010) (Scalia, J.) (legislative history did not persuade the Supreme Court that a New York statute provided a substantive, rather than procedural, right for purposes of *Erie* analysis); *N.L.R.B. v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 582 (1994) (Kennedy, J.) (rejecting the National Labor Relation Board's citations to legislative history in advocating for a particular interpretation of statutory language); *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) (Rehnquist, J.) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."); *Penn Mut. Life Ins. Co. v. Lederer*, 252 U.S. 523, 538 (1920) (Brandeis, J.) (declining to consider the legislative history of different iterations of the Revenue Act, ruling that "no aid could possibly be derived from the legislative history of another act passed nearly six years after the

one in question" and that such a use of legislative history would be "inappropriate"). Even more to the point, the Supreme Court found no need to resort to legislative history in *Husky* when holding that an interpretation of a subsection of § 523 was not improper even if it rendered other subsections partially superfluous. *See generally* 136 S. Ct. at 1585–90.

Setting aside the Supreme Court's admonishments that this Court should not allow itself to be guided by a statement from a non-legislator in relation to a superseded version of § 523(a)(8), the purported legislative history actually supports an expansive interpretation of subsection 523(a)(8)(A)(ii). That is, the purported legislative history on which the minority cases rely states that "benefits . . . scholarships . . . and stipends" should "receive *the same treatment as a 'student' loan* with regard to restriction on dischargeability in bankruptcy." *Federal Debt Collection Procedures of 1990: Hearing on P.L. 101–647 Before the H. Subcomm. On Econ. and Commercial Law of the H. Comm. on the Judiciary*, 101st Cong. 74–75 (1990) (Mr. Brooks's Questions for the Record for Mr. Wortham) [hereinafter "*Federal Debt Collection Procedures of 1990*"]) (emphasis added). To be clear, this statement concerns a prior law that has received substantive amendments. But if it were indicative of Congress's intent with regard to all future versions of § 523(a)(8)— including that passed in 2005, which is the only version at issue here—it would show that the phrase "scholarships and stipends" was intended to take meaning from and receive the same exceptions as student loans.

Further, this piece of purported legislative history goes on to "recommend" that "subsection (8) [of § 523(a)] be amended by adding the following after 'educational benefit, scholarship or stipend': '(other than a loan made under subpart I of part C of title VII of the Public Health Service Act or an obligation for payment of damages arising under section 338E of such Act)'." *Id.* at 75 (Mr. Brooks's Questions for the Record for Mr. Wortham). By recommending that Congress omit one particular type of loan from § 523(a)(8)'s discharge exemption, the legislative history demonstrates that, at least in the mind of one non-legislator, the phrase "obligation to repay funds received as an educational benefit, scholarship or stipend" *was always considered to encompass student loans*. In other words, if the language that now appears in § 523(a)(8)(A)(ii) did *not* encompass loans, there would be no need to exclude by explicit reference any particular loan type that it wanted to omit from the discharge exemption.

Thus, Homaidan's student loans are excepted from discharge as "obligations to repay funds received as [] educational benefit[s]" under § 523(a)(8)(A)(ii) of the Bankruptcy Code. Those loans could not have been, and were not, discharged. The Court should therefore dismiss Homaidan's Complaint with prejudice.

## IV. HOMAIDAN'S CLAIM FOR DAMAGES BASED ON NONEXISTENT VIOLATIONS OF THE DISCHARGE INJUNCTION IS A DEFECTIVE CONTEMPT OF COURT CLAIM

Homaidan's second claim seeks an award of damages against NSL, NCFC, and Sallie Mae for alleged violations of the discharge injunction. This claim fails for the reasons described above—namely, that Homaidan's obligations to NSL, NCFC, and Sallie Mae were not discharged in his chapter 7 bankruptcy. But Homaidan's second

claim is also invalid because he can recover damages for violation of the discharge injunction through a contempt of court claim only (like any other injunction). Homaidan, however, does not plead a valid contempt claim. And even if he had, the Court's general Discharge Order would not be sufficiently specific to support it.

### A.    Homaidan must enforce the discharge injunction through a contempt proceeding.

The discharge injunction is a court order. *See, e.g.*, *In re Schott*, 282 B.R. 1, 5 (B.A.P. 10th Cir. 2002). As such, it is enforceable only through contempt proceedings. The Bankruptcy Code doesn't provide a private right of action for violation of a discharge injunction.[11] *See Garfield v. Ocwen Loan Servicing*, 811 F.3d 86, 91–92 (2d Cir. 2016) and *Necci v. Universal Fidelity Corp.*, 297 B.R. 376, 379 (E.D.N.Y. 2003) ("The remedy provided by the bankruptcy code for a violation of [§ 524] is a motion for contempt pursuant to section 105 of the bankruptcy code."). Indeed, this Court has repeatedly stated that a debtor prosecutes discharge-violation claims through contempt. *See, e.g.*, *In re Haemmerle*, 529 B.R. 17, 25–27 (Bankr. E.D.N.Y. 2015) (Trust, J.); *In re Szenes*, 515 B.R. 1, 7 (Bankr. E.D.N.Y. 2014) (Scarcella, J.); *In re*

---

[11]    Nearly every circuit to have considered the question has required a debtor to enforce discharge orders through contempt and has held that no private right of action for discharge violations exists. *See, e.g.*, *In re Fina*, 550 F. App'x 150, 154 (4th Cir. 2014) (noting that § 105 authorizes the imposition of contempt sanctions for violations of § 524); *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 966, 970 (11th Cir. 2012); *In re Joubert*, 411 F.3d 452, 456 (3d Cir. 2005); *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002); *Cox v. Zale Del., Inc.*, 239 F.3d 910, 915 (7th Cir. 2001) (Posner, J.); *Bessette v. Avco Fin. Srvs., Inc.*, 230 F.3d 439, 445 (1st Cir. 2000). *See also Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1063 (5th Cir. 1997) (stating that a discharge injunction is "often enforced by a motion for contempt" but may also be "enforceable through a declaratory judgment action").

*Nicholas*, 457 B.R. 202, 224–25 (Bankr. E.D.N.Y. 2011) (Craig, J.); *In re McKenzie-Gilyard*, 388 B.R. 474, 481 (Bankr. E.D.N.Y. 2007) (Stong, J.).  Thus, Homaidan's second claim must necessarily be construed as one for contempt.

## B.    The Court's general Discharge Order is not sufficiently specific to support a finding of contempt under these circumstances.

To be enforceable in contempt proceedings, a discharge order, just like any other order, must be clear and unambiguous.  *See, e.g.*, *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 789 F.3d 29, 33 (2d Cir. 2015) and *In re Chief Executive Officers Clubs, Inc.*, 359 B.R. 527, 535 (Bankr. S.D.N.Y. 2007) (Glenn, J.).  Put another way, the court order must "leave no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden."  *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (quotation marks and internal citations omitted).  Otherwise, a party would be left "open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and thus make [the party] vulnerable to prosecution for contempt."  *Williams v. United States*, 402 F.2d 47, 48–49 (10th Cir. 1967).  To support a contempt claim sufficient to justify damages, then, "the court's order 'must set forth in specific detail an unequivocal command.'"  *Matter of Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (quoting *H.K. Porter Co. v. Nat'l Friction Products Corp.*, 568 F.2d 24, 27 (7th Cir. 1977)).

Here, the Discharge Order did not contain *any statement whatsoever*, let alone a clear and specific order or "unequivocal command," that Homaidan's obligation to repay his Tuition Answer Loans was discharged and that NSL, NCFC, and Sallie

Mae could not collect on them. *See* No. 1:08–48275–ess, Dkt. No. 21 (Bankr. E.D.N.Y. Apr. 9, 2017).  To the contrary, Homaidan's Discharge Order and the accompanying Official Form B18 stated that most student loans are *not* dischargeable.[12]  *Id.* at 2. The Court never made any finding—and Homaidan never sought one—that the Tuition Answer Loans were discharged.  That should not be a surprise: Homaidan paid the relevant student-loan debts in full more than four years before any court in the country adopted the novel—and incorrect—legal theory he now espouses.

Thus, this Court's general Discharge Order cannot support contempt sanctions against NSL, NCFC, or Sallie Mae before any arbitrator or court makes the determination—as Supreme Court precedent requires—that Homaidan's Tuition Answer Loans are dischargeable. *See Hood*, 541 U.S. at 450.  Homaidan effectively concedes this point by requesting in this adversary proceeding a declaratory judgment on his allegedly unresolved, justiciable claim that his "Tuition Answer Loans are not non-dischargeable student loans or qualified educational loans, and were therefore discharged upon entry of the [his] discharge injunction." Dkt. No. 1 ¶ 78.  As applied to Homaidan's Tuition Answer Loans, then, the general Discharge Order is just that: a *general* order that provides no guidance to NSL, NCFC, or Sallie

---

[12]  To be clear, NSL, NCFC, and Sallie Mae are not suggesting that Homaidan's general Discharge Order, which is based on a national form, is deficient or that bankruptcy courts ought to draft individual discharge orders for each case. Rather, NSL, NCFC, and Sallie Mae assert that the general Discharge Order at issue here cannot support contempt damages for actions taken prior to any determination (required by the Supreme Court, and unsought by Homaidan in his bankruptcy case) of whether Homaidan's Tuition Answer Loans were discharged.

Mae on what conduct is prohibited with respect to their claims.  In other words, with respect to whether Homaidan discharged his obligations on his Tuition Answer Loans, the Discharge Order merely "contains . . . an abstract conclusion of law, not an operative command capable of 'enforcement'" that could support a finding of contempt.  *Int'l Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74, 76 (1967).

For these reasons, there is no specific, clear, unequivocal command directed toward NSL, NCFC, or Sallie Mae specifically regarding the Tuition Answer Loans that could support a finding of contempt sufficient to justify the award of damages that Homaidan seeks.  Accordingly, Homaidan's second claim is an invalid contempt claim and should be dismissed.  *See, e.g.*, *Int'l Longshoreman's Ass'n*, 389 U.S. at 74, 76 (finding an order that "did not state in specific . . . terms the acts that it required or prohibited" to be an "unintelligible . . . command that defies comprehension" that could not support contempt).[13]

---

[13]    *See also In re Robinson*, 342 F. App'x 235, 236 (8th Cir. 2009) (reversing imposition of contempt sanctions for violations of "a bankruptcy court order that enjoined [the defendant] from taking any actions to interfere in any way with the administration of [ ] jointly administered bankruptcies because the bankruptcy court's order was neither sufficiently specific to be enforceable, nor clear and unambiguous"); *In re Gervin*, 300 F. App'x 293, 300–01 (5th Cir. 2008) (affirming reversal of contempt finding where bankruptcy court discharge order was not specific and unequivocal); *In re Logsdon*, 32 F. App'x 427, 428–29 (9th Cir. 2002) ("We reverse because the Dischargeability Order upon which the Contempt Order was founded was not sufficiently specific and clear to give rise to contempt.").

## V.    HOMAIDAN WAIVED THE RIGHT TO PARTICIPATE IN A CLASS ACTION

Even if Homaidan could maintain his contempt claims, he cannot do so on behalf of a nationwide class of debtors: he has waived that right in a valid, enforceable class-action waiver that applies to both court actions and arbitration proceedings. Homaidan's promissory notes provide that, if any party elects to arbitrate a claim, both parties "waive the right to . . . participate in a class action in court or in arbitration, either as a class representative or a class members, or act as a private attorney general in court or in arbitration[.]" Ex. A at 9; Ex. B at 9.

NSL, NCFC, and Sallie Mae have elected to arbitrate the claims that Homaidan asserts in his Complaint. And, as discussed above, Homaidan's allegations arise from and relate to his promissory notes for which he requests various monetary and equitable relief. This action therefore constitutes a "Claim" under the terms of his class-action waivers. Homaidan has not contested in his Complaint the validity or enforceability of his class-action waivers; the Court should enforce them and strike his class allegations. *See, e.g.*, *Italian Colors*, 133 S. Ct. at 2310 (rejecting argument "that federal law secures a nonwaivable opportunity to vindicate federal policies by satisfying the procedural strictures of Rule 23") and *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 601 (N.D. Ill. 2016) (citing *Italian Colors* for the point that "an individual's procedural right to pursue a claim under Rule 23 can be contractually waived").

## VI.    The Court Lacks Jurisdiction to Entertain a Nationwide Class for Alleged Discharge Violations

In addition to his class-action waiver, Homaidan's attempt to prosecute discharge-violation claims on a nationwide class basis suffers from a significant procedural defect: it purports to assert claims for violations of discharge orders issued by other courts.  A discharge order is unique to the court that issued it.  That is, because an alleged violation constitutes contempt (if proven), only the issuing court can enforce the discharge order allegedly violated.  As a result, the Court should dismiss Homaidan's class allegations for lack of jurisdiction.

Though authorized by statute, a discharge in bankruptcy is ultimately effected when a court enters an order affording that relief to a debtor via injunction.  11 U.S.C. § 524(a)(2)–(3); *see Cox*, 239 F.3d at 915 and *Nat'l Gypsum*, 118 F.3d at 1063.  Thus, when a party attempts to collect on a discharged debt, it violates a court-ordered injunction.  *See, e.g.*, *Cox*, 239 F.3d at 915 and *Nat'l Gypsum*, 118 F.3d at 1063; *see also Pertuso*, 233 F.3d at 421–23.  And when a party violates a court-ordered, clear and unambiguous injunction, it commits contempt.  *See, e.g.*, *Cox*, 239 F.3d at 917 (finding that suit alleging discharge violation can be brought as contempt action) and *Nat'l Gypsum*, 118 F.3d at 1063 (the same).

However, it is a "well-established principle that only the court that issued an order or injunction has subject matter jurisdiction to hold in contempt a violator of that order or injunction."  *Barrett v. Avco Fin. Srvs. Mgmt. Co.*, 292 B.R. 1, 8 (D. Mass. 2003) (collecting authorities); *see also, e.g.*, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) ("[C]ivil contempt proceedings leave the

offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct."); *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426–27 (1923); *In re McLean*, 794 F.3d 1313, 1318–20 (11th Cir. 2015) ("It is settled that the court that issued the injunctive order alone possesses the power to enforce compliance with and punish contempt of that order, and this power to sanction contempt is jurisdictional.") (internal quotations and citations omitted); *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (collecting authorities and stating that "[e]nforcement of an injunction through a contempt proceeding must occur in the issuing jurisdiction because contempt is an affront to the court issuing the order"). This conclusion applies regardless of whether the plaintiff seeks a declaratory judgment, sanctions, or both. *See, e.g.*, *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 969–73 (11th Cir. 2012) (considering, *inter alia*, a declaratory judgment count and holding that the issuing court was the proper body to hear that claim); *see also McLean*, 794 F.3d at 1319–20, 1319 n.2 (describing a court's ability to enforce its own orders through contempt as jurisdictional).

As applied here, this principle forecloses Homaidan's ability to represent a nationwide class of debtors for alleged discharge violations. Homaidan may have received his Discharge Order from this Court, but the class that he seeks to represent necessarily includes individuals who did not. *See* Dkt. No. 1 ¶ 63 (asserting claims on behalf of "[c]itizens of the various states who filed for bankruptcy in any of [the] district courts of the United States"). Because the court that enters a discharge order is uniquely positioned to enforce it, this Court lacks jurisdiction to entertain claims

that (or determine whether) discharge orders issued by other courts have been violated.

This limitation is consistent with the overwhelming weight of case law from jurisdictions across the country that have held that only the court that issues a discharge order may enforce it. For example, in 2012 the Eleventh Circuit considered the exact issue of whether "a bankruptcy court in one federal district has jurisdiction to determine whether a debt was discharged in a bankruptcy case litigated in another federal district." *Alderwoods*, 682 F.3d at 961. After writing that "the ultimate question in a case like this one is which court has the power to enforce the discharge injunction," the Eleventh Circuit concluded that, for both declaratory and monetary relief, "the court that issued the injunctive order alone possesses the power to enforce compliance with and punish contempt of that order." *Id.* at 968, 969. This result followed from the nature of a bankruptcy court's jurisdiction over a debtor's estate, *id.* at 969, and from the general proposition that a court that enters an injunction retains the jurisdiction to enforce it, *id.* at 970. The Eleventh Circuit also cited pragmatic concerns, though. It reasoned that "it would wreak havoc on the federal courts to leave enforcement of the injunctive order of a bankruptcy court in one district to the interpretive whims of a bankruptcy court in another district." *Id.*; *see also Jones v. CitiMortg., Inc.*, No. 15–14853, 2016 WL 6610208, at *6 (11th Cir. Nov. 9, 2016) (the same, in a chapter 7 case) and *McLean,* 794 F.3d at 1318–20 (the same, in a chapter 7 case).

Indeed, lower courts routinely reach the same conclusion as did the Eleventh Circuit.[14]  *See, e.g.*, *In re Forson*, 549 B.R. 866, 870 (Bankr. S.D. Ohio 2016) ("A contempt proceeding resulting from a violation of an order or injunction may only be maintained in the court that issued the order or injunction that was violated."); *In re Motichko*, 395 B.R. 25, 31 (Bankr. N.D. Ohio 2008) ("Even where a complaint is brought in the appropriate bankruptcy court, it will be dismissed under the *Pertuso* rule if debtors attempt to create a nationwide class because that would require the bankruptcy court to rule upon violations of injunctions issued by other courts."); *Barrett*, 292 B.R. at 8 (collecting authorities); *Bessette v. Avco Fin. Servs., Inc.*, 279 B.R. 442, 448–49 (D.R.I. 2002) (determining, on remand, that the court could only hear claims that relate to bankruptcy estates in the District of Rhode Island); *In re Cline*, 282 B.R. 686, 693–95, 696 (W.D. Wash. 2002); *In re Singleton*, 284 B.R. 322,

---

[14]  A minority position does exist, and has been adopted in one decision from the U.S. Bankruptcy Court for the Southern District of New York. *In re Haynes*, No. 13–08370–rdd, 2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) (Drain, J.) (modified oral ruling). The *Haynes* decision rests on faulty premises, though, and should not be followed. First, it is premised on the presence of statutory subject-matter jurisdiction. The limitation that a court cannot enforce another's order, however, is a prudential, Article III limitation that is separate and distinct from statutory subject-matter jurisdiction. Second, the *Haynes* decision relies on *In re Cano*, 410 B.R. 506 (Bankr. S.D. Tex. 2009). But *Cano* antedates binding Fifth Circuit authority that authorizes, at most, a district-wide class action comprised of debtors. *Wilborn*, 609 F.3d at 754 (citing *Waffenschmidt*). And it failed to address binding Fifth Circuit authority that holds that contempt claims must be adjudicated by the court that issued the order allegedly violated. *Waffenschmidt*, 763 F.2d at 716. *Cano* also dismissed claims for discharge violations under section 524, so its statements about the viability of a nationwide class are dicta as applied to that statute. 410 B.R. at 536, 555. Finally, *Haynes* also relied on *Bessette*, 230 F.3d at 445. That reliance, too, is misplaced. Specifically, on remand, the *Bessette* court found that the First Circuit's opinion authorized *at most* a district-wide class for discharge-violation claims—not the nationwide class for which *Haynes* cites it. *See* 279 B.R. at 448–49.

325 (D.R.I. 2002); *In re Beck*, 283 B.R. 163, 166–75 (Bankr. E.D. Penn. 2002); *Williams v. Sears, Roebuck & Co.,* 244 B.R. 858, 867–68 (S.D. Ga. 2000); *In re Nelson*, 234 B.R. 528, 534 (Bankr. M.D. Fla. 1999); *Pereira v. First N. Am. Nat'l Bank*, 223 B.R. 28, 31 (N.D. Ga. 1998) (collecting authorities); *see also Cox*, 239 F.3d at 916; *Xcentric Ventures, LLC v. Arden*, No. C 10–80058 SI, 2011 WL 806629, at *2 (N.D. Cal. Mar. 2, 2011) (collecting authorities); *Dickey v. Bullard*, No. 07–0632, 2007 WL 1202449, at *1 (W.D. La. Apr. 20, 2007); *Transam. Fin. Serv. v. Danney*, No. 99–228– P–H, 1999 WL 33117201, at *2 (D. Me. Dec. 23, 1999); *Hodge ex rel. Skiff v. Hodge*, 66 F. Supp. 2d 342, 344 (N.D.N.Y. 1999) (McAvoy, J.); *Ehlinger & Assocs. v. La. Architects Ass'n*, No. 96–2413, 1996 WL 603928, at *2 (E.D. La. Oct. 22, 1996) ("The Fifth Circuit has consistently held that the district court that originally issued an order must enforce such order."); *Gray v. Petroseed Co., Inc.*, 985 F. Supp. 625, 631 n.5 (D.S.C. 1996); *In re Hamilton Allied Corp.*, 87 B.R. 43, 45 (Bankr. S.D. Ohio 1988). *Cf. Lubrizol*, 871 F.2d at 1289–90 (requiring defendant to assert in issuing court counterclaim based on New Jersey protective order restraining treatment of evidence) and *In re Montano*, 488 B.R. 695, 710–15 (Bankr. D.N.M. 2013) (granting motion to decertify classes of New Mexico debtors that alleged discharge violations).

For these reasons, the Court lacks jurisdiction to hear and determine claims for violations of discharge orders entered by courts in other jurisdictions. It should therefore dismiss Homaidan's nationwide class allegations with prejudice.

## VII. THE COURT SHOULD STRIKE HOMAIDAN'S IRRELEVANT ALLEGATIONS ABOUT A NONEXISTENT FRAUD CLAIM

### A. Homaidan's impertinent allegations confuse the matters for trial.

Federal Rule of Civil Procedure 12(f) allows a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." The Court should exercise that authority here to strike paragraphs 2 and 13–35 of Homaidan's Complaint, which are inappropriate for a short and plain statement of the claim.

In those paragraphs, Homaidan alleges that, for ten years, NSL, NCFC, and Sallie Mae "have been engaged in a massive effort to defraud student debtors and subvert the ordinary working of the bankruptcy courts." Dkt. No. 1 ¶ 2. Homaidan goes on to make similar non-specific allegations that NSL, NCFC, and Sallie Mae engaged in a "scheme to manipulate [the] presumption of non-dischargeability and deceive [unnamed] debtors and the bankruptcy courts" and that NSL, NCFC, and Sallie Mae made other misrepresentations to various, unnamed student debtors. *See, e.g.*, *id.* ¶¶ 27–38, 33. Homaidan then makes numerous allegations concerning the history of § 523(a)(8) of the Bankruptcy Code, taking particular pains to malign the incentives of unidentified lenders who lobbied for the 2005 amendments to § 523(a)(8) and to decry general educational lending practices. *Id.* ¶¶ 13–26.

Yet, Homaidan does not have a fraud claim in this case to which his allegations might pertain. His overblown claims of pervasive, systemic wrongdoing against unnamed debtors therefore do not bear on any issues in this case. Rather than enabling NSL, NCFC, and Sallie Mae to respond to his claims and narrow the issues, these allegations have no bearing on the controversy at hand—whether, as a legal

matter, Homaidan's student loans were discharged in bankruptcy—and serve only to confuse matters.  Similarly, Homaidan's allegations of nonspecific fraud perpetrated by unspecified means against unnamed victims are inflammatory, unnecessary, and irrelevant.  Indeed, they are so unspecific, unnecessary, and irrelevant that they have been generally copied and pasted into a complaint against entirely different parties. *Golden v. Nat'l Collegiate Student Loan Trust 2005–3 et al.*, No. 17–1005-ess, Dkt. No. 32 (Bankr. E.D.N.Y. Oct. 17, 2017).

The Court should therefore strike paragraphs 2 and 13–35 of the Homaidan's Complaint as an irrelevant, impertinent, and scandalous attack on NSL, NCFC, and Sallie Mae, which is inappropriate for a short and plain statement of the claim.

### B.    Homaidan's fraud claims fall below federal pleading standards.

Alternatively, if the Court doesn't strike paragraphs 2 and 13–35 as irrelevant, impertinent, and scandalous, it should strike them for failing to satisfy federal pleading standards for fraud, which must make clear exactly *who* is alleged to have done *what* to *whom* and *when*.  Fed. R. Civ. P. 7009 (incorporating Federal Rule of Civil Procedure 9 into adversary proceedings); *see, e.g., DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  *Id.* at 1247.

Here, Homaidan alleges that NSL, NCFC, and Sallie Mae have been engaged in a decade-long effort to "defraud student debtors and subvert the orderly working of the bankruptcy courts."  Dkt. No. 1 ¶ 2.  Homaidan further claims that unspecified creditors engaged in fraud by "represent[ing] to student debtors that the Bankruptcy Code

prohibited discharge of <u>any</u> loan made to any person for any educational purpose." *Id.* ¶ 18 (emphasis in original). But when it comes to identifying particular statements by NSL, NCFC, or Sallie Mae on this point that were fraudulent, Homaidan falls short.

Homaidan notes that he received "correspondence . . . requesting payment" on his student loans, including his Tuition Answer Loans, on five occasions between December 2008 and July 2011. *Id.* ¶¶ 49–51. Yet he does not identify what specific statements are allegedly fraudulent. Nor does he explain how the statements are allegedly fraudulent. And, despite the length of the inflammatory and unnecessary alleged history about § 523(a)(8) included in his Complaint, Homaidan fails to identify any particular lender or debt collector who undertook the lobbying and allegedly wrongful acts detailed therein. Thus, the Court should strike paragraphs 2 and 13–35 as impermissible group pleading that fails to satisfy stringent federal pleading standards.

## CONCLUSION

For the reasons set forth above, this Court should compel arbitration of all claims raised by Plaintiff in the Complaint and dismiss this action with prejudice or stay this proceeding pending arbitration. In the alternative, this Court should dismiss Homaidan's Complaint with prejudice for failure to state a claim and grant such further relief as the Court deems just, necessary, and proper.

[*Signature follows on next page.*]

Dated: October 30, 2017
    New York, New York

Respectfully submitted,

*/s/ Shawn R. Fox*
Shawn R. Fox
McGuireWoods LLP
1345 Avenue of the Americas, 7th Floor
New York, New York 10105
Telephone:  212.548.2100
Facsimile:  212.548.2150
Email:     sfox@mcguirewoods.com

—and—

K. Elizabeth Sieg (*pro hac* pending)
Kyle R. Hosmer (*pro hac* pending)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone:  804.775.1000
Facsimile:  804.775.1061
Email: bsieg@mcguirewoods.com
      khosmer@mcguirewoods.com

*Counsel for Sallie Mae, Inc.,*
*Navient Solutions, LLC, and*
*Navient Credit Finance Corporation*

## CERTIFICATE OF SERVICE

I certify that on this 30th day of October, 2017, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Shawn R. Fox*