UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

_____

|                                                      |   |                              |
|------------------------------------------------------|---|------------------------------|
| HILAL K. HOMAIDAN                                    | ) |                              |
| Debtor.                                              | ) | Ch. 7 Number 08-48275 (ESS)  |
| _____                | ) |                              |
|                                                      | ) |                              |
| HILAL K. HOMAIDAN on behalf of himself              | ) |                              |
| and all others similarly situated                   | ) |                              |
|                                                      | ) |                              |
| Plaintiffs,                                          | ) | Adv. Pro. 17-01085 (ESS)     |
|                                                      | ) |                              |
| v.                                                   | ) |                              |
|                                                      | ) |                              |
| NAVIENT SOLUTIONS, LLC, NAVIENT                     | ) |                              |
| CREDIT FINANCE CORPORATION                          | ) |                              |
|                                                      | ) |                              |
| Defendants.                                          | ) |                              |
|                                                      | ) |                              |
| _____                | ) |                              |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii-x

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 4

    A.    Evolution of § 523(a)(8) ........................................................................... 4

    B.    Plaintiff's Private Commercial Loans ..................................................... 6

ARGUMENT ........................................................................................................................ 7

I.    STANDARD FOR MOTIONS TO DISMISS .................................................... 7

II.    THE COURT SHOULD NOT COMPEL ARBITRATION ................................ 8

    A.    Plaintiff's Claims Fall Outside the Scope of the Relevant Arbitration Provision ... 8

    B.    Plaintiff's Claims are not Arbitrable under *McMahon* .......................... 10

        1.    The Legislative History of the Bankruptcy Code Evidences
                Congress's Intent to Preclude Arbitration of Claims to Enforce
                the Discharge Injunction ........................................................... 10

        2.    There is An Inherent Conflict Between Plaintiff's Claims and
                Arbitration ................................................................................. 12

            a.    Arbitration Is Impermissible Because It Would Strip the
                    Bankruptcy Court of Its Power to Enforce its Own Orders ........... 13

            b.    Arbitration is Impermissible Because the Financial "Fresh Start"
                    Is a Fundamental Right Granted by the Bankruptcy Code and
                    Arbitration of That Right Would Be Inconsistent with the
                    Bankruptcy Code ........................................................... 16

            c.    Arbitration is Impermissible Because Federal Litigation of
                    the Claims at Issue Promotes Uniform Application of the
                  Bankruptcy Law ........................................................... 19

            d.    *CompuCredit* Does Not Affect the Vitality of the Inherent
                  Conflict Test or Even Address It ................................... 21

    C.    Plaintiff Did Not Waive the Right to Participate in a Class Action ...... 23

III.    PLAINTIFF'S LOANS ARE NOT EXCEPTED FROM DISCHARGE UNDER
§ 523(a)(8) .............................................................................................................24

 A.    Plaintiff's Private Commercial Loans are not an "Obligation to Repay
Funds Received as an Educational Benefit." .......................................................24

 B.    Contractual Language Cannot Alter the Nature of Plaintiff's Private
Commercial Loans ...............................................................................................26

 C.    Plaintiff's Loan is not an "Educational Loan." ...................................................27

IV.    PLAINTIFF HAS PROPERLY PLED DISCHARGE VIOLATIONS ............................29

 A.    Courts Have the Power to Enforce Discharge Injunctions through
Adversary Proceedings ........................................................................................29

 B.    The Discharge Injunctions can Support a Finding of Contempt...........................30

V.    THIS COURT HAS JURISDICTION TO ENTERTAIN A NATIONWIDE CLASS
ACTION ......................................................................................................................33

VI.    THE COURT SHOULD NOT STRIKE ANY PORTION OF THE COMPLAINT.........40

CONCLUSION.....................................................................................................................41

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alderwoods Group, Inc. v. Garcia*,
   682 F. 3d 958 (11th Cir. 2012) ............................................................................... 35

*American Express Co. v. Italian Colors Restaurant*,
   133 S. Ct. 2304 (2013)........................................................................................... 22

*Anderson, Adv.*,
   Proc. No. 15-8214 (RDD) ......................................................................................... 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................. 7

*Bank United v. Manley*,
   273 B.R. 229 (N.D. Ala. 2001) ............................................................................... 34

*Barrett v. Avco Fin. Servs. Mgmt. Co.*,
   292 B.R. 1 (D. Mass. 2003) .................................................................................... 39

*Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*,
   409 F.3d 87 (2d Cir. 2005).............................................................................. 20, 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................ 7, 8

*Bessette v. Avco Fin. Servs., Inc.*,
   279 B.R. 442 (D.R.I. 2002)..................................................................................... 38

*Bessette v. Avco Financial Services, Inc.*,
   230 F.3d 439 (1st Cir. 2000)................................................................................... 38

*Borecki v. Raymours Furniture Co., Inc.*,
   2017 WL 5900288 (S.D.N.Y. June 21, 2017) ....................................................... 23

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)................................................................................................. 36

*CompuCredit Corp. v. Greenwood*,
   132 S. Ct. 665 (2012)....................................................................................... 21, 22

*Cox v. Zale Delaware, Inc.*,
   239 F.3d 910 (2001)............................................................................................... 39

*Deep v. Copyright Creditors*,
   122 F. App'x 530 (2d Cir. 2004) ............................................................................ 13

*Economic Development Growth Enterprise v. McDermott*,
    478 B.R. 123 (Bankr. N.D.N.Y. 2012) ................................................................ 31

*In re Harrier*,
    903 F. Supp. 2d 1281 (M.D. Fla. 2012) ................................................................ 9

*Holmes v. Fischer*,
    764 F. Supp. 2d 523 (W.D.N.Y. 2011) ................................................................ 40

*Hooks v. Acceptance Loan Co., Inc.*,
    2011 WL 2746238 (M.D. Ala. July 14, 2011) ...................................................... 15

*In Matter of Swenson*,
    2016 WL 4480719 (Bankr. W. D. Wis. 2016) ...................................................... 26

*In re Aiello*,
    231 B.R. 693 (N.D. Ill. 1999) ............................................................................. 34

*In re Alibatya*,
    178 B.R. 335 (Bkrtcy. E.D.N.Y. 1995) ................................................................ 26

*In re Anderson*,
    550 B.R. 228 (S.D.N.Y. 2016) ............................................................................. 30

*In re Belton*,
    2014 WL 5819586 (Bankr. S.D.N.Y. Nov. 10, 2014) ............................ 9, 16, 18, 20

*In re Bogdanovich*,
    292 F.3d 488 (E.D.N.Y. 2017) ............................................................................. 17

*In re Brizinova*,
    565 B.R. 488 (E.D.N.Y. 2017) ............................................................................. 37

*In re Campbell*,
    547 B.R. 49 (Bankr. E.D.N.Y. 2016) ............................................................ 25, 28

*In re Cano*,
    410 B.R. 506 (S.D. Tex. 2009) ........................................................................... 34

*In re Casse*,
    198 F.3d 327 (2d Cir. 1999) ............................................................................... 13

*In re Chief Executive Officers Clubs, Inc.*,
    359 B.R. 527 (Bankr. S.D.N.Y. 2007) ................................................................ 32

*In re Christoff*,
    527 B.R. (9th Cir. B.A.P. 2015) ......................................................................... 26

*In re Clouser*,
  2016 WL 5864493 (Bkrtcy. D.Or. 2016)................................................................... 27

*In re Decena*,
  549 B.R. 11 (Bankr. E.D.N.Y.)................................................................................... 25

*In re DiGeronimo*,
  354 B.R. 625 (Bankr. E.D.N.Y. 2006)....................................................................... 32

*In re Dufrane*,
  566 B.R. 28 (Bankr. C.D. Cal. 2017).................................................................... 26, 27

*In re Dyer*,
  322 F.3d 1178 (9th Cir. 2003) .................................................................................. 33

*In re Essangui*,
  573 B.R. 614 (Bankr. D. Md. 2017) .......................................................................... 25

*In re Extended Stay, Inc.*,
  466 B.R. 188 (S.D.N.Y. 2011)................................................................................... 19

*In re Fagan*,
  559 B.R. 718 (Bankr. E.D. Cal. 2016)....................................................................... 30

*In re Farmer*,
  No. C17-0764, 2017 WL 4619209 (W.D. Wash. Oct. 16, 2017) ............................. 22

*In re Grant*,
  281 B.R. 721 (S.D. Ala. 2000)...................................................................... 9, 10, 15

*In re Haemmerle*,
  529 B.R. 17 (Bankr. E.D.N.Y. 2015).......................................................................... 33

*In re Hardy*,
  97 F.3d 1384 (11th Cir. 1996) ................................................................................... 30

*In re Haroon*,
  313 B.R. 686 (Bankr. E.D. Va. 2004)......................................................................... 32

*In re Harris*,
  280 B.R. 876 (Bankr. S.D. Ala. 2001)........................................................................ 34

*In re Hayes*,
  183 F.3d 162 (2d Cir. 1999)....................................................................................... 18

*In re Haynes*,
  No. 13-08370-rdd, 2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) ......................... passim

*Jernstad v. Green Treee Servicing*,
  2012 WL 8169889 (N.D. Ill. Aug. 2, 2012) ............................................................ 9

*In re Jones*,
  242 B.R. 441 (Bankr. W.D. Tenn. 1999) ............................................................... 26

*In re Jorge*,
  568 B.R. 25 (N.D. Ohio 2017) ............................................................................... 9

*In re Kalikow*,
  602 F.3d 82 (2d Cir. 2010) .............................................................................. 30, 38

*In re Kashikar*,
  567 B.R. 160, (9th Cir. B.A.P. 2017) .................................................................... 25

*In re Krause*,
  414 B.R. 243 (S.D. Ohio 2009) ............................................................................ 34

*In re Lehman Bros. Holdings Inc.*,
  480 B.R. 179 (S.D.N.Y. 2012) ............................................................................. 19

*In re Lehman Bros. Holdings Inc.*,
  663 Fed. Appx. 65 (2d Cir. 2016) ........................................................................ 12

*In re Lehman Bros. Holdings, Inc., No.*,
  2015 WL 5729645 (S.D.N.Y. Sept. 30, 2015) ..................................................... 22

*In re McClure*,
  210 B.R. 985 (Bankr. N.D. Tex. 1997) ............................................................ 26, 29

*In re McFadyen*,
  192 B.R. 328 (Bkrtcy. N.D.N.Y., 1995) ............................................................... 27

*In re McKenzie-Gilyard*,
  388 B.R. 474 (Bankr. E.D.N.Y 2007) ............................................................. 13, 32

*In re Meinhart*,
  211 B.R. 750 (Bankr. D. Colo. 1997) ................................................................... 26

*In re Meyer*,
  2016 WL 3251622 (Bankr. N. D. Ohio 2016) ...................................................... 26

*In re Motichko*,
  395 B.R. 25 (Bkrtcy. N. D. Ohio 2008) ................................................................ 30

*In re Nat'l Gypsum Co.*,
  118 F.3d 1056 (5th Cir. 1997) ............................................................................. 14

*In re Noletto*,
    244 B.R. 845 (S.D. Ala. 2000) .................................................................................. 34

*In re Norman*,
    No. 06-1133, 2006 WL 2818814 (Bankr. M.D. Ala. Sept. 29, 2006) ...................................... 15

*In re Nunez*,
    527 B.R. 410 (Bankr. D. Ore. 2015) ........................................................................... 26

*In re Oh*,
    362 Fed. Appx. 576 (9th Cir. 2009) ........................................................................... 33

*In re Pappas*,
    517 B.R. 708 (Bkrtcy. W.D. Tex., 2014) ...................................................................... 27

*In re Patrick*,
    344 B.R. 56 (Bankr. M.D. Pa. 2005) ........................................................................... 34

*In re Reis*,
    274 B.R. 46 (Bkrtcy. D. Mass. 2002) .......................................................................... 26

*In re Relativity Fashion, LLC*,
    696 Fed. Appx. 26 (2d Cir. 2017) ........................................................................ 12, 22

*In re Rojas*,
    2009 WL 2496807 (Bankr. S.D. Texas Aug. 12, 2009) ......................................................... 34

*In re Schultz*,
    2016 WL 8808073 (Bankr. D. Minn. Dec. 13, 2016) ........................................................ 25, 26

*In re Scott*,
    287 B.R. 470 (Bankr. E.D. Mo. 2002) .......................................................................... 26

*In re Sheffield*,
    281 B.R. 24 (Bankr. S.D. Ala. 2000) ........................................................................... 34

*In re Shorts*,
    209 B.R. 818 (Bkrtcy. D.R.I. 1997) ............................................................................ 26

*In re Sims*,
    278 B.R. 457 (Bankr. E.D. Tenn. 2002) ........................................................................ 34

*In re Texaco Inc.*,
    182 B.R. 937 (Bankr. S.D.N.Y. 1995) .......................................................................... 13

*In re The First Marblehead Corp. Securities Litigation*,
    639 F.Supp.2d 145 (D. Mass. 2009) ............................................................................ 29

*In re Torres*,
  367 B.R. 478 (Bankr. S.D.N.Y. 2007) ............................................................ 13

*In re Touchstone Home Health LLC*,
  -- B.R. --, 2017 WL 3669541 (Bankr. D. Colo. Aug. 21, 2017) .......................... 19

*In re U.S. Lines, Inc.*,
  197 F.3d 631 (2d Cir. 1999) ............................................................................ 12

*In re Underwood*,
  299 B.R. 471 (Bankr. S.D. Ohio 2003) ............................................................ 19

*In re Wagner*,
  74 B.R. 898 (Bankr. E.D. Pa. 1987) ................................................................ 32

*In re West*,
  2015 WL 3962569 (Bankr. N.D. Ohio June 29, 2015) ...................................... 30

*Ind. Univ. v. Canganelli*,
  149 Ill. App. 3d 852 (1986) ............................................................................ 19

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994) ....................................................................................... 39

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995) ............................................................................ 32

*Lehman Bros. Holdings Inc. v. Wellmont Health Sys.*,
  2014 WL 3583089 (S.D.N.Y. July 18, 2014) ................................................... 20

*Local Loan Co. v. Hunt*,
  292 U.S. 234 (1934) ....................................................................................... 18

*London–Marable v. Sterling*,
  2008 WL 2705374 (D. Ariz. 2008) .................................................................. 26

*Lonnie Davis*,
  2006 WL 2827270 (Bankr. S.D. Tex. Sept. 27, 2006) ...................................... 39

*Matter of Baum*,
  606 F.2d 592 (5th Cir. 1979) .......................................................................... 32

*Matter of DePoy*,
  29 B.R. 471 (Bankr. N.D. Ind. 1983) ............................................................... 31

*Matter of Roberson*,
  999 F.2d 1132 (7th Cir. 1993) ........................................................................ 28

*MBNA America Bank, N.A. v. Hill*,
   436 F.3d 104 (2d Cir. 2006) ........................................................................ 13, 17, 18

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) ................................................................................................ 31

*Meyer v. Kalanick*,
   185 F. Supp. 3d 448 (S.D.N.Y. 2016) .................................................................... 23

*Meyer v. Uber Technologies Inc.*,
   868 F.3d 66 (2d Cir. 2017) ..................................................................................... 23

*PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*,
   2015 WL 1442487 (S.D.N.Y. Mar. 27, 2015) ....................................................... 14

*Ramdharry v. Gurer*,
   1995 WL 41353 (Conn. Super. Ct. Jan. 25, 1995) ................................................. 19

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ....................................................................................... 7

*Shearson/American Express v. McMahon*,
   482 U.S. 220 (1987) ............................................................................ 10, 11, 12, 22

*Toledo Scale Co. v. Computing Scale Co.*,
   261 U.S. 399 (1923) ................................................................................................ 39

*U.S. Dept. of Health and Human Services v. Smith*,
   807 F.2d 122 (8th Cir. 1986) .................................................................................. 28

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
   789 F.3d 29 (2d Cir. 2014) ..................................................................................... 32

*Waffenschmidt v. MacKay*,
   763 F.2d 711 (5th Cir. 1985) ............................................................................ 38, 39

*Walls v. Wells Fargo Bank, NA.*,
   262 B.R. 519 (Bankr. E.D. Cal. 2001) ................................................................... 38

*Weber v. U.S. Trustee*,
   484 F.3d 154 (2d Cir. 2007) ................................................................................... 20

*Young v. United States ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987) ................................................................................................ 14

<u>Statutes</u>

11 U.S.C. § 105 ................................................................................................... passim

11 U.S.C § 523 ............................................................................................................ 24, 25, 27

11 U.S.C. § 524 .................................................................................................................. passim

11 U.S.C § 727 ...................................................................................................................... 34, 36

20 U.S.C. § 1087 ........................................................................................................................... 25

26 U.S.C. § 221 ............................................................................................................................. 25

28 U.S.C. § 157 ......................................................................................................................... 3, 34

28 U.S.C. § 1334 ..................................................................................................................... 34, 35

28 U.S.C. § 2201 .......................................................................................................................... 40

<u>Rules</u>

Federal Bankrutpcy Procedure 7023 ........................................................................................... 34

Federal Rule of Civil Procedure 65 ............................................................................................. 36

Federal Rule of Civil Procedure 23 ............................................................................................. 34

<u>Other Authorities</u>

Kara Bruce, *The Debtor Class*,
  88 Tul. L. Rev. 21 (2013) ......................................................................................................... 37

*Vindicating Bankruptcy Rights*,
  75 Md. Law Rev. 443 (2016) .................................................................................................... 15

Plaintiff Hilal K. Homaidan ("Plaintiff") hereby submits this Memorandum of Law in Opposition to Defendants Navient Solutions, LLC, Navient Credit Finance Corporation and Sallie Mae Inc.'s (collectively "Defendants") Motion to Compel Arbitration or, Alternatively, to Dismiss.

## PRELIMINARY STATEMENT

Quite simply, not all money borrowed by students is protected from discharge. Some student loan debt is dischargeable in bankruptcy. This case is about that dischargeable debt – money loaned for non-qualified educational expenses.

Defendants are private entities that lend, service and collect student debt. In 2005, the Bankruptcy Abuse and Consumer Protection Act, amended the Bankruptcy Code to prevent the discharge through bankruptcy of certain types of private student debt. Contrary to subsequent prevailing understanding of bankruptcy, however, the amendment did not protect all private student loans from dischargeability. The exception to dischargeability is limited to very specific private student loans. Nonetheless, for the last ten years, Defendants have perpetuated and exploited the mistaken impression that all student loans are non-dischargeable in bankruptcy. They have done so for the purpose of continuing to collect on debt that has been discharged in bankruptcy. Their actions violate the discharge injunction of 11 U.S.C. § 524.

Defendants now advance a variety of arguments to avoid liability under § 524. Defendants' arguments are wrong.

First, Defendants seek to avoid this Court altogether by moving to enforce boilerplate arbitration language contained within Plaintiff's loan documents. This very issue, *i.e.,* whether a § 524 claim can be compelled to arbitration, is currently pending before the Second Circuit. *In re Anderson*, 16-2496-bk (2d Cir.). This Court should follow the lead of the lower courts in *In re Anderson*, 15-08214-RDD (Bankr. S.D.N.Y. May 5 and 14, 2016) (Dkt. Nos. 15 and 16), *aff'd,*

553 B.R. 221 (S.D.N.Y. 2016), and other courts and hold that compelling arbitration of a motion to hold a creditor in contempt for violation of the discharge injunction in § 524 inherently conflicts with the purpose of the Bankruptcy Code.

Second, Defendants' argument that the private commercial loans at issue in this case are non-dischargeable "educational benefits" has been rejected by bankruptcy judges in this very District and elsewhere.

The loans at issue in this case are direct-to-consumer loans made by a private lender to a consumer with no involvement of any educational institution.  Private lenders like Defendants chose to eschew school involvement and make direct-to-consumer loans in order to increase the lending pool, *i.e.,* to increase the size of loans and the number of borrowers, but that strategy came at a cost.  School involvement provides checks and balances to the lending programs by certifying that the loans are qualified educational loans, exempt from discharge under § 523(a)(8)(B).  By lending directly to consumers, Defendants cut out the schools and removed that certification. Moreover, the direct-to-consumer loans are different than most educational loans.  These loans are based on credit scores and underwriting considerations, include co-signers, and were advertised for non-educational uses like fraternity/sorority and club dues.  The fact that the loans at issue were clothed to mimic traditional educational loans cannot alter the economic reality that they were, in fact, ordinary consumer loans simply made to individuals during their educations, and therefore not entitled to any special protection under the Bankruptcy Code.

Indeed, Defendants knew these loans were dischargeable because that is what they told their investors.  They told their investors: "direct-to-consumer loans are disbursed directly to borrowers . . . . and, therefore, may be subject to some additional risk that the loans were not used for qualified educational expenses and thus could be dischargeable in a bankruptcy proceeding."

They told investors that the debts were dischargeable while at the same time they told debtors they were not dischargeable.

Third, Defendants argue that there is no private right of action under § 524. This argument has been rejected by the courts. Bankruptcy courts have the statutory power to enforce violations of statutory orders through adversary proceedings. Defendants' related argument – that the discharge order is too vague to support a finding of contempt – ignores both the proper standard and the fact that Defendants were specifically aware that the loans at issue here were discharged. Thus, Defendants knew that they were violating discharge injunctions in collecting on this debt.

Fourth, Defendants are incorrect that this Court lacks jurisdiction to consider violations of discharge injunctions that originated in other courts. This Court has subject matter jurisdiction to adjudicate the core bankruptcy matters that arise under the Bankruptcy Code. Where there is subject matter jurisdiction in the district court over a bankruptcy matter, there is subject matter jurisdiction in this Court by way of the referral under 28 U.S.C. § 157. That the case is brought as a class action does not divest the Court of subject matter jurisdiction.

Indeed, the issue of subject matter jurisdiction has been analyzed and considered by multiple courts, including from this District, that have concluded that discharge injunctions issued under § 524 are core bankruptcy matters that can be adjudicated under § 105 of the Bankruptcy Code. Moreover, those courts have determined that discharge injunctions under § 524 are different than traditional, specialized court orders and can be enforced under § 105 even if the discharge order was issued by a different bankruptcy judge.

Finally, Defendants request that the Court strike paragraphs in the Amended Complaint that relate to fraud. However, Plaintiff has not alleged a claim of fraud and need not meet any heightened pleading standard. Plaintiff intends to prove the allegations after discovery.

## **FACTUAL BACKGROUND**

**A.      Evolution of § 523(a)(8)**

Prior to 1978, all student loans, like any typical consumer loan, could be discharged.  Some students were borrowing money from the federal government to go to school and then were seeking to discharge those loans through bankruptcy when the loans came due upon graduation.  To limit that practice, in 1978, Congress enacted § 523(a)(8) of Title 11 of the U.S. Bankruptcy Code. Complaint ("Compl.") ¶ 13.  At that time, only the government was involved in issuing student loans and the newly enacted § 523(a)(8) was intended to protect the government from the discharge of student loans right after graduation.  Compl. ¶ 16.  Initially, § 523(a)(8)'s prohibition on discharge applied only to the attempt to discharge government loans within five years of the loan coming due. All other (*i.e.*, non-governmental) and older student loans (*i.e.*, loans that were more than five years old) could be discharged.  Compl. ¶ 14.  Through later amendments of § 523 that that time period was lengthened and eventually eliminated, but the prohibition on discharge continued to apply only to government loans to students.  Compl. ¶ 15.

In 2005, the Bankruptcy Abuse and Consumer Protection Act was enacted.  For the first time, the Bankruptcy Code's prohibition on discharge found in § 523 was extended to private lenders.  Compl. ¶ 17. However, that extension was not unlimited.  In order to be non-dischargeable, the private student loans had to meet specific criteria articulated in § 523(a)(8). These criteria included that the money be for accredited schools and for qualified education expenses.  Compl. ¶ 18.

Initially, private lenders were able to loan within the criteria for non-dischargeability because private lenders followed the same procedures as the government; *i.e.,* they lent money to students through financial aid offices at accredited schools which retained the funds for tuition or

provided them to students for qualified expenses.  The school thus served to ensure that the loans came within § 523(a)(8)'s requirements for non-dischargeability.

That changed when private lenders developed programs to lend money directly to students, bypassing the schools completely.  Lenders began to market and lend to students in direct-to-consumer loan programs such as the Defendants' Tuition Answer Program, which is the type of loan at issue in this case.  These programs emerged for many reasons, such as the avoidance of some of the paperwork and overall bureaucracy associated with involving a school in the lending process.  However, a main reason for direct-to-consumer lending was the fact that school involvement acted as a check on the size of the lending pool because of restrictions on the types of institutions that could be accessed (*e.g.,* only schools accredited under Title IV were eligible for protection) and the amount of money that could be lent (because Title IV schools would not certify loans that exceeded qualified expenses such as the cost of attendance).  Compl. ¶¶ 20-21.  Private student loan lenders undertook direct-to-consumer lending purposefully to increase their lending pool and while doing so purposely undertook the risks of dischargeability that came with it.  While lending directly to students undoubtedly increased the total loan amounts and number of borrowers, it also removed the certification provided by school involvement that the loans would be "qualified educational loans" under § 523(a)(8) and thus exposed private lenders to the risk that the loans were not protected from discharge.

These direct-to-consumer loans were different than typical educational loans.  The direct-to-consumer loans relied on credit scores and underwriting, included co-signers, and were advertised for non-educational expenses such as fraternity/sorority and club dues.

The direct-to-consumer loans were so notoriously deceptive to consumers that they were discontinued in 2008 after investigators and settlements with state Attorneys General.  *See, e.g.,*

https://ag.ny.gov/press-release/attorney-general-cuomo-announces-groundbreaking-settlements-8-companies-market-student.    Indeed, Defendants knew their direct-to-consumer loans were dischargeable because that is what they told their investors:

> Currently, private education loans made for qualified education expenses are generally not dischargeable by a borrower in bankruptcy.  Private education loans can become dischargeable if the borrower proves that keeping the loan non-dischargeable would impose an undetermined hardship on the debtor and the debtor's dependents.  In addition, direct-to-consumer loans are disbursed directly to borrowers based upon certifications and warranties contained in their promissory notes, including certification of the borrower's cost of attendance.  This process does not involve school enrollment verification as an additional criteria and, therefore, may be subject to some additional risk that the loans were not used for qualified educational expenses and this couple become dischargeable in a bankruptcy proceeding.

*See* Compl. ¶ 34.

## B.    Plaintiff's Private Commercial Loans

Plaintiff Homaidan attended Emerson College in Boston, Massachusetts from 2003-2007.  Compl. ¶ 36.  In 2007, Plaintiff received a scholarship and took out a series of loans.  He received a $4,800 scholarship and a school certified loan from Defendants for $22,100.  Compl. ¶39.  The cost of attendance at Emerson College was $19,372.  Compl. ¶ 38.  Plaintiff also received additional loans from Defendants under their Tuition Answer program.  Compl. ¶ 40.  Defendants provided directly to Plaintiff two Tuition Answer Loans of $4,800 and $4,000 plus fees, totaling $12,567.[1]  *Id.*  The Tuition Answer Loans that were provided directly to Plaintiff exceeded the cost of qualified education expenses and the cost of attendance.  *Id.*

---

[1] The discrepancy in the amount of the Tuition Answer loans alleged by Plaintiff and claimed by Defendants appears to be based on the loan fees which Defendants do not account for in their discussion.

In December of 2008 Plaintiff sought relief under Chapter 11 of the Bankruptcy Code and listed his debts, including the Tuition Answer Loans, on his Schedule F form.  Compl. ¶ 44.  In April 2009, this Court ordered that Plaintiff's debts were discharged. Compl. ¶ 45.  Defendants were notified of the discharge and they never contested the dischargeability of the debts.   Compl. ¶¶ 45-46.

 In addition to the discharge order, other evidence demonstrates that Defendants knew that Plaintiff's Tuition Answer Loans were discharged.  Defendants, as lenders, are required to issue 1098-E forms to borrowers who have qualified educational loans so that the borrower can deduct the interest.  Defendants never issued to Plaintiff a 1098-E tax form and thus did not consider the loan a qualified educational loan.  Compl. ¶ 42.  Also, as noted above, Defendants told investors and government regulators that direct-to-consumer loans (such as Tuition Answer Loans) that were not used for qualified education expenses were dischargeable.  Compl. ¶ 34.

Despite knowing that Plaintiff's Tuition Answer loans were discharged, Defendants continued to collect on them in violation of §524.  Compl. ¶¶ 48-52.

## ARGUMENT

### I.    STANDARD FOR MOTIONS TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted).   "The plausibility standard is not akin to a probability requirement. . . ." *Iqbal,* 556 U.S. at 678 (citations omitted).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citations omitted).  "In addressing the sufficiency of a complaint [the Court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences . . . ." *Rothstein v. UBS AG,*

708 F.3d 82, 94 (2d Cir. 2013).  At the pleading stage, the Court need only consider whether the complaint includes factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 556.  The Complaint here adequately states a claim under this standard.

## II.    THE COURT SHOULD NOT COMPEL ARBITRATION

The issue of whether adversary proceedings seeking orders of contempt for violation of the discharge injunction of § 524 should be sent to arbitration is currently before the Second Circuit Court of Appeals in *In re Anderson*, Case No. 16-2496 (2d Cir.).  In that case, both the Bankruptcy Court and the District Court held that compelling arbitration would inherently conflict with the purposes of the Bankruptcy Code.  *See In re Anderson*, Adv. Proc. No. 15-8214 (RDD) (Bankr. S.D.N.Y. May 5, 2015) (Dkt. No. 16) (attached as Appendix A), and *In re Anderson*, 553 B.R. 221 (S.D.N.Y. 2016).  Nonetheless, should the Court wish to address the issue of arbitration before the Second Circuit rules, below are the reasons why Defendants' Motion to Compel Arbitration should be rejected.

### A.    Plaintiff's Claims Fall Outside the Scope of the Relevant Arbitration Provision.

Defendants assert that Plaintiff's claims must be sent to arbitration pursuant to the arbitration agreement contained in Plaintiff's loan documentation.  But such a private agreement cannot — and did not purport to — bind the bankruptcy court to relinquish its jurisdiction to adjudicate a contempt of that court's orders, and no reading of the arbitration agreements supports such a conclusion.

Simply put, the nature of this proceeding renders it outside the scope of the parties' arbitration agreement, even given its broad language.  Where, as here, a debtor brings a claim under § 524 and 105(a) alleging that the creditor has violated the discharge injunction issued by

the bankruptcy court, an arbitration clause between the debtor and the creditor is not implicated. This case involves the invocation of the bankruptcy court's contempt powers, not private contractual claims by Plaintiff. *See In re Haynes*, Adv. Proc. No. 13-08370-rdd, 2014 WL 3608891, at *8 (Bankr. S.D.N.Y. July 22, 2014) ("The Court has its own contempt power [and] also has § 105(a), which goes beyond its own contempt power."). Defendants have violated the bankruptcy court's injunction and it is the bankruptcy court's equitable powers under § 105 and its contempt powers that provide the means through which the violation can be remedied. Yet, the bankruptcy court was not a party to the arbitration agreement and it is black letter law that "a contract [to arbitrate] cannot bind a nonparty." *In re Belton*, Adv. P. No. 14-08223 (RDD), 2014 WL 5819586 at *4 (Bankr. S.D.N.Y. Nov. 10, 2014) ("*Belton I*"), *rev'd by In re Belton*, 15-CV-1934, 2015 WL 6163083 (S.D.N.Y. Oct. 14, 2015) ("*Belton II*"), petition for mandamus pending, *In re Belton*, No. 16-833 (2d Cir.).

Courts considering whether a § 524 claim is within the scope of an arbitration agreement have found the same. For example, in *In re Jorge*, 568 B.R. 25 (N.D. Ohio 2017), the court held that "Mr. Jorge and Verizon's agreement to arbitrate claims arising out of or relating to the Contract is wholly inapplicable to Mr. Jorge's claims for violation of . . . the discharge injunction." *Id*. at 31 (citing *In re Jernstad*, No. 11 C 7974, 2012 WL 8169889 (N.D. Ill. Aug. 2, 2012) and *In re Harrier*, 903 F. Supp. 2d 1281 (M.D. Fla. 2012)).

In *In re Haas*, Case No. 16-03175-H2-ADV, Dkt. No. 88 at 11-18 (Bankr. S.D. Tex. Jan. 9, 2017) (attached as Appendix B), the Court denied these same Defendants' motion to compel arbitration of a § 524 claim noting that the court was not a party to the arbitration agreement. "Well, now wait a minute. The discharge injunction is something I enforce. I'm not a party to the Note. That discharge injunction is my Order." Appendix B at 11. Similarly, the court in *In re*

*Grant*, 281 B.R. 721 (S.D. Ala. 2000), held that the court was not bound by the parties' private

agreement:

> This Court entered those [discharge] orders. This Court is a party to those orders and the Court is an entity offended if the orders are not obeyed. A party who has not agreed to arbitration of its claim cannot be forced to arbitrate. This Court does not agree to arbitrate the claims. Therefore, the arbitration clause cannot require arbitration of the claims alleging violations of §§ 362 and 524 of the Code.

281 B.R. at 724.

### B.    Plaintiff's Claims are not Arbitrable under *McMahon*.

In *Shearson/American Express v. McMahon*, 482 U.S. 220, 226-27 (1987), the Supreme

Court stated that "[l]ike any statutory directive the [Federal Arbitration Act's] mandate may be

overridden by a contrary congressional command." *Id.* *McMahon* goes on to state that a party can

demonstrate that a contrary congressional command exists by making a showing of Congress'

express or inherent intent "to limit or prohibit waiver of a judicial forum for a particular claim . . .

deducible from the statute's text or legislative history, or from an inherent conflict between

arbitration and the statute's underlying purposes." *Id.* at 227. Thus, under *McMahon*, a party may

rely on (1) a statute's text; (2) its legislative history; or (3) an inherent conflict between arbitration

and the statute's underlying purposes to demonstrate that Congress intended that particular claims

should not be arbitrated. Here, the legislative history of the Bankruptcy Code demonstrates

Congress's intent to have § 524 claims adjudicated in bankruptcy court and, moreover, there is an

inherent conflict between arbitration and § 524's underlying purposes.

### 1.    The Legislative History of the Bankruptcy Code Evidences Congress's Intent to Preclude Arbitration of Claims to Enforce the Discharge Injunction.

Contrary to Defendants' claim, Memorandum in Support of Motion to Compel Arbitration

or, in the Alternative, to Dismiss ("Mem.") at 14, the legislative history of the Bankruptcy Code

shows that Congress intended for bankruptcy courts to enforce the discharge. In fact, Congress

ultimately enacted the discharge injunction in order to prevent creditors from filing state court actions seeking to collect on previously discharged debts. This had been a common practice of creditors and unsuspecting former debtors would often default in those state court lawsuits. Unless they appeared in the action and raised the discharge as an affirmative defense, they would default and have to pay on discharged debts, which undermined the efficacy of the bankruptcy discharge. 4 Collier on Bankruptcy ¶ 524.LH[1] (15th rev. ed., Lawrence P. King ed. 2000).

The legislative history of § 14(f) of the Bankruptcy Act, which is the predecessor to § 524 of the Bankruptcy Code, demonstrates that Congress enacted it to stop creditors from bringing such suits in state court by ensuring that bankruptcy courts enforce the discharge. The House Committee on the Judiciary stated that "the major purpose of the proposed legislation is to effectuate, more fully, the discharge in bankruptcy by rendering it less subject to abuse by harassing creditors," who it noted "bring suit in State courts after a discharge in bankruptcy has been granted . . . in the hope the debtor will not appear in that action, relying to his detriment upon the discharge." *Id.*; *see also id.* (quoting floor statement of Rep. Wiggins that under § 14(f), "the bankruptcy court would be vested with authority to determine not only the bankrupt's right to a discharge but also the effect of a discharge when granted"). Moreover, "[t]he reasons behind the enactment of § 524(a), which is certainly comparable to and, in effect, amounts to a continuation of § 14f of the Act, include those that originally prompted the enactment of § 14f itself." *Id.*

Thus, the legislative history demonstrates that Congress's intent was that bankruptcy courts would enforce the discharge and former debtors would not have to defend harassing actions in state court:

> Accordingly, if a creditor brings a collection suit after discharge, and obtains a judgment against the debtor, the judgment is rendered null and void by § 524(a). The purpose of the provision is to make it absolutely unnecessary for the debtor to do anything at all in the collection action. Before the enactment of § 14f, a debtor

could not safely ignore a post discharge collection action; the discharge had to be pled as an affirmative defense.

Moreover, because the provisions of the discharge order take the form of an automatic injunction, if they are violated by a creditor subject to the order, **the creditor will be subject to citation for contempt in the bankruptcy court** upon application of the debtor.

*Id.* (emphasis added).

Thus, the legislative history supports a finding that Congress did not intend for § 524 claims to be determined in any other forum, including in arbitration.

### 2.    There is An Inherent Conflict Between Plaintiff's Claims and Arbitration.

In a bankruptcy action, the inherent conflict test requires a determination of whether "any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause." *In re Relativity Fashion, LLC*, 696 Fed. Appx. 26, 30 (2d Cir. 2017) (quoting *In re U.S. Lines, Inc.*, 197 F.3d 631, 641 (2d Cir. 1999)).  If arbitration would "seriously jeopardize the objectives of the [Bankruptcy] Code," the arbitration clause should not be enforced.  *U.S. Lines*, 197 F.3d at 641; *In re Lehman Bros. Holdings Inc.*, 663 Fed. Appx. 65, 68 (2d Cir. 2016).

Here, there is an inherent conflict between the arbitration of Plaintiff's claims and the underlying purposes of the Bankruptcy Code because (i) bankruptcy courts have the undisputed power to interpret and enforce their own orders and delegating that power to private arbitrators would jeopardize the underlying purposes of the Bankruptcy Code; (ii) providing and protecting the financial "fresh start" is a fundamental, if not *the* fundamental, purpose of the Bankruptcy Code and the discharge injunction is the mechanism through which the fresh start is achieved; thus, the central purpose of the Code would be frustrated by leaving enforcement of that purpose in the hands of privately-chosen arbitrators; and (iii) uniform application of bankruptcy law would be jeopardized by arbitration of violation of discharge orders.

a.  **Arbitration Is Impermissible Because It Would Strip the Bankruptcy Court of Its Power to Enforce its Own Orders.**

The nature of Plaintiff's claims makes them unsuitable for arbitration. Claims for violation of § 524 are civil contempt claims. *See, e.g., In re Torres*, 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007); *In re McKenzie-Gilyard*, 388 B.R. 474, 481-82 (Bankr. E.D.N.Y 2007) (Stong, B.J.). Thus, in order to prevail, Plaintiff must satisfy the standard for civil contempt sanctions by proving that Defendants had actual or constructive knowledge of the discharge injunctions of the bankruptcy courts and willfully violated them by continuing with the activity complained of. *Id.* This type of claim, which insures the integrity of the court, protects the fresh start, and is adjudicated under the civil contempt standard, is exactly the type of claim that should not go to arbitration.

As the *Anderson* district court held, the discharge injunction is "an affirmative order of the bankruptcy court" and bankruptcy courts have "undisputed power" to enforce their own affirmative orders. *In re Anderson*, 553 B.R. 221, 233 (S.D.N.Y. 2016) (citing *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108-09 (2d Cir. 2006). Indeed, "courts in the Second Circuit consistently recognize the unique power of a bankruptcy court to interpret its own orders." *Id.* (citing *Deep v. Copyright Creditors,* 122 F. App'x 530, 533 (2d Cir. 2004) (citing *In re Casse*, 198 F.3d 327, 333 (2d Cir. 1999) ("The bankruptcy court [is] in the best position to interpret its own orders."); *In re Texaco Inc.,* 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995) ("A bankruptcy court is undoubtedly the best qualified to interpret and enforce its own orders including those providing for discharge and injunction"). The *Anderson* district court found that this consideration supported its refusal to compel arbitration.

The *Anderson* district court's findings are supported by overwhelming precedent and academic authority. Indeed, it is elemental that federal courts have the exclusive power to enforce their orders and, equally important, to determine the proper remedy for violation of those orders.

That power to enforce orders — the power of contempt — cannot be delegated or outsourced to private parties. Placing that contempt power in the hands of private arbitrators is repugnant to our judicial system. *See, e.g., PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*, No. 14–cv–764 (RJS), 2015 WL 1442487, at *6 (S.D.N.Y. Mar. 27, 2015) ("Federal courts, and federal courts alone, possess the inherent authority to enforce their judgments, and the FAA may not be construed to divest courts of their traditional powers to police their own orders. A pending arbitration cannot prevent this judicial function, regardless of what the parties may have privately agreed.") (internal quotation and citation omitted). *See also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798-99 (1987). A contempt of a court order, which can be punished both civilly and criminally, cannot be left in the hands of an arbitrator who cannot provide the constitutional protections required for such a proceeding, and the integrity of a bankruptcy judge's order should not be at the mercy of a private arbitrator. Only a court should have the power to determine contempt of a court order.

Because it is an underlying purpose of the Bankruptcy Code that bankruptcy judges have the ability to interpret and enforce court orders, especially in a contempt setting, courts have held that sending § 524 claims to arbitration conflicts with the Bankruptcy Code. For example, the Fifth Circuit held that claims to enforce the discharge injunction are not arbitrable. *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1071 (5th Cir. 1997) ("We are convinced that arbitration of a core bankruptcy adversary proceeding brought to determine whether [defendant's] collection efforts were barred by the § 524(a) discharge injunction ... would be inconsistent with the Bankruptcy Code.").

Similarly, a bankruptcy court in the Southern District of Texas recently denied a motion to compel arbitration on this ground in a student loan case against Navient. *In re Haas*, Appendix B

at 44-45.   The court was clear that a claim to enforce the discharge injunction in § 524 is a form of contempt.  *Id.* at 16 ("They're essentially seeking to have you held in contempt.  A discharge injunction is my Order.  They're seeking to hold you responsible for violating my Order.  That's contempt.").   Moreover, the court emphasized that enforcement of the discharge injunction is at the heart of the bankruptcy process.  *Id.* at 20-21 ("No, but you're going to the very heart of the integrity of the bankruptcy process itself.  I mean, I took an oath to defend and enforce the bankruptcy system.  And if the conduct that is alleged turns out to be true, I mean, how can folks come in here and ask for a discharge . . . and if they don't have any confidence that the discharge that they get is going to be enforced, then what's the process worth at that point?").   The court denied the motion to compel arbitration, stating that the defendant's argument was "about as frivolous as it gets;" that "the motion ha[d] no foundation in the applicable law;" and that denying the motion was "not even a close call."  *Id.* at 16, 44.

Other courts have made similar holdings.  *See, e.g., Hooks v. Acceptance Loan Co., Inc.*, No. 2:10-CV-999, 2011 WL 2746238, at *5 (M.D. Ala. July 14, 2011), at *5 ("It would seem anomalous to allow an arbitrator to construe a court's order in a contempt setting.  As a general matter, allowing arbitration of contempt proceedings would effectively strip the courts of their primary enforcement mechanism."); *In re Grant*, 281 B.R. 721, 724-25 (Bankr. S.D. Ala. 2000) ("Allowing arbitrators to resolve a contempt matter would present a conflict with the Code because it would allow an arbitrator to decide whether or how to enforce a federal injunction under §§ 362 and 524"); *In re Norman*, Adversary No. 06-1133, 2006 WL 2818814, at *2 (Bankr. M.D. Ala. Sept. 29, 2006) ("[t]he question of whether a discharge injunction issued by the Federal Bankruptcy Court has been violated ought to be decided by a Bankruptcy Judge and not by an arbitrator")*; see also* Kara J. Bruce, *Vindicating Bankruptcy Rights*, 75 Md. Law Rev. 443, 473-

74 (2016) (discussing the fact that "courts and commentators have widely recognized that it would be improper" to allow arbitration of claims, such as § 524 claims, that are either remediable through contempt sanctions or enforceable by operation of the court's equitable authority under § 105 of the Bankruptcy Code).

> **b.**    **Arbitration is Impermissible Because the Financial "Fresh Start" Is a Fundamental Right Granted by the Bankruptcy Code and Arbitration of That Right Would Be Inconsistent with the Bankruptcy Code.**

The discharge injunction, and the ability of debtors to enforce it before the bankruptcy court, is central to enabling the fresh start, the core purpose of bankruptcy and, as such, cannot be enforced piecemeal in arbitration.  As the bankruptcy court in *Belton* stated, "nothing is more fundamental to the adjustment of debtor/creditor relations than the discharge, an event that is not derived from the parties' pre-bankruptcy conduct but, rather, is the bankruptcy case's culminating event." *Belton I*, 2014 WL 5819586 at *9.  The *Belton* bankruptcy court emphasized that it, rather than a private arbitrator, "sees hundreds of individual debtors in bankruptcy every month." *Id*. at *7.  Each debtor makes the very difficult decision to file bankruptcy as "a last resort" in return for the promise of a fresh start.  *Id*.  "The discharge is why they subject themselves to everything else. If a party subsequently violates the discharge, the debtor's reason for seeking relief and enduring all of the constraints imposed by Congress in the Bankruptcy Code go for nothing.  Indeed, if the violation persists the case itself can be said to have been for nothing, which, of course, means that the effectiveness of bankruptcy as a fair, collective remedy for creditors and a fresh start for debtors is eviscerated."  *Id*. at *8.  These words make it clear that the *Belton* bankruptcy court found it incongruous that this most important function of the Bankruptcy Code would be relegated to a private arbitrator.

For this reason, the *Anderson* district court reached the same conclusion as the *Belton* bankruptcy court, concluding that the fresh start "is predominantly achieved through the discharge, and, therefore, the question of whether a discharge injunction has been violated is essential to proper functioning of the Bankruptcy Code, and arbitration is inadequate to protect such core, substantive rights granted by the Code." *In re Anderson*, 553 B.R. at 232. Key to Judge Roman's conclusion was the fact that "the discharge is so fundamentally related to a debtor's fresh start." *Id.* at 233.

The *Belton* bankruptcy court and *Anderson* district court undoubtedly correct, given that ensuring the fresh start through the discharge injunction is at the heart of the bankruptcy court's function. Every single adjudication by the bankruptcy court of a violation of § 524 involves the court's application of bankruptcy law and policy. The court considers the context of the debtor's entire bankruptcy, all other creditors involved in the bankruptcy, and the policies underlying the Bankruptcy Code in determining whether there is a violation and the appropriate remedy for that violation. A claim to enforce the discharge injunction is not merely a dispute between two parties, and it cannot be parceled off from the bankruptcy and ceded to an arbitrator who has none of the context of the bankruptcy or the institutional knowledge of a bankruptcy court.

Defendants rely on the Second Circuit's decision in *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 107 (2d Cir. 2006), in support of their conclusion that Plaintiff's claim is not arbitrable. Mem. at 18-19. However, to the contrary, *Hill* supports the conclusion that plaintiff's claim is *not* arbitrable. As the *Anderson* district court held, *Hill* "confirmed [a] central objective of the Bankruptcy Code – providing debtors with a fresh start – which also has been recognized consistently by Second Circuit courts." *In re Anderson*, 553 B.R. at 233 (citing *Hill*, 436 F.3d at 109; *In re Bogdanovich,* 292 F.3d at 107 ("Congress made it a central purpose of the [B]ankruptcy

[C]ode to give debtors a fresh start in life and a clear field for future effort unburdened by the existence of old debts."); *In re Hayes*, 183 F.3d 162, 167 (2d Cir. 1999) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)) ("one of the primary purposes of the bankruptcy act is to ... permit [the honest debtor] to start afresh") (alteration in original)).  The *Anderson* district court further concluded that the fresh start "is predominantly achieved through the discharge, and, therefore, the question of whether a discharge injunction has been violated is essential to proper functioning of the Bankruptcy Code, and arbitration is inadequate to protect such core, substantive rights granted by the Code."  *In re Anderson*, 553 B.R. at 233.  Key to the *Hill* court's conclusion was the fact that "the discharge is so fundamentally related to a debtor's fresh start."  *Id.*[2]  As Judge Drain noted, the Second Circuit in *Hill* compelled arbitration expressly because the case before it did not involve a threat to a debtor's fresh start.  *Belton I*, 2014 WL 5819586 at *9.

In *Hill*, the Second Circuit allowed the plaintiff's § 362 claim for violation of the automatic stay provision to go to arbitration under the unique facts of that case.  There, the bankruptcy proceedings had ended; the violation was related to the automatic stay, which had ceased to operate under the terms of the statute once the proceedings ended; and MBNA had already agreed to repay the $159.01 that had been collected in violation of the automatic stay.  Thus, the bank's conduct had no implications for the plaintiff's ability to get a fresh start and arbitration would not inherently conflict with the underlying purpose of the Bankruptcy Code.  436 F.3d at 110.  The *Hill* facts are fundamentally different from the putative class's claims here, which involve the discharge

---

[2] As Defendants have acknowledged, Mem. at 22 n. 7, the *Anderson* and *Belton* district courts are split on the issue of whether discharge violations should be arbitrated and the issue is on appeal to the Second Circuit in the *Anderson* action.  For all the reasons set forth here and in the appellee brief in the *Anderson* appeal, the *Belton* district court decision is wrongly decided.  *In re Anderson*, No. 16-2496 (2d Cir.), Dkt. No. 117.

injunction, and not the automatic stay, and in which Defendants' actions directly threaten the fresh start of Plaintiff and the putative class.[3]

Here, the putative class continues to need the protection of the discharge injunction to ensure their fresh starts. Defendants' continued efforts to collect discharged debt has been persistent and based on company-wide practices. Compl. at ¶¶ 53-61. Those practices have threatened the putative class members' ability to move on with their lives, free of the discharged debts. Thus, *Hill* is clearly distinguishable.

> **c.    Arbitration is Impermissible Because Federal Litigation of the Claims at Issue Promotes Uniform Application of the Bankruptcy Law.**

The goal of uniform application of the bankruptcy law also prohibits arbitration of Plaintiff's claims here. Uniform application of the bankruptcy laws is an important purpose of the Bankruptcy Code, one which has long been recognized. *In re Anderson*, 553 B.R. at 234 (the bankruptcy court "emphasized the importance of the uniform application of bankruptcy law, which has been recognized consistently in courts throughout this district") (citing *In re Lehman Bros. Holdings Inc.*, 480 B.R. 179, 196 (S.D.N.Y. 2012); *In re Extended Stay, Inc.,* 466 B.R. 188, 207 (S.D.N.Y. 2011)). It is particularly important to create precedent to promote uniform application

---

[3] The other cases cited by Defendants to show that "other adjudicatory bodies can, and often do, resolve bankruptcy matters," Mem. at 19, merely state the unremarkable proposition that bankruptcy courts do not have exclusive jurisdiction over all claims brought under the Bankruptcy Code. However, none of the cases concern § 524 claims and they are all distinguishable. *See In re Underwood,* 299 B.R. 471, 477 (Bankr. S.D. Ohio 2003) (allowing seven year old action concerning issues in addition to dischargeability of student loan to continue in another court); *Ind. Univ. v. Canganelli*, 149 Ill. App. 3d 852, 855 (1986) (allowing state court to consider dischargeability); *In re Touchstone Home Health LLC*, -- B.R. --, 2017 WL 3669541, *11 (Bankr. D. Colo. Aug. 21, 2017) (compelling the parties to arbitrate liquidation of fee dispute claim). Moreover, one of the cases cited by Defendants stands for exactly the opposite, explicitly acknowledging that "[in] passing § 524 of the Bankruptcy Code, Congress made the bankruptcy court the exclusive forum for determining whether a debt may survive bankruptcy." *Ramdharry v. Gurer*, No. 89-cv-42620, 1995 WL 41353, at *2-3 (Conn. Super. Ct. Jan. 25, 1995).

of the bankruptcy laws, where, as the Second Circuit has noted, there has been a historical lack of consistent, reliable precedent. *Weber v. U.S. Trustee*, 484 F.3d 154, 158 & n.1 (2d Cir. 2007) (discussing the "paucity of settled bankruptcy-law precedent").

This purpose is best achieved through litigation in the bankruptcy court, which creates transparency, as well as binding legal precedents, and thus encourages consistent outcomes. *Id.* (citing, *Lehman Bros. Holdings Inc. v. Wellmont Health Sys.*, No. 14 CIV. 01083 LGS, 2014 WL 3583089, at *1 (S.D.N.Y. July 18, 2014) (finding that uniformity in the administration of bankruptcy laws weighs in favor of leaving the case in bankruptcy court, noting that although the claims are principally private and contractual in nature, "they are brought within the context of similar disputes arising out of various [] agreements"); *Belton I*, 2014 WL 5819586, at *10 (there is a need for "complete and consistent relief," which "is more likely to occur if [the disputes are] determined by … a bankruptcy court [rather] than on an arbitration-by-arbitration basis of separate alleged violations of the discharge")).

As the *Anderson* district court further reasoned, arbitration would undermine the Code's purpose of achieving uniformity and could in fact produce "wildly inconsistent results." 553 B.R. at 234. This is because in that action, as here, each member of the putative class asserts a virtually identical claim against a single creditor. If Plaintiffs were forced to arbitrate each claim individually, it is "certainly plausible, if not probable" that the arbitrations would reach disparate outcomes, especially given that arbitrators have broad discretion as to whether to apply collateral estoppel offensively. *Id.* (citing *Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 92 (2d Cir. 2005) ("In view of differing results reached by different panels, the arbitrators had discretion to apply collateral estoppel or not."). For this reason, the

*Anderson* district court concluded that "multiple violations of a discharge injunction by one creditor are more efficiently and uniformly decided by federal litigation." *Id*.

This is especially true in the student loan context where there are a number of older, conflicting decisions on dischargeability. That conflict will eventually be resolved through the courts reaching a consensus on a majority view or through appellate rulings. If the issue were left to arbitration, however, there would be no mechanism to form a consensus and debtors and creditors would lose all predictability on this critical issue.

> **d.    *CompuCredit* Does Not Affect the Vitality of the Inherent Conflict Test or Even Address It.**

Defendants suggest that the Supreme Court's decision in *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012), "casts doubt on the continuing vitality of the 'inherent conflict' test" set forth in *McMahon*. Mem. at 31-32 & n.11. This is a mischaracterization of *CompuCredit*. *CompuCredit* addressed only the issue of whether the text of a statute exempts a claim from arbitration. *CompuCredit* did not address situations in which Congress's intent to exempt a claim from arbitration is evident from the legislative history of the statute or, as here, from an inherent conflict between arbitration and underlying purposes of the statute. As such, *CompuCredit* does not address the inherent conflict test and it does not cast doubt on that test.

The district court in *Belton* properly analyzed and rejected the reading of *CompuCredit* that Defendants propose here. The court stated that *CompuCredit* "cannot be read as impliedly overruling McMahon" and noted that "Justices Sotomayor and Kagan, who concurred in the judgment in *CompuCredit*, did 'not understand the majority opinion to hold that Congress must speak so explicitly in order to convey its intent to preclude arbitration of statutory claims. We have never said as much, and on numerous occasions have held that proof of Congress' intent may also be discovered in the history or purpose of the statute in question.'" *Belton II*, 2015 WL 6163083

at *5 (quoting 132 S. Ct. at 675 (Sotomayor and Kagan, J.J., concurring)).  Moreover, as the district

court explained, 'respondents in *CompuCredit* did not rely on the [relevant statute]'s legislative

history, nor did they make an 'inherent conflict' argument; '[c]onsequently, the sole question for

the Court [wa]s whether the text of the [statute] precludes arbitration with sufficient clarity to

override the operation of the FAA.'"  *Id*. (quoting petitioners' brief in *CompuCredit,* 2011 WL

2533009, at *18 (June 23, 2011)).

This argument has also been rejected in *In re Farmer*, Case No. C17-0764, 2017 WL

4619209, at *1–2 (W.D. Wash. Oct. 16, 2017): "Navient argues that Supreme Court jurisprudence

has evolved since *McMahon* and no longer includes the inherent conflict factor. (Dkt. No. 10 at

34.) . . . this Court finds that the bankruptcy court's consideration of the inherent conflict factor

was appropriate."

In addition to *Belton II* and *Farmer*, the Second Circuit and lower courts in this Circuit

have continued to apply the inherent conflict test following *CompuCredit*, as well.[4]  *See, e.g.,*

*Netflix*, 696 Fed. Appx. at 30 ("a bankruptcy court may retain jurisdiction over a core proceeding

in spite of a mandatory arbitration provision if, in the exercise of its discretion, it concludes that

any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an

arbitration clause") (internal citation omitted); *In re Lehman Bros. Holdings, Inc.*, No. 14 Civ.

7643, 2015 WL 5729645, at *14 (S.D.N.Y. Sept. 30, 2015) (affirming bankruptcy court's finding

---

[4] Defendants also assert that the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), demonstrates that it has "effectively abandoned" the inherent conflict test.  Mem. at 15.  This is not true.  *Italian Colors* does not address the inherent conflict test at all, but rather the separate "effective vindication doctrine."  As described above, the inherent conflict test is a method of determining congressional intent—whether Congress intended a particular claim to be arbitrable or not.  *McMahon*, 482 U.S. at 226-27.  By contrast, the effective vindication doctrine is a "judge-made exception" to the FAA, in which courts will invalidate, on public policy grounds, arbitration agreements that "operate . . . as a prospective waiver of a party's right to pursue statutory remedies."  *Italian Colors*, 133 S. Ct. at 2310 (internal quotation omitted).

of inherent conflict and denial of motion to compel arbitration), *aff'd*, *by In re Lehman Bros. Holdings, Inc.*, 663 Fed. Appx. 65, 67 (2016) ("If arbitration would severely conflict with the text, history, or purposes of the Bankruptcy Code, the bankruptcy court has discretion to compel or to stay the arbitration."). Thus, *McMahon's* inherent conflict test remains unaffected by *CompuCredit* (or *Italian Colors*) and should be applied here.

### C.    Plaintiff Did Not Waive the Right to Participate in a Class Action.

Defendants argue that, even if its motion to compel arbitration is denied, the class action allegations should be dismissed because Plaintiff waived all class action rights in her loan contract. Mem. at 44.   This argument has no merit.

The clause in question is not a stand-alone provision in Plaintiff's Promissory Note. Rather, the class action waiver is part and parcel of the unenforceable agreement to arbitrate and thus cannot itself be enforced.   Dkt. #17-1 at 9 ("Arbitration replaces the right to go to court, including the right to a jury and the right to participate in a class action or similar proceeding, in arbitration, a dispute is resolved by a neutral arbitrator instead of a judge or jury.").

Thus, if the arbitration agreement itself is not enforceable (which it is not), then the class action waiver within that agreement is not enforceable either.  *Borecki v. Raymours Furniture Co., Inc.*, 2017 WL 5900288, at *5 (S.D.N.Y. June 21, 2017) ("Because the Agreement's class action waiver is applicable only to arbitrable claims, and because . . . The Arbitration Agreement does not require [Plaintiff] to arbitrate his TCPA claim, [Plaintiff's] TCPA claim may be asserted as a class action."); *Meyer v. Kalanick*, 185 F. Supp. 3d 448 (S.D.N.Y. 2016) (holding that the class action waiver was unenforceable because it was an integral part of the arbitration provision which defendant had waived; court also held that, in any event, the class action waiver was unconscionable under California law), *rev'd on other grounds by Meyer v. Uber Technologies Inc.*, 868 F.3d 66 (2d Cir. 2017).

### III.    PLAINTIFF'S LOANS ARE NOT EXCEPTED FROM DISCHARGE UNDER § 523(a)(8).

#### A.    Plaintiff's Private Commercial Loans are not an "Obligation to Repay Funds Received as an Educational Benefit."

11 U.S.C § 523 (a)(8) lists exceptions to the general rule that debts are discharged in bankruptcy but restricts those exemptions to specific areas:

- (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

- (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

- (B) any other educational loan that is a qualified education loan, as defined in § 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual. . . .

11 U.S.C. § 523(a)(8).

Essentially, that subsection (8)(A)(i) protects government loans; (8)(A)(ii) protects scholarships; and, (8)(B) protects private loans made to accredited schools for certain qualified educational expenses.

Subsection (8)(A)(i) is not at issue here. The Tuition Answer Loans at issue here are not made, insured or guaranteed by a governmental unit or nonprofit institution and Defendants do not argue otherwise.

Similarly, Defendants' do not claim that the debt is excepted from discharge under subsection (8)(B) and thus the Court need not adjudicate it. In any event, the direct-to-consumer loans in this case are not "qualified education loans" because they do not meet the terms of §

221(d)(1) of the Internal Revenue Code.  Only loans that do not exceed the "cost of attendance" qualify and the loans at issue here exceeded the cost of Plaintiff's attendance.[5]

Defendants' sole argument for non-dischargeability is that the Tuition Answer Loans are "obligation[s] to repay funds received as an educational benefit" under § 523(a)(8)(A)(ii).  Mem. at 25.  Defendants have made that argument before without success.[6]  In fact, that exact argument recently was considered and rejected – twice – by bankruptcy judges in this very District in *In re Campbell,* 547 B.R. 49 (Bankr. E.D.N.Y. 2016) (Craig, C.B.J.) and in *In re Decena,* 549 B.R. 11 (Bankr. E.D.N.Y.) (Grossman, B.J.), *rev'd in part on other grounds*, 562 B.R. 202 (E.D.N.Y. 2016).  Many courts have come to the same conclusion and this is the modern interpretation of § 523(a)(8).  *See In re Kashikar,* 567 B.R. 160, (9th Cir. B.A.P. 2017); *In re Essangui*, 573 B.R. 614

---

[5] 26 U.S.C. § 221(d)(1) defines a "qualified education loan" as any loan used to pay "qualified education expenses," which, in turn, are defined as the "cost of attendance." 26 U.S.C. § 221(d)(2). "Cost of attendance" is defined by 20 U.S.C. § 1087ll as tuition and certain other expenses "as determined by the institution."  Each school publishes its cost of attendance and Plaintiff alleges that the Tuition Answer Loan he received exceeded the cost of attendance for Emerson.  (Compl. ¶¶ 40-41).

[6] *See, e.g., In re Schultz*, 2016 WL 8808073, at *4 (Bankr. D. Minn. Dec. 13, 2016).

(Bankr. D. Md. 2017); *In re Dufrane,* 566 B.R. 28 (Bankr. C.D. Cal. 2017). [7]  This Court should follow suit.[8]

### B.    Contractual Language Cannot Alter the Nature of Plaintiff's Private Commercial Loans.

Defendants also attempt to recast Plaintiff's private commercial loans as "obligations to repay funds received as educational benefits" through boilerplate language in a promissory note. Mem. at 23-24.  That position is without merit.  Contractual language cannot change that the loans are outside the realm of what Congress intended to qualify as funds for an "educational benefit"; no amount of identifying references and tangential connections to Plaintiff's education in the contractual language can transform this loan into something other than a loan.    Indeed, Defendants' same argument was rejected by the bankruptcy court in *Dufrane v. Navient Solutions, Inc.:*

> The fact that SunTrust provided in each of the promissory notes evidencing the SunTrust Private Loans that the loan proceeds would be used to pay educational and living expenses, as alleged by SunTrust, does not make the SunTrust Private Loans the type of "obligation to repay funds received as an educational benefit" that Congress sought to make nondischargeable under § 523(a)(8)(A)(ii).

---

[7] *See also In re Christoff*, 527 B.R. at 624 (9TH Cir. B.A.P. 2015); *In Matter of Swenson*, 2016 WL 4480719, at *3 (Bankr. W. D. Wis. 2016); *In re Schultz*, 2016 WL 8808073, at *1 (Bankr. D. Minn. 2016); *In re Meyer*, 2016 WL 3251622, at *2 (Bankr. N. D. Ohio 2016); *In re Nunez*, 527 B.R. 410, 415 (Bankr. D. Ore. 2015); *London–Marable v. Sterling*, 2008 WL 2705374, *6 (D. Ariz. 2008); *In re Scott,* 287 B.R. 470, 474 (Bankr. E.D. Mo. 2002); *In re Reis*, 274 B.R. 46, 50 (Bkrtcy. D. Mass. 2002); *In re Jones*, 242 B.R. 441, 444 (Bankr. W.D. Tenn. 1999); *In re Meinhart*, 211 B.R. 750, 751 (Bankr. D. Colo. 1997);  *In re McClure*, 210 B.R. 985, 987 (Bankr. N.D. Tex. 1997); *In re Shorts*, 209 B.R. 818, 819 (Bkrtcy. D.R.I. 1997); *In re Alibatya*, 178 B.R. 335, 340 (Bkrtcy. E.D.N.Y. 1995).

[8] Defendants make the dubious assertion that its position is the majority view.  While it is true that courts have split on the issue, Defendants ignore the fact that a majority of recent cases – including cases from this very District - favor Plaintiff's position.

*Dufrane*, 566 B.R. at 40.   *See also Ryan Lancaster v. Educational Financial Services, A Division of Wells Fargo, N.A.*, Adv. Pro. No. 16-80315-jtg, Order on Motion to Dismiss Second Amended Complaint, at 13 (Bankr. E.D. Mich. Nov. 8, 2017) ("Although the Plaintiff's Schedules seemed to indicate that the Plaintiff believed the loans were for scholastic pursuits, the Schedules are matters of fact, not law.") (attached as Appendix C).[9]

### C.    Plaintiff's Loan is not an "Educational Loan."

While Plaintiff alleges in the Amended Complaint that the Tuition Answer Loans are not exempted from discharge because they are not "qualified educational loans" under § 523(a)(8)(B), it is likely  that the loans do not even qualify as "educational loans" under that provision at all. Instead, Plaintiff's direct-to-consumer Tuition Answer Loans are simple consumer loan, subject to the same discharge rules as any other consumer debt.

A creditor has the burden to show that debt is an "educational loan." *In re Pappas*, 517 B.R. 708, 717–18 (Bkrtcy. W.D. Tex., 2014); *In re McFadyen*, 192 B.R. 328, 331 (Bkrtcy. N.D.N.Y., 1995). The term "educational loan" is not defined anywhere in the Bankruptcy Code but courts have repeatedly held that educational loans differ from consumer loans because they are made to directly to schools on the student's behalf, without credit or collateral considerations, without business considerations, at low or subsidized interest rates (often as low as 2.5%), in order

---

[9] *See also In re Clouser*, 2016 WL 5864493, at *2 (Bkrtcy. D.Or. 2016) ("It is true that Debtor's description in his schedules is consistent with the Loan Documents, which describe the transaction as an 'Education Loan.' However these labels are not binding on the court. Perhaps more importantly, even though Debtor's schedules do constitute an admission, this admission is not enough to carry NCSLT's evidentiary burden because the terms 'student loan' and 'education loan' are not coextensive with *nondischargeable loans* covered by § 523(a)(8). To cite just one hypothetical: a bank loan that is used to pay secondary school tuition, but which is neither made nor guaranteed by a nonprofit or governmental agency, would qualify in common parlance as a student loan, but would not fit under any of the three subparagraphs of § 523(a)(8).") (citations omitted).

to further a public good.  *See Matter of Roberson*, 999 F.2d 1132, 1135–36 (7th Cir. 1993) ("Educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rely [ ] for repayment solely on the debtor's future increased income resulting from the education."); *U.S. Dept. of Health and Human Services v. Smith*, 807 F.2d 122, 126 (8th Cir. 1986) (same); *In re Campbell*, 547 B.R. at 60 (same).

Plaintiff's Tuition Answer Loans lack the traditional characteristics of "educational loans." First, the instruments were made under Defendants' direct-to-consumer lending program as Tuition Answer Loans.  As this was a direct-to-consumer program, it was not conducted through the financial aid offices of eligible schools (as are all government lending programs and most private lending programs),[10] and thus was not limited as to the amount of money that could be lent above and beyond the published cost of attendance.  Compl. ¶ 30.

Moreover, the Tuition Answer Loans were assigned an adjustable interest rate at the time of origination, the same as any commercial loan. Dkt. No. 17-1 at 4.  Defendants themselves refer to the loan as a "consumer credit transaction."  And the loans are based on credit scores and underwriting considerations, included co-signers and were marketed to pay for non-education expenses like fraternity/sorority and club dues.  Defendants should not be able to behave like commercial lenders while simultaneously receiving the same protection in bankruptcy as governmental student lending programs.[11]

---

[10]  Defendant Sallie Mae points to that characteristic in distinguishing between private student loans (which "are usually disbursed (sent) directly to your school's financial aid office") and general personal loans, which are sent "directly into the borrower's bank account." *See* https://www.salliemae.com/college-planning/student-loans-and-borrowing/compare-federal-vs-private-loans/.

[11]  "Direct-to-Consumer" lending programs such as the Tuition Answer Loan program were largely the creation of the First Marblehead Corporation ("FMC").  FMC partnered with JP Morgan Chase and number of other banks to create these direct-to-consumer lending programs, whereby the

Such lending behavior is inconsistent with a traditional educational lending program. These direct-to-consumer debts were consumer loans, similar to those as were then being made in the mortgage industry.  As noted above, Defendants had available to them a straightforward way to ensure that its loans were qualified educational loans (and thus protected from discharge under the Bankruptcy Code) by lending through the financial aid offices of accredited schools.  Instead, Defendants chose to bypass the schools entirely by lending direct-to-consumer.  While that strategy no doubt drastically expanded the lending pool, it also cast aside the protections that came with lending through qualified educational institutions.[12]  Defendants made their choice to accept the risk of non-dischargeability and should not be permitted to avoid that risk with impunity to the fresh start and discharge injunction.

## IV.    PLAINTIFF HAS PROPERLY PLED DISCHARGE VIOLATIONS.

### A.    Courts Have The Power To Enforce Discharge Injunctions through Adversary Proceedings.

Defendants argue that Plaintiff cannot seek a remedy for discharge violations through an adversary proceeding because there is no private right of action for violation of a discharge injunction.  Mem. at 40.  That argument is a red herring.  There is no question that bankruptcy

---

commercial bank originated the debt and then FMC purchased the loans.  FMC then securitized the loans into National Collegiate Student Loan Trusts.  FMC quickly massaged its lending criteria to originate more debt to feed the securitization market.  *See In re The First Marblehead Corp. Securities Litigation,* 639 F.Supp.2d 145, 149–50 (D. Mass. 2009) (describing allegations in a securities action that FMC aggressively sought to expand the student lending pool and systematically lowered or ignored its own credit lending standards).

[12] *See, e.g., In re McClure*, 210 B.R. 985, 988 (Bkrtcy. N.D. Tex. 1997) ("ACT offers loans in order to broaden its base of potential customers. This is akin to a furniture store which extends credit to high risk debtors in order to sell more furniture. Although many of the credit risks pay up, some do not. That is a risk a business must take if it thinks that the benefit outweighs the risk. This court declines to offer ACT protection under an umbrella created by Congress in order to protect government programs designed to allow individuals to further their education who otherwise might not be able to do so.").

courts have the power to enforce discharge injunctions regardless of any specified private right of action. *In re Kalikow,* 602 F.3d 82, 96 (2d Cir. 2010) (court may invoke §105(a) as well as its inherent contempt powers to enforce § 524); *In re Anderson,* 550 B.R. at 228 ("The Bankruptcy Court is correct, therefore, that the argument 'there's no private right of action under 524 is essentially a red herring' because bankruptcy courts can invoke §105 to enforce a discharge injunction.").

Likewise, an action to enforce a discharge injunction may be maintained in an adversary proceeding. *See In re Anderson,* 550 B.R. at 240 (finding "no ground for substantial dispute" that actions for enforcement of discharge injunctions may be brought through adversary proceedings).[13]  Thus, there is no question that this is a proper action to address the alleged discharge injunction violations.

### B.    The Discharge Injunctions Can Support A Finding Of Contempt.

Defendants' second argument – that the discharge order issued by this Court is too vague to support a contempt finding – is also wrong.

Because all discharge injunctions are the same, Defendants' argument here would strip the Court's power to enforce its own discharge orders through contempt proceedings.  Taken to its

---

[13]  The district court in *Anderson* read the Second Circuit's decision in *Kalikow* as an endorsement of the adversary proceeding as a vehicle for enforcement of discharge injunctions. *Anderson,* 550 B.R. at 240 ("The Court agrees with the Bankruptcy Court that a careful reading of *Kalikow* and § 105 demonstrate that an adversary proceeding is an appropriate vehicle to enforce a discharge injunction.")  *See also Kalikow,* 602 F.3d at 93; *In re Hardy*, 97 F.3d 1384 (11th Cir. 1996) (allowing the adversary proceeding and holding that the bankruptcy court could issue contempt ruling under § 105 and award sanctions, attorney fees and costs in an adversary proceeding); *In re Fagan,* 559 B.R. 718, 727 (Bankr. E.D. Cal. 2016) (bankruptcy court has discretion to allow contempt claims to proceed in adversary proceeding); *In re Motichko*, 395 B.R. 25, 29–30 (Bkrtcy. N. D. Ohio 2008) ("[§] 524 provides not private cause of action in the Sixth Circuit.  However, this rule does not prohibit Debtors from bringing the instant adversary proceeding"); *In re West*, 2015 WL 3962569, at *3 (Bankr. N.D. Ohio June 29, 2015) ("courts routinely hear contempt actions brought as adversary proceedings, notwithstanding the fact that the traditional method of bringing such matters before the court is by motion to show cause") (citations omitted).

logical extreme, Defendants' argument is that there could never be a contempt of a discharge order because every discharge order is vague.  Clearly, that is not the case.

Defendants' prior attempts to make this same argument have all been rejected.    In *Ferguson v. Navient Solutions, LLC*, currently pending in the bankruptcy court in the District of Minnesota.  Judge Kressel found that the discharge order was not too vague.  *See Ferguson v. Navient Solutions, LLC*, Adv. Pro. 17-5051, Hearing on Motion to Dismiss, at 14 (Bankr. D. Minn. Aug. 17, 2017) (attached as Appendix D).  Likewise, Judge David Jones of the Bankruptcy Court of the Southern District of Texas, found that Defendants' decision not to seek a determination of dischargeability for those loans was a risk that they took themselves.  *See Haas v. Navient Solutions Inc.,* Adv. Pro. No. 16-03175, Hearing on Motion for Preliminary Injunction and Limited Class Certification, at 68 (Bankr. S.D. Tex. Mar 23, 2017) ("Navient engaged or didn't engage in collection activities without seeking a determination of the dischargeability.  They did that at their own peril.") (attached as Appendix E).

It is a creditor's burden to establish the discharge status of debts post-discharge.  *See Economic Development Growth Enterprise v. McDermott,* 478 B.R. 123, 127-128 (Bankr. N.D.N.Y. 2012).  If the creditor is unsure whether their debt is discharged, it may apply to the court for guidance through an adversary proceeding.  *See Matter of DePoy,* 29 B.R. 471, 476 (Bankr. N.D. Ind. 1983) (creditor "could have sought a clarification from the bankruptcy court" about the scope and his failure to do so was a "calculated risk under the threat of contempt in making his own determination of what the stay order means.")  Otherwise, the creditor bears the risk that post-discharge collections violate the discharge injunction and expose them to the possibility of a finding of contempt.  *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192 (1949) (ignorance is no defense to contempt finding where party could have sought guidance from

the court); *In re Haroon,* 313 B.R. 686, 689 (Bankr. E.D. Va. 2004) ("The [debt] status, although perhaps unknown to the parties or disputed by them, was fixed by the discharge order."); *In re Wagner*, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987) ("By taking matters into his own hands, rather than seeking clarification from this court as to his status and the scope of the automatic stay, [creditor] undertook a calculated risk under threat of contempt that his legal judgment was correct.").

The situation is even clearer here because Defendants were specifically aware that the loans at issue would discharged in bankruptcy.  Defendants told their investors that there was "some additional risk that the [direct-to-consumer] loans were not used for qualified education expenses and thus could become dischargeable in a bankruptcy proceeding." Compl. ¶ 34.  And Defendants purposely did not issue the IRS 1098-E form to Plaintiff.  Compl. ¶ 42.  Defendants cannot now claim that they had insufficient notice that the debts were discharged by the discharge order.

The cases Defendants cite do not help their position and most do not even involve discharge injunctions.[14]  For civil contempt based on a violation of a discharge injunction, the only questions a court must ask are whether the defendant (1) knew of the discharge violation; and (2) intended the action that violated the discharge.  *In re DiGeronimo,* 354 B.R. 625, 642 (Bankr. E.D.N.Y. 2006); *see also In re McKenzie-Gilyard*, 388 B.R. at 482.  Importantly, a creditor's subjective belief that a debt was not discharged is irrelevant.  *Id.*  ("[M]istaken belief that a debt at issue was

---

[14] *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.,* 789 F.3d 29 (2d Cir. 2014) (trademark order); *In re Chief Executive Officers Clubs, Inc.,* 359 B.R. 527 (Bankr. S.D.N.Y. 2007) (specific order issued by the court regarding permissible asset transfers); *King v. Allied Vision, Ltd.,* 65 F.3d 1051 (2d Cir. 1995) (consent decree); *Matter of Baum,* 606 F.2d 592 (5th Cir. 1979) (specific order regarding taking of depositions).  *Williams v. United States,* involved the standard for criminal contempt.  402 F.2d 47 (10th Cir. 1967) (criminal contempt for violation of a permanent injunction).

not discharged . . . does not negate a finding that a creditor willfully violated the discharge injunction.").  Those two elements have been plead here.  (Compl. ¶¶ 46-52).

Discharge injunctions are unambiguous and may be enforced through contempt.  *See In re Oh,* 362 Fed. Appx. 576, at *1 (9th Cir. 2009) ("Nor was the discharge injunction vague and indefinite.  The terms of the discharge injunction were unambiguous and fixed by statute"); *In re Dyer,* 322 F.3d 1178, 1191 (9th Cir. 2003) ("Because the metes and bounds of the automatic stay are provided by statute and systematically applied to all cases there can be no doubt that the automatic stay qualifies as a specific and definite court order") (internal citations omitted).  *See also In re Haemmerle,* 529 B.R. 17, 25 (Bankr. E.D.N.Y. 2015) ("Section 524(a)(2) of the Bankruptcy Code, which creates the discharge injunction, is unambiguous…").

Prior attempts to make this same argument have all been rejected in the student loan context.  In *Ferguson v. Navient Solutions, LLC*, currently pending in the bankruptcy court in the District of Minnesota, Judge Kressel found that the discharge order was not too vague.  *See Ferguson v. Navient Solutions, LLC*, Appendix D at 14.  Likewise, Judge David Jones of the Bankruptcy Court of the Southern District of Texas, found that Defendants' decision not to seek a determination of dischargeability for those loans was a risk that they took themselves.  *See In re Haas*, Appendix E at 68 ("Navient engaged or didn't engage in collection activities without seeking a determination of the dischargeability.  They did that at their own peril.").

## V.    THIS COURT HAS JURISDICTION TO ENTERTAIN A NATIONWIDE CLASS ACTION.

Defendants misunderstand subject matter jurisdiction when they claim that the Court lacks subject matter jurisdiction to adjudicate nationwide violations of the discharge injunction.  They also ignore the clear difference between enforcing specialized, judge-specific orders and enforcing the statutory orders at issue here.

Notably, Judge Drain addressed the same arguments Defendants assert here and held that the court "has the statutory power and subject matter jurisdiction to decide this nationwide class action." *In re Haynes,* 2014 WL 3608891, at *9 (Bankr. S.D.N.Y. July 22, 2014).

Subject matter jurisdiction here is provided by 28 U.S.C. § 1334(b) which gives the district courts jurisdiction of all civil proceedings arising under Title 11. The enforcement of the discharge injunction here is a core bankruptcy matter that arises under 11 U.S.C §§ 727, 524 and 105. Once federal subject matter jurisdiction is proper in the district court as to a core bankruptcy matter arising under the Bankruptcy Code, subject matter jurisdiction is proper in the bankruptcy court to which the matter is referred under 28 U.S.C. § 157.

Subject matter jurisdiction is not lost or limited merely because the action is brought as a class action. Class action proceedings are expressly allowed in the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7023 ("Rule 23 F. R. Civ. P. applies in adversary proceedings"). *See In re Rojas,* No. 09-07003, 2009 WL 2496807, at *1 (Bankr. S.D. Texas Aug. 12, 2009) ("[N]othing in the jurisdictional statute limits the District Court's subject matter jurisdiction (and by extension, the matters that can be referred to the bankruptcy judges) to claims filed by debtors with bankruptcy cases pending in this District.").[15]

The cases relied on by Defendants for limiting the scope of a bankruptcy court's jurisdiction for class actions misread the basis for subject matter jurisdiction. While

---

[15] *See also In re Cano,* 410 B.R. 506 (S.D. Tex. 2009); *In re Krause,* 414 B.R. 243 (S.D. Ohio 2009); *In re Patrick,* 344 B.R. 56 (Bankr. M.D. Pa. 2005); *In re Sims,* 278 B.R. 457 (Bankr. E.D. Tenn. 2002); *Bank United v. Manley,* 273 B.R. 229 (N.D. Ala. 2001); *In re Harris,* 280 B.R. 876 (Bankr. S.D. Ala. 2001); *In re Noletto,* 244 B.R. 845(S.D. Ala. 2000); *In re Sheffield,* 281 B.R. 24 (Bankr. S.D. Ala. 2000); *In re Aiello,* 231 B.R. 693 (N.D. Ill. 1999).

bankruptcy court jurisdiction is often founded on "related to" jurisdiction over the *in rem* debtor's estate, that is not the only basis for jurisdiction.  As Judge Drain explained in *In re Haynes*, actions under 11 U.S.C. §§ 524 and 727 have to do with prohibiting the collection of *in personam* debts and have nothing to do with the debtor's estate or *in rem* jurisdiction. *In re Haynes*, 2014 WL 3608891, at *7.  Subject matter jurisdiction here is not based on "related to" or *in rem* jurisdiction and the cases that rely on that basis to limit the scope of the court's jurisdiction are inapt here.

Similarly, bankruptcy jurisdiction founded on 28 U.S.C. § 1334 (e), which states that the court where a case is commenced has exclusive jurisdiction over the "debtor's property" and "estate", is not implicated here.  "Again, however, the present class action does not involve a debtor's interests in property or property of the estate. . . . It is an action to enforce the discharge, that is, to protect a statutory right prohibiting collection of *in peronam* claims against the members of the debtor class that arose pre-bankruptcy."  *In re Haynes*, 2014 WL 3608891, at *7.

That is why Defendants' reliance on *Alderwoods Group, Inc. v. Garcia*, 682 F. 3d 958 (11th Cir. 2012) is misplaced.  *Alderwoods* limited the bankruptcy court's jurisdictional reach only to the court administering the property of the estate, without even considering that subject matter jurisdiction for discharge violations is founded on those claims arising under Title 11.

Judge Drain also carefully analyzed and rejected the other argument Defendants make here: that only the judge who issued the discharge order can enforce it.  Judge Drain concluded – as have many other courts – that discharge injunctions under § 524 are

fundamentally different from other specific, judge-crafted injunctions or orders and bankruptcy courts do not lack subject matter jurisdiction to enforce them.

Defendants erroneously contend that there is a "prudential, Article III limitation that is separate and distinct from statutory subject-matter jurisdiction" which precludes a class action here. Mem. at 48 n.14. According to Defendants, contempt can only be adjudicated by the judge whose order was defied. While it is true that judges have inherent power to control their cases and proceedings and to sanction behavior that interferes with their lawful orders, *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991), this case is not seeking contempt for violation of a judge crafted order. This case seeks contempt for violation of statutory injunction, an important distinction that was explained by Judge Drain in *Haynes*:

> There is, however, a fundamental difference between the normal injunction issued by a court after considering the factors required to be applied in issuing an injunction order and the injunction created by Congress in § 524(a) to support the discharge under § 727 of the Bankruptcy Code.

*In re Haynes*, 2014 WL 3608891, at *8.

The discharge orders in this case are not unique to any particular judge and the power to enforce them comes from § 105. Moreover, the discharge orders at issue are made on identical standardized forms that are used for all debtors nationwide. *Id.* at *8 ("It is not a handcrafted order"). And because the discharge orders are statutorily created, a debtor seeking to enforce them need not establish the factors ordinarily required under for an injunction under Rule 65. *Id.* ("By statute, in 524(a)(2), it operates as an injunction. For the discharge injunction to be granted, the debtor does not have to prove the factors required for an injunction under Federal Rule of Civil

Procedure 65.").[16]  All that is required is to show that the debt was subject to discharge and not specifically declared to be non-dischargeable.  *Id.*

Indeed, in *In re Brizinova,* 565 B.R. 488 (E.D.N.Y. 2017) (Stong, B.J.), this Court specifically recognized the important distinction between unique court orders and "purely statutory" orders.  In *Brizinova,* a claim for sanctions arose from statements made in a motion to dismiss that arguably violated an order issued in a different court.  This Court noted the general rule that judge specific orders be enforced by the issuing judge (and ultimately ruled that the judge-specific order in *Brizinova* follow that rule), but contrasted other situations in which more general enforcement would be acceptable.  Specifically, this Court stated:

> That is not to say that it is never appropriate for one judge to enforce an order that was entered by another judge in a different case. For example, in the bankruptcy context, courts may distinguish between whether they are asked to enforce a "purely statutory order" such as the automatic stay contained in Bankruptcy Code § 362 or the discharge injunction set forth in Bankruptcy Code § 524, on the one hand, and an injunction individually crafted by the bankruptcy judge, on the other.

*Id.* at 503 (citations omitted).

---

[16]  This reasoning is consistent with scholarly analysis on the issue.  For example, then-professor Elizabeth Warren and Jay L. Westbrook also take the position that contempt of a statutory injunction must be treated different than contempt of a local court order when considering the jurisdiction to enforce such orders nationwide jurisdiction analysis.  They criticize cases – like those cited by Defendants – that limit redress for statutory injunctions to the "issuing court" because, in effect, there is no issuing court.  Elizabeth Warren & Jay L. Westbrook, Class Actions for Post-Petition Wrongs: National Relief Against National Creditors, Am. Bankr. Inst. J. March 2003, at 14, 46-47.  *See also* Kara Bruce, The Debtor Class, 88 Tul. L. Rev. 21, 25,71-74 (2013) (surveying the law and concluding that "courts generally should not hesitate, on jurisdictional grounds, to certify nationwide classes of consumer debtors asserting violations of bankruptcy law" and that rather than limiting § 524 contempt cases to the issuing court, a "court may instead (1) interpret § 524 to provide an implied right of action to enforce its violation, (2) interpret § 105 to permit nationwide class relief for discharge-injunction violations, or (3) find that the limitations on judicial contempt power do not apply with equal force for statutory injunctions.").

The First Circuit followed the same reasoning in *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439 (1st Cir. 2000), when it ruled claims for violations of discharge injunctions under § 524 could be brought as a nationwide class.[17]  *Bessette* found that § 105 empowered the district court to exercise its equitable powers to facilitate the implementation of other Bankruptcy Code provisions and noted the important distinction between statutory and inherent powers.  *Id.* at 445 ("§ 105 provides a bankruptcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have" including the power to sanction for contempt.) *Accord In re Kalikow,* 602 F.3d at 97.  *Bessette* rejected the argument that only the issuing judge could enforce a discharge injunction.  According to the Court:

> Appellant seeks enforcement of the statutory injunction set forth in §524, not one individually crafted by the bankruptcy judge, in which that judge's insights and thought processes may be of particular significance. Thus, few of the practical reasons for confining contempt proceedings to the issuing tribunal apply here.

*Id.* at 446.  *See also id.* at 445 (noting the significance of "dealing, as here, with violation of a purely statutory order.")  *See also Walls* v. *Wells Fargo Bank, NA.,* 262 B.R. 519, 528 (Bankr. E.D. Cal. 2001) ("The [automatic stay and discharge] injunctions . . .  are Code created, statutory injunctions . . . . Their extent does not depend on individual judges for injunctive relief fashioned by individual bankruptcy judges.")

Defendants' cases ignore the distinction.  *Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985), involved a case-specific injunction and has been rejected as support for the proposition

---

[17]  On remand, the district court did not abide by the First Circuit's mandate approving a nationwide class under §§ 105 and 524 and inexplicably narrowed the First Circuit's ruling to apply to only a district-wide class.  *See Bessette v. Avco Fin. Servs., Inc.*, 279 B.R. 442, 449 (D.R.I. 2002).  That ruling was not appealed.

Defendants advance here.[18] *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994) and *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399 (1923) likewise involve adjudications of a specific judge crafted order.  While *Barrett v. Avco Fin. Servs. Mgmt. Co*., 292 B.R. 1, 11 (D. Mass. 2003) and *Cox v. Zale Delaware, Inc.,* 239 F.3d 910 (2001) involve statutory discharge injunctions, they also involved reaffirmation agreements that added jurisdiction-specific issues.[19]

As Judge Drain also noted, the position that discharge injunctions can be enforced by other judges within a particular district, but not judges from a different district is logically inconsistent. If the rationale for restricting jurisdiction to a district-wide class is that only the judge who issued the order can adjudicate contempt of it, then it makes no sense to allow judges in the same district to enforce discharge injunctions issued by other judges within the district.  In other words, why would a district-wide class be permissible to adjudicate § 524 claims, but a nationwide class be impermissible?  Both seemingly run afoul of the rationale that only the judge who issued the order can adjudicate contempt of it.  *See In re Haynes,* 2014 WL 3608891, at *9 (rejecting the district-wide approach and finding nationwide jurisdiction for enforcement of discharge injunctions).

---

[18]  *See In re Lonnie Davis*, 2006 WL 2827270, at *2 (Bankr. S.D. Tex. Sept. 27, 2006) ("The enforcement of the injunction in *Waffenschmidt* refers to an injunction crafted for a specific case . . . .  However, when an injunction is statutorily created rather than individually created, 'few of [these] practical reasons for confining contempt proceedings to the issuing tribunal apply . . .' Since the discharge injunction is a statutory injunction, this Court has subject matter jurisdiction. . . . ") (citations omitted).

[19]  The *Barrett* court cited that fact specifically as a reason nationwide jurisdiction would not be found.  *See Barrett,* 292 B.R. at 11 (existence of reaffirmation agreements weighed against nationwide class because "dramatic legal differences exist from district to district as to what is an acceptable binding reaffirmation, to what extent reliance on the reaffirmation form is an element, and to what extent post-discharge payments made after a failed reaffirmation attempt are able to be characterized as voluntary.").

To be sure, many cases repeat the principle that a only the judge who issued an order can adjudicate contempt of it and some bankruptcy courts have applied that reasoning to limit class actions seeking enforcement of discharge injunctions.  *See* Mem. at 48-49.  Respectfully, those courts fail to appreciate the underlying scope of subject matter jurisdiction and the rationale for limiting enforcement of a judge's specifically crafted order and the application of that rationale to statutory injunctions.

It should also be noted that, in any event, the nationwide class allegations would still be available for Plaintiff's claims for declaratory judgment under 28 U.S.C. § 2201.  That claim seeks a declaration that Plaintiff's Tuition Answer Loans were not protected by § 523(a)(8) and were discharged in bankruptcy.

Accordingly, the Court has subject matter jurisdiction to entertain a nationwide class.

## VI.    THE COURT SHOULD NOT STRIKE ANY PORTION OF THE COMPLAINT

Defendants move to strike paragraphs 2 and 13-35 of the Plaintiff's complaint as "inflammatory, unnecessary, and irrelevant."  Mem at 51.  The evolution of § 523(a)(8) and the actions of Defendants are relevant to this action.  Plaintiff believes that through discovery he will prove his allegations. The Court should not strike any allegations in a motion to dismiss before discovery has taken place.  *See Holmes v. Fischer*, 764 F. Supp. 2d 523, 532 (W.D.N.Y. 2011) (motions to strike are disfavored and not granted absent a showing of prejudice).  Plaintiff will demonstrate a knowing violation of the discharge injunctions and the allegations reflect that intent.

Defendants' similar motions to strike allegations in complaints in other courts have all failed.  *See Ferguson v. Navient Solutions, LLC,* Appendix D at 14; *In re Haas,* Appendix E.

Defendants' alternative argument for striking allegations is equally meritless. Plaintiff is not asserting a fraud claim and his allegation asserting claims for violation of the discharge injunction are not subject to the heightened pleading standards for claims of fraud.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be dismissed in its entirety.

Respectfully submitted,

Dated: January 8, 2018

*/s/ George F. Carpinello*

**BOIES SCHILLER FLEXNER LLP**
George F. Carpinello
Adam R. Shaw
Robert Tietjen
30 South Pearl St., 11th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email:  gcarpinello@bsfllp.com
            ashaw@bsfllp.com
            rtietjen@bsfllp.com

**SMITH LAW GROUP**
Austin Smith
3 Mitchell Place
New York, New York 10017
Telephone: (917) 992-2121
Email:  austin@acsmithlawgroup.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing document was served by the Court's ECF system on all parties of record this 8th day of January, 2018.

/s/ George F. Carpinello