UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

In re:                                                    Chapter 7

HILAL KHALIL HOMAIDAN,                                     Case No. 08-48275-ess
*aka* HELAL K HOMAIDAN,

                              Debtor.
--------------------------------------------------------------------------x

HILAL KHALIL HOMAIDAN,                                     Adv. Pro. No.: 17-01085-ess

                              Plaintiff,

        -against-

SLM CORPORATION, SALLIE MAE, INC.,
NAVIENT SOLUTIONS, LLC, and NAVIENT
CREDIT FINANCE CORPORATION,

                              Defendants.
--------------------------------------------------------------------------x

## MEMORANDUM DECISION ON THE DEFENDANTS'
## MOTION TO COMPEL ARBITRATION

*Appearances*:

George F. Carpinello, Esq.              Thomas M. Farrell, Esq.
Adam Shaw, Esq.                         McGuire Woods LLP
Boies Schiller Flexner LLP              JPMorgan Chase Tower
30 South Pearl Street (11th Floor)      600 Travis Street (Suite 7500)
Albany, NY 12207                        Houston, TX 77002
  *Attorneys for Plaintiff*               *Attorneys for Defendants*
  *Hilal Khalil Homaidan*

                                        Shawn R. Fox, Esq.
Austin C. Smith, Esq.                   McGuireWoods LLP
Smith Law Group                         1345 Avenue of the Americas (7th Floor)
3 Mitchell Place (Suite 5)              New York, New York 10105
New York, NY 10017                        *Attorneys for Defendants*
  *Attorneys for Plaintiff*
  *Hilal Khalil Homaidan*

**HON. ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is a motion to compel arbitration by defendants Navient Solutions, LLC, Navient Credit Finance Corporation, and Sallie Mae, Inc. (the "Defendants"). The Defendants seek an order referring the parties to arbitration with respect to the claims set forth in Hilal Khalil Homaidan's complaint, and argue that the Federal Arbitration Act requires that this Court compel arbitration pursuant to arbitration agreements between the Defendants and Mr. Homaidan.[1] Mr. Homaidan responds that compelling arbitration here would create an inherent conflict with the purposes and policies of the Bankruptcy Code, and for those reasons, the Court should not compel arbitration, and the Defendants' motion should be denied.

## Jurisdiction

This Court has jurisdiction over this proceeding pursuant to Judiciary Code Sections 157(b)(1) and 1334(b), and the Standing Order of Reference dated August 28, 1986, as amended by the order dated December 5, 2012, of the United States District Court for the Eastern District of New York. In addition, this Court may adjudicate these claims to final judgment to the extent that they are core proceedings pursuant to Judiciary Code Section 157(b), and to the extent that they are not core proceedings, pursuant to Judiciary Code Section 157(c) because the parties have stated their consent to this Court entering a final judgment. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015) (holding that in a non-core proceeding, a bankruptcy

---

[1] In addition to an order directing this matter to arbitration, the Defendants seek, as alternative relief, the dismissal of Mr. Homaidan's Complaint. In this decision, the Court addresses only the Defendants' request to compel arbitration of Mr. Homaidan's claims.

court may enter final orders "with the consent of all the parties to the proceeding" (quoting 28 U.S.C. § 157(c)(2)).

**Background**

*Mr. Homaidan's Bankruptcy Case*

On December 4, 2008, Hilal Khalil Homaidan, *aka* Helal K. Homaidan, filed a petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 08-48275.  On January 15, 2009, the Chapter 7 Trustee filed a "no-asset" report stating that "[t]he estate has no non-exempt property to distribute."  Case No. 08-48275, Doc. entry dated January 15, 2009.  On April 9, 2009, the Court entered an order discharging Mr. Homaidan (the "Discharge Order"), and on that same day, his bankruptcy case was closed.  On April 14, 2017, Mr. Homaidan filed a motion to reopen his bankruptcy case to obtain a determination of the dischargeability of certain of his student loans, and on May 26, 2017, the Court entered an order reopening the case.

*This Adversary Proceeding*

On June 23, 2017, Mr. Homaidan commenced this adversary proceeding as a putative class action, on behalf of himself and others similarly situated, by filing a complaint (the "Complaint") against SLM Corporation, Sallie Mae, Inc., Navient Solutions, LLC, and Navient Credit Finance Corporation seeking a determination that certain debts that he incurred as a student are not nondischargeable student loan debts under Bankruptcy Code Section 523(a)(8)(B), and a finding of civil contempt for willful violations of the bankruptcy discharge injunction.  Compl., Adv. Pro No. 17-01085, ECF No. 1.

On October 30, 2017, the Defendants filed this motion to compel arbitration, or in the alternative, to dismiss.  And on December 1, 2017, the Court approved a stipulation of dismissal as to defendant SLM Corporation.

*The Complaint*

Mr. Homaidan alleges that "[f]or the last ten years, the Defendants have . . . engaged in a massive effort to defraud student debtors and to subvert the orderly working of the bankruptcy courts."  Compl. ¶ 2.  He claims that the "Defendants . . . originat[ed] and service[ed] dischargeable consumer loans [while] disguising them as nondischargeable student loans."  *Id*.  Mr. Homaidan advances these allegations on behalf of an alleged class of similarly situated "individuals who have declared bankruptcy since 2005 [across the United States,] with loans originated and/or serviced by Defendants."  Compl. ¶ 4.  And he alleges that these loans "do not meet the definition of a non-dischargeable qualified education loan" as set forth in Internal Revenue Code Section 221(d) and Bankruptcy Code Section 523(a)(8)(B).  *Id*.

Mr. Homaidan attended Emerson College in Boston, Massachusetts during the four academic years from 2003 to 2007.  He withdrew from Emerson College in the Fall of 2006, and returned in the Spring of 2007 to complete his degree.  During the 2006-07 academic year, Mr. Homaidan received $4,800 in scholarship funds from Emerson College, and $22,100 in school-certified loans from the Defendants.  He alleges that the Defendants lent him "an additional $12,567 in 'direct to consumer' . . . loans that were made outside the financial aid office and were not made for qualified education expenses."  Compl. ¶ 40.  He claims that the Defendants knew that these "were not qualified education loans" exempt from discharge as defined in Bankruptcy Code Section 523(a)(8)(B), and notes that Internal Revenue Code Section 6050S requires lenders to issue 1098-E tax forms to all customers with qualified education loans, and he never received a 1098-E tax form.  Compl. ¶ 42.

Mr. Homaidan alleges that the "Defendants represented to student debtors that the Bankruptcy Code prohibited discharge of *any* loan made to any person for any educational

purpose." Compl. ¶ 28.  He claims that the Defendants utilized bankruptcy laws "to defraud vulnerable and unsophisticated student borrowers." Compl. ¶ 29.  Mr. Homaidan states that the "Defendants either misrepresented or failed to disclose facts and information related to the dischargeability of private loans," and that the Defendants did not make the same misrepresentations "to more sophisticated borrowers." Compl. ¶ 33.

He alleges that while the Defendants and other lenders informed consumers that their loans were nondischargeable, these lenders securitized these same obligations for sale on the secondary market.  And he asserts that the prospectuses for these asset-backed securities cautioned investors that, pursuant to Bankruptcy Code Section 523(a)(8), "only private loans made for qualified expenses were excepted from discharge." Compl. ¶ 34.  He alleges that instead of then treating these debts as discharged, the Defendant Navient Solutions, LLC "engaged the services of various collection firms to attempt to collect on this discharged debt in violation of this Court's [o]rder and the Bankruptcy Code," and on December 6, 2008, the Defendant "sent correspondence to Hamaidan stating that they received notice of the bankruptcy filing and requested a copy of the 'first meeting of creditors.'" Compl. ¶ 48.

Mr. Homaidan requests a declaratory judgment pursuant to Judiciary Code Section 2201 and Bankruptcy Rule 7001(9) that his debts were discharged by operation of law on April 9, 2009, the date of his bankruptcy discharge, because they were not student loans excluded from discharge under Bankruptcy Code Section 523(a)(8).  Mr. Homaidan also alleges that since the Defendants were notified of the Discharge Order pursuant to Bankruptcy Rule 4004(g), and still sought to collect on his debts by use of "dunning letters, phone calls, negative reports made to credit bureaus, failure to update credit reports, and commencing or continuing legal action to recover [these] debts in violation of [Bankruptcy Code Section 524]," the Court should cite the

Defendants for civil contempt for their willful violations of the Discharge Order, and order them to pay damages in an amount to be determined at trial pursuant to Bankruptcy Code Sections 524 and 105, and also to pay his attorneys' fees and costs.  Compl. ¶¶ 82-83.

*This Motion To Compel Arbitration, or in the Alternative, To Dismiss this Case*

On October 30, 2017, the Defendants moved to compel arbitration of Mr. Homaidan's claims, or in the alternative, to dismiss this case (the "Motion to Compel Arbitration"), and filed a memorandum of law in support (the "Defs' Mem.").  The Defendants argue that Mr. Homaidan agreed to arbitrate all claims alleged in his Complaint, and that the agreement to arbitrate is "valid, irrevocable, and enforceable."  Defs' Mem. at 9, ECF No. 17.  The Defendants argue that the Federal Arbitration Act (the "FAA") provides that where the parties have entered into a valid arbitration agreement, a party may move to compel the refusing party to arbitrate its claims pursuant to the relevant agreement.

The Defendants argue that the Supreme Court has established a "strong policy favoring arbitration" agreements under the FAA.  Defs' Mem. at 10.  They urge that courts are required rigorously to enforce arbitration agreements according to their terms, and that this applies to statutory claims.  The Defendants acknowledge that there are exceptions where the claim originates from a competing federal statute "express[ing] a congressional command to override the [FAA's] mandate."  Defs' Mem. at 12.  And they argue that to determine whether there is "a contrary congressional command" to the FAA, courts must inquire first as to whether that command is "'deducible from [the statute's] text or legislative history,'" and then as to "whether 'an inherent conflict between arbitration and the statute's underlying purpose'" exists.  Defs' Mem. at 13 (citations omitted).

The Defendants argue that the Bankruptcy Code's text and legislative history are "completely silent" as to whether discharge violation claims are exempt from the FAA. Defs' Mem. at 14. They note that Congress has enacted several bankruptcy statutes since the adoption of the FAA in 1925, and did not address arbitration in any of that legislation. According to the Defendants, this demonstrates that Congress never intended claims for violations of the discharge injunction to be exempt from the FAA.

The Defendants also argue that the Supreme Court's decision in *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012), addressing whether the Credit Repair Organizations Act ("CROA") precluded enforcement of an arbitration agreement, supports their position. They argue that in *CompuCredit*, the Supreme Court looked to the CROA's text and history to determine that claims under the CROA can be heard and determined in arbitration, and concluded that the FAA required the parties' predispute arbitration agreement to be enforced. The Defendants state that in its decision, the Supreme Court identified three statutes that evince a "clear Congressional intent to displace the Federal Arbitration Act." Defs' Mem. at 16. These statutes are the Commodity Exchange Act, the Motor Vehicle Franchise Contract Arbitration Fairness Act, and the Dodd-Frank Wall Street Reform and Consumer Protection Act, and in each, the Court found explicit language prohibiting arbitration. The Defendants note that "[t]he Bankruptcy Code does not include any analogous language; it is entirely silent as to arbitration." Defs' Mem. at 17.

With respect to the "inherent conflict" inquiry, the Defendants argue that the Supreme Court has abandoned it, and even if the inherent conflict test is still viable, there is no inherent conflict between the FAA and the Bankruptcy Code. They assert that in order to find a conflict between the FAA and a statute, "the two must be 'irreconcilable' such that the statutory right

6

may not be effectively vindicated through arbitration." Defs' Mem. at 18. The Defendants argue

that Mr. Homaidan's claims with respect to violations of the discharge injunction are not

"peculiar" in that only a bankruptcy court can resolve the dispute. Defs' Mem. at 18. For this

reason, they are not "unsuitable" for arbitration. Defs' Mem. at 19.

And the Defendants argue that even if this Court does find that there is an inherent

conflict, it must then determine "whether to exercise its discretion to refuse to compel

arbitration." Defs' Mem. at 21. And here, the Defendants argue, the Court should refuse to

compel arbitration. Additionally, the Defendants state that the Court "lacks the degree of

institutional history and oversight that courts sometimes cite as justification for refusing to

compel arbitration." *Id*.

Mr. Homaidan opposes the arbitration of his claims. On January 8, 2018, Mr. Homaidan

filed a memorandum of law in opposition (the "Plf's Opp.") to the arguments raised in the

Motion to Compel Arbitration, as well as the motion to dismiss.

Mr. Homaidan responds that arbitration here is not appropriate, and that "a private

agreement [to arbitrate] cannot bind the bankruptcy court to relinquish its jurisdiction to

adjudicate a contempt of that court's powers." Plf's Opp. at 8, ECF No. 27. He argues that

under the Supreme Court's decision in *Shearson/American Express, Inc. v. McMahon*, 482 U.S.

220 (1987), his claims are not subject to arbitration. He argues that following *McMahon*:

> [A] party can demonstrate that a contrary congressional command exists by
> making a showing of Congress' express or inherent intent "to limit or prohibit a
> waiver of a judicial forum for a particular claim . . . deducible from the statute's
> text or legislative history, or from an inherent conflict between arbitration and the
> statute's underlying purposes."

Plf's Opp. at 10 (quoting *McMahon*, 482 U.S. at 227). And he notes that under *McMahon*, "a

party may rely on (1) a statute's text, (2) its legislative history, or (3) an inherent conflict

7

between arbitration and the statute's underlying purposes" to show that Congress did not intend that a particular claim be subject to arbitration. *Id*.

Mr. Homaidan also responds that "there is an inherent conflict between" the relief that he seeks in his claims here and arbitration, for several reasons. Plf's Opp. at 12. First, he argues that "bankruptcy courts have the undisputed power to interpret and enforce their own orders, and delegating that power to private arbitrators would jeopardize the underlying purpose of the Bankruptcy Code." *Id*. Second, he argues that "providing and protecting the financial 'fresh start' is a fundamental, if not *the* fundamental, purpose of the Bankruptcy Code, and the discharge injunction is the mechanism by which the fresh start is achieved," so that the "purpose of the Code would be frustrated by leaving enforcement of that purpose in the hands of privately-chosen arbitrators." *Id*. And finally, he argues that "uniform application of bankruptcy law would be jeopardized by arbitration," rather than adjudication, of discharge violations. *Id*.

Mr. Homaidan also responds that the Defendants may not rely on *CompuCredit* in support of their argument that the Supreme Court has somehow abandoned the inherent conflict inquiry, because *CompuCredit* does not stand for that rule. Rather, he argues, *CompuCredit* "addressed only the issue of whether the text of a certain statute exempts a claim from arbitration," but "did not address situations in which Congress's intent to exempt a claim from arbitration is evident from the legislative history of the statute or, as here, from an inherent conflict between arbitration and underlying purposes of the statute." Plf's Opp. at 21.

On January 26, 2018, the Defendants filed a reply (the "Reply") in further support of their Motion to Compel Arbitration. The Defendants argue that their dispute with Mr. Homaidan is within the scope of his arbitration agreement. Reply at 4, ECF No. 29. They also state that "the Bankruptcy Code is bereft of any indication that discharge violation claims can be

adjudicated only by bankruptcy courts, and in fact shows that the opposite is true." Reply at 5. The Defendants argue that "[b]ankruptcy courts hear bankruptcy matters only by reference from the district courts," as bankruptcy courts "were not granted . . . original or exclusive jurisdiction over any matter." *Id*. And the Defendants respond that the legislative history of the Bankruptcy Code does not show that Congress intended discharge violations to be exempt from the FAA.

In addition, the Defendants reply that, while they maintain that the inherent conflict test is no longer viable, no inherent conflict exists between the FAA and the Bankruptcy Code. They claim that the discharge is a statutory right, not a Constitutional right, and therefore, "it must be balanced with other statutory rights – such as those granted by the [FAA]." Reply at 7. Furthermore, the Defendants argue that when Congress drafted the Bankruptcy Code, it made a policy choice not to place dischargeability out of the reach of the FAA. If Congress intended for the Bankruptcy Code to be outside the scope of the FAA, Congress would have been explicit, as it has been with other statutes.

## Discussion

In order to determine whether the Court should compel arbitration of Mr. Homaidan's claims, the Court must answer two questions: first, whether this proceeding is core or non-core; and second, whether arbitration of these claims would present a severe, inherent conflict with, or necessarily jeopardize the objectives of, the Bankruptcy Code.

### *Whether this Proceeding Is Core or Non-Core*

One key piece of the picture in determining whether Mr. Homaidan's claims should be referred to arbitration is the scope of and boundary between core and non-core proceedings. Congress has outlined a non-exhaustive list of many of the matters that are considered "core" proceedings under the bankruptcy law. 28 U.S.C. § 157. These include matters concerning the

administration of the estate, determinations as to the dischargeability of particular debts, and objections to a debtor's discharge, among others. As the Supreme Court has observed, Bankruptcy Code Section 157 is a "nonexclusive list . . . in which . . . bankruptcy courts could constitutionally enter judgment." *Wellness Int'l Network,* 135 S. Ct. at 1940.

To similar effect, courts have outlined three categories of proceedings that bankruptcy courts may exercise jurisdiction over: proceedings arising under the Bankruptcy Code, proceedings arising in a case under the Bankruptcy Code, and those related to a case under the Bankruptcy Code. "Proceedings 'arising under title 11, or arising in a case under title 11,' are deemed 'core proceedings.'" *Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.),* 829 F.3d 135, 153 (2d Cir. 2016), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, 137 S. Ct. 1813 (2017) (quoting *Stern v. Marshall,* 564 U.S. 462, 476 (2011)). And as the Second Circuit recently observed, "[p]roceedings that are 'core' are those that involve 'more pressing bankruptcy concerns.'" *Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 388 (2d Cir. 2018) (quoting *United States Lines, Inc. v. Am. Steamship Owners (In re United States Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999)). "It is clear and undisputed that the dischargeability of debt is a matter that arises only under a federal statute [and] dischargeability of debt is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I)." *Trinity Christian Ctr. v. Koper (In re Koper)*, 516 B.R. 707, 719 (Bankr. E.D.N.Y. 2014). *See Spencer v. Spencer (In re Spencer)*, 168 B.R. 142, 145 (Bankr. N.D. Tex. 1994) (observing that "[i]t is clear from [28 U.S.C. § 157(b)(2)(I)] that bankruptcy courts are to hear and determine the dischargeability of particular debts."); *Haden v. Edwards (In re Edwards)*, 104 B.R. 890, 895 (Bankr. E.D. Tenn. 1989) (asserting that "[p]roceedings to determine the dischargeability of debts or in opposition to the debtor's discharge . . . are clearly core proceedings.").

In the Complaint, Mr. Homaidan alleges, among other things, that certain of his student loans are not exempt from discharge under Bankruptcy Code Section 523, and that the Defendants violated the Court's discharge injunction imposed by Bankruptcy Code Section 524 by seeking to collect on these obligations.  In particular, Mr. Homaidan alleges that certain "student loans" made to him in excess of Emerson College's cost of attendance for the 2006-07 academic year are "not nondischargeable student loans or qualified education loans, and were therefore discharged upon entry of the applicable discharge injunctions."  Compl. ¶ 78.  And he alleges that the Defendants resumed their collection efforts "through various means, including but not restricted to the use of dunning letters, phone calls, negative reports made to the major credit bureaus, failure to update these credit reports, and commencing or continuing legal action to recover the discharged debts in violation of [Bankruptcy Code Section] 524."  Compl. ¶ 82.

The Defendants acknowledge that the allegations in the Complaint are core matters.  Still, the Defendants argue that the FAA mandates that the Court should compel arbitration, and that there is no clear Congressional command that the Bankruptcy Code should override the FAA.  And the Defendants argue that Mr. Homaidan's allegations fall squarely within their arbitration agreement.  They also argue that bankruptcy courts do not have exclusive jurisdiction to adjudicate his claims.

Mr. Homaidan responds that "a private agreement cannot . . . bind the bankruptcy court to relinquish its jurisdiction to adjudicate a contempt of that court's orders, and no reading of the arbitration agreements supports such a conclusion."  Plf's Opp. at 8.  And he argues that "[t]his case involves the invocation of the bankruptcy court's contempt powers, not private contractual claims" between the parties.  Plf's Opp. at 9.

Here, a review of the allegations and claims for relief set forth in the Complaint makes plain that Mr. Homaidan's allegations are grounded in the determination of whether the debts at issue were discharged in his bankruptcy case, and if so, whether the bankruptcy court's Discharge Order has been violated. They are not contract claims, and they do not arise solely from the violation of a statutory right. Rather, they address the alleged knowing violation of a court order. For example, Mr. Homaidan alleges that his debts were discharged pursuant to the Court's Discharge Order "because they were unsecured consumer loans and not non-dischargeable student loans under section 523(a)(8)," and that the "Defendants nonetheless sought to collect on the debts, either directly or indirectly through various means . . . in violation of [Bankruptcy Code Section] 524." Compl. ¶¶ 80, 82. That is, the claims here concern, and seek the enforcement of, a court order – which is fundamentally different from a contract dispute.

And a review of the applicable law makes it equally plain that the questions of the dischargeability of a debt, and whether the bankruptcy discharge has been violated, are core proceedings. As a starting point for this analysis, Judiciary Code Section 157(b)(2)(I) states that "determinations as to the dischargeability of particular debts" are core proceedings. In addition, courts have consistently held that the dischargeability of debt is a matter that arises only under a federal statute. *In re Koper*, 516 B.R. at 719. Similarly, Mr. Homaidan's request to hold the Defendants in contempt for violations of the discharge injunction is a matter that arises under the Bankruptcy Code, and is therefore a core proceeding. And again, the asserted violations are not violations of a contract term, but of a court order.

For these reasons, the Court finds that Mr. Homaidan's claims for a determination that certain of his debts were discharged by operation of law because they are not student loans

excluded from discharge under Bankruptcy Code Section 523(a)(8), and that the Defendants

violated the Discharge Order, are core matters.

*Whether Arbitration Would Present a Severe or Inherent Conflict with, or Necessarily Jeopardize the Objectives of, the Bankruptcy Code*

Another key consideration in determining whether Mr. Homaidan should be compelled to

arbitrate his claims is the important and well-established federal policy in support of arbitration,

as reflected in the enforcement of pre-dispute arbitration clauses.  The FAA "establishes a

'federal policy favoring arbitration.'"  *McMahon*, 482 U.S. at 226 (1987) (quoting *Moses H.

Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  It "reflects the

overarching principle that arbitration is a matter of contract."  *Italian Colors*, 570 U.S. at 233.

The FAA states:

> A written provision in . . . a contract evidencing a transaction involving commerce
> to settle by arbitration a controversy thereafter arising out of such contract or
> transaction, or the refusal to perform the whole or any part thereof, or an
> agreement in writing to submit to arbitration an existing controversy arising out of
> such a contract, transaction, or refusal, shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in equity for the revocation
> of any contract.

9 U.S.C. § 2.

The Supreme Court recently confirmed the importance of this policy in *Epic Systems

Corp. v. Lewis*, 138 S. Ct. 1612 (2018).  There, the Court stated that "we have often observed

that the [FAA] requires courts 'rigorously' to 'enforce arbitration agreements according to their

terms, including terms that specify *with whom* the parties choose to arbitrate their disputes and

*the rules* under which that arbitration will be conducted.'"  *Epic Systems*, 138 S. Ct. at 1621

(quoting *Italian Colors*, 570 U.S. at 233 (2013)).  The Court also observed that attempts to avoid

the FAA's directive in favor of arbitration based on an argument that arbitration would displace a

significant statutory objective face "a stout uphill climb" and that courts are "not at liberty to

pick and choose among congressional enactments and must instead strive to give effect to both." *Epic Systems*, 138 S. Ct. at 1616-17 (internal quotations and citation omitted).

The Supreme Court next turned to a close analysis of the statutes at issue, the Fair Labor Standards Act and the National Labor Relations Act (the "NLRA"), to determine whether those statutes, and in particular, Section 7 of the NLRA, "displace the [FAA] and outlaw [arbitration] agreements like" the one at issue. *Epic Systems*, 138 S. Ct. at 1624. The Court concluded that "[a] close look at the employees' best evidence of a potential conflict turns out to reveal no conflict at all." *Epic Systems*, 138 S. Ct. at 1625. Both the particular language of the NLRA's Section 7 and the "NLRA's broader structure" supported the conclusion that Congress did not address "what rules should govern the adjudication of class or collective actions in court or arbitration," or "what procedures Section 7 might protect." *Id.*

Consistent with this policy, the party opposing arbitration has the burden to demonstrate that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. *Epic Systems*, 138 S. Ct. at 1624. *See McMahon*, 482 U.S. at 227 (stating that "[t]he burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."). Congressional intent may be discerned through the "'text or legislative history . . . or from an inherent conflict between arbitration and the statute's underlying purposes.'" *Id*. (quoting *Mitsubishi Motors Corp.*, v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 632 (1985)). Only those proceedings that are "premised on provisions of the [Bankruptcy] Code that 'inherently conflict'" with the FAA, and proceedings where arbitration would "necessarily jeopardize the objectives of the Bankruptcy Code," present the type of severe and inherent conflict necessary to demonstrate congressional intent to preclude a waiver of judicial remedies. *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims*

*Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1067 (5th Cir. 1997). That is, just as arbitration clauses require the arbitration of claims within their scope, they do not – and cannot – reach claims that are outside those bounds.

Courts recognize that not every dispute between parties that have entered into a predispute arbitration agreement necessarily comes within the scope of that agreement, and also recognize that additional considerations may arise within the context of a bankruptcy proceeding.

In a recent decision that has particular resonance here, the Second Circuit found that a bankruptcy court did not abuse its discretion in denying to compel arbitration of violations of a bankruptcy court's discharge order. In *In re Anderson*, the Second Circuit held that in order to determine whether enforcement of an arbitration agreement would present an inherent conflict with the Bankruptcy Code, a bankruptcy court must first determine whether the issue involves a core or non-core proceeding. *In re Anderson*, 884 F.3d at 387. The Second Circuit observed that "'[b]ankruptcy courts are more likely to have discretion to refuse to compel arbitration of core bankruptcy matters.'" *In re Anderson*, 884 F.3d at 388 (quoting *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006)).

As the Second Circuit explained, if the court determines that the issues are core, then in order to determine whether an inherent conflict exists, "the bankruptcy court is tasked with engaging in a 'particularized inquiry into the nature of the claim and the facts of the specific bankruptcy.'" *In re Anderson,* 884 F.3d at 389 (quoting *Hill*, 436 F.3d at 108). "'The objectives of the Bankruptcy Code relevant to this inquiry include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.'" *Id.* And as the Second Circuit concluded, if the bankruptcy court determines that arbitration would create

a "severe" or "inherent" conflict with the purposes of the Bankruptcy Code, "it has discretion to conclude that 'Congress intended to override the [FAA's] general policy favoring the enforcement of arbitration agreements.'" *In re Anderson*, 884 F.3d at 387 (quoting *Hill*, 436 F.3d at 108).

The Second Circuit concluded in *In re Anderson* that arbitration of a claim based on an alleged violation of the Bankruptcy Code's discharge injunction would "'seriously jeopardize a particular core bankruptcy proceeding.'" *In re Anderson*, 884 F.3d at 389-90 (quoting *In re United States Lines*, 197 F.3d at 641). The Second Circuit arrived at this conclusion for several reasons. First, it found that "the discharge injunction is integral to the bankruptcy court's ability to provide debtors with the fresh start that is the very purpose of the [Bankruptcy] Code." *In re Anderson*, 884 F.3d at 390. Second, the debtor's claim in that case was with respect to an "ongoing bankruptcy matter that requires continuing court supervision." *Id*. And finally, "the equitable powers of the bankruptcy court to enforce its own injunctions are central to the structure of the Code." *Id*. The Second Circuit observed that the fact that the claim stemmed from a putative class action did not alter their conclusion.

These considerations are consistent with the Supreme Court's recent guidance in *Epic Systems*. There, the Court cautioned that it was not the role of a court to rewrite statutes in order to find a bar to arbitration of a claim, and that "[a]llowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*." *Epic Systems*, 138 S. Ct. at 1624. And here, the Second Circuit's analysis in *In re Anderson* looks to the "objectives of the Bankruptcy Code" and the overall structure of the bankruptcy system, including the question of whether an issue is core or non-core, and a "'particularized inquiry into the nature of the claim and the facts of the specific

bankruptcy,'" as well as "'the undisputed power of a bankruptcy court to enforce its own orders.'"[2] *In re Anderson,* 884 F.3d at 389 (quoting *Hill*, 436 F.3d at 108). This is akin to the "close look" at the statute and claim undertaken by the Supreme Court in *Epic Systems*. *Epic Systems*, 138 S. Ct. at 1625. In undertaking these tasks, a court does no more and no less than interpreting and applying the law in the context of a particular case.

As the Second Circuit has held, to determine whether an inherent conflict exists, this Court must engage in a particularized inquiry into the nature of Mr. Homaidan's claims and the facts of this specific bankruptcy case. Courts may refuse to compel arbitration where "resolution of the [disputed] claims directly implicated matters central to the purposes and policies of the Bankruptcy Code." *Hill*, 436 F.3d at 110. Courts have considered policies including the discharge as a tool to provide a fresh start, and a bankruptcy court's ability to enforce its own injunctions, among others. As the Second Circuit observed, "the discharge injunction is integral to the bankruptcy court's ability to provide debtors with the fresh start that is the very purpose of the [Bankruptcy] Code," and "the equitable powers of the bankruptcy court to enforce its own injunctions are central to the structure of the [Bankruptcy] Code." *In re Anderson,* 884 F.3d at 389.

Here, the Court considers whether compelling arbitration of this dispute would interfere with Mr. Homaidan's ability to receive a fresh start, and whether compelling arbitration infringes upon the Court's ability to enforce its own injunctions, including the discharge injunction.

---

[2] The Court in *In re Anderson* did not look to the history and statutory text because "arguments regarding legislative history and text were not raised below. Accordingly, [the court] need only inquire whether arbitration of Anderson's claim presents the sort of inherent conflict with the Bankruptcy Code that would overcome the strong congressional preference for arbitration." *In re Anderson*, 884 F.3d at 386.

The discharge as a tool to provide a fresh start.  One of the fundamental principles of bankruptcy law is that a bankruptcy discharge enables the "'honest but unfortunate debtor'" to receive a fresh start.  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 287 (1991)).  *See McKenzie-Gilyard v. HSBC (In re McKenzie-Gilyard)*, 388 B.R. 474, 480 (Bankr. E.D.N.Y. 2007) (observing that a debtor's ability to receive a fresh start is one of the fundamental principles of bankruptcy).  The "discharge is the paramount tool used to effectuate the central goal of bankruptcy:  providing debtors a fresh financial start."  *In re Anderson*, 884 F.3d at 390.  It protects not only the debtor, but also those creditors whose debts were incurred after the debtor filed her bankruptcy case, as well as those creditors whose debts are nondischargeable.  And it takes the form of a court order.  11 U.S.C. § 524.

The Defendants argue that Mr. Homaidan's "bankruptcy case closed more than six years ago and was only reopened for him to seek a determination of whether he discharged his obligation to repay his student loans."  Defs' Mem. at 21.  They claim that in drafting the Bankruptcy Code, Congress made deliberate policy choices.  And the Defendants argue that even when invoking the fresh start policy, the Supreme Court has "'been careful to explain that the [Bankruptcy Code],' does not entitle debtors to a 'completely unencumbered new beginning.'"  Reply at 8 (quoting *Grogan*, 498 at 286-87 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934))).

Mr. Homaidan responds that the fresh start is "the core purpose of bankruptcy and, as such, cannot be enforced piecemeal in arbitration."  Plf's Opp. at 16.  He argues that in making "the very difficult decision" to commence a bankruptcy proceeding, the Debtor seeks the "promise of a fresh start."  *Id.*  And "'[i]f a party subsequently violates the discharge, the

debtor's reason for seeking relief and enduring all of the constraints imposed by Congress in the Bankruptcy Code go for nothing.'" *Id*. (quoting *Belton v. GE Capital Consumer Lending, Inc. (In re Belton)*, 2014 WL 5819586 at *9).

In *Hill*, the Second Circuit held that the court had discretion to compel arbitration of an automatic stay violation, and found that compelling arbitration of such claims would not inherently conflict with the Bankruptcy Code because the violation was not an ongoing one, the bankruptcy case was closed, the debtor was discharged, and resolution of the claim would not affect an ongoing reorganization or any party's future conduct. *Hill*, 436 F.3d at 110.

Some twelve years later, in *In re Anderson*, the Second Circuit distinguished its conclusion in *Hill* and recognized that while arbitration of automatic stay violations under the circumstances present in that case might not pose an inherent conflict with the Bankruptcy Code, there would be such a conflict if a discharge violation claim was sent to arbitration "[b]ecause there is no matter more 'central to the purposes and policies of the Bankruptcy Code' than the fresh start provided by discharge." *In re Anderson*, 884 F.3d at 389. As a result, the court concluded, arbitration of Anderson's [discharge violation] claim presents an inherent conflict with the Bankruptcy Code." *Id.*

Here, as in *In re Anderson*, compelling arbitration of Mr. Homaidan's claims for violations of the discharge injunction would create an inherent conflict with the Bankruptcy Code. Discharge violations inherently impede a debtor's ability to achieve a fresh start, and therefore, compelling parties to arbitrate an alleged discharge violation is inappropriate. The resolution of Mr. Homaidan's claims directly implicates a central purpose of the Bankruptcy Code, namely his ability to achieve a fresh start. For these reasons, the Court finds that arbitration of Mr. Homaidan's claims would inherently conflict with the Bankruptcy Code's

objectives of providing a fresh start, and therefore, that this consideration weighs against

compelling arbitration of these claims.

    The enforcement of the discharge injunction.  Part of "the particularized inquiry into the

nature of the claim and the facts of a specific bankruptcy" is the "undisputed power of a

bankruptcy court to enforce its own orders."  *Hill*, 436 F.3d at 108.  The Second Circuit has

recognized that the "enforcement of injunctions is a crucial pillar of the powers of the

bankruptcy courts and central to the statutory scheme."  *In re Anderson*, 884 F.3d at 390.

    To the same effect, bankruptcy courts have significant familiarity and expertise in the

interpretation and application of the law surrounding alleged discharge violations.  As the

Second Circuit observed, "[t]hough the discharge injunction itself is statutory and thus a standard

part of every bankruptcy proceeding, the bankruptcy court retains a unique expertise in

interpreting its own injunctions and determining when they have been violated."  *In re Anderson*,

884 F.3d at 390-91.  The Second Circuit further recognized that the fact that the discharge

injunction is statutorily based and that it is similar, and often uniform, across bankruptcy cases

does not change "the simple fact that the discharge injunction is an order issued by the

bankruptcy court and that the bankruptcy court alone possesses the power and unique expertise

to enforce it," and that violations of the discharge injunction "are enforceable only by the

bankruptcy court and only by a contempt citation."  *In re Anderson*, 884 F.3d at 391.

    This is consistent with the power generally accorded to courts, rather than arbitrators, to

attend to the question of compliance with court orders, and more broadly, the significance of

respect for courts and the judicial process.  As the Second Circuit noted:

> The power to enforce an injunction is complementary to the duty to obey the
> injunction, which the Supreme Court has described as a duty borne out of 'respect
> for judicial process.' . . . That same respect for judicial process requires us to hold

that the bankruptcy court alone has the power to enforce the discharge injunction
in Section 524.

*Id*. (citation omitted).

In the Complaint, Mr. Homaidan alleges that certain of his debts were discharged pursuant to the Court's Discharge Order on April 9, 2009, that the Defendants were notified pursuant to Bankruptcy Rule 4004(g), and that the Defendants nevertheless sought to collect on those debts by use of dunning letters, emails, text messages, and phone calls to recover the discharged debt in violation of Section 524. That is, Mr. Homaidan alleges that the Defendants are in contempt of the discharge injunction contained in the Court's Discharge Order.

Here, Mr. Homaidan's allegations and claims for relief seek the enforcement of a court order – the discharge injunction – that is central to the statutory scheme and purpose of the Bankruptcy Code. Courts – not arbitration proceedings – are the appropriate forums to address alleged violations of court orders. And the resolution of Mr. Homaidan's claims directly implicates goals and objectives that are central to the purposes of the Bankruptcy Code, including the goal of providing a debtor with a fresh start. For these reasons, the Court finds that arbitration of Mr. Homaidan's claims would inherently conflict with the Bankruptcy Code's objectives, and that therefore, this consideration too weighs against compelling arbitration of these claims.

*      *      *

For these reasons, the Court finds that arbitration of Mr. Homaidan's would present a severe and inherent conflict with the Bankruptcy Code, and additionally, that it would necessarily jeopardize the objectives of the Bankruptcy Code. As a result, the Court declines to compel arbitration of Mr. Homaidan's claims.

### Conclusion

Based on the entire record, and for the reasons set forth herein, the Court concludes that the Defendants have not established that the Court should compel arbitration of the claims in this adversary proceeding, and the Defendants' Motion to Compel Arbitration is denied.  An order in accordance with this Memorandum Decision shall be entered simultaneously herewith.



Dated: Brooklyn, New York
     July 25, 2018

                                          Elizabeth S. Stong
                             United States Bankruptcy Judge