# Exhibit L

to

Declaration of George F. Carpinello

# In The Matter Of:

*Haas v.*
*Navient Solutions, LLC,*

---

*Patricia P. Peterson*
*September 19, 2017*
*Confidential*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



WILCOX & FETZER LTD.

Original File Haas v. Navient 09-19-17 depo of Patricia Peterson Confidential.txt
**Min-U-Script® with Word Index**

Patricia P. Peterson                                    Page 189

1  A.  Yes.
2  Q.  Okay.  And do you know why you
3  provided just the monetary information for
4  loan 13?
5  A.  I could speculate it's the only
6  student loan that has a balance -- I don't
7  know.  No.  I don't know.
8  Q.  Okay.  Then if you go to the next
9  page, there's the servicing dashboard.  So
10  talk me through this.  What is this?
11     MR. FARRELL: Can you just give
12  the Bates page so we're all -- so we're all
13  clear?
14     MR. BURGE: Yes.  It's 1898.
15     MR. FARRELL: Thanks.
16     THE WITNESS: This is a screen
17  shot of our CARES system, which is the
18  interface that our customer service call
19  center employees use when they're talking to
20  customers.
21     BY MR. BURGE:
22  Q.  This is the servicing as opposed to
23  the collection side?
24  A.  Yes.

Patricia P. Peterson                                    Page 190

1  Q.  From this we can see the Signature
2  loan.  Can you tell if that's the same loan
3  No. 13 that we were looking at on the previous
4  page?
5  A.  I can't tell with the information
6  that's listed on here, but all things point
7  that it is the same one.  The disbursement
8  date and the disbursement -- principal is the
9  same.
10  Q.  Okay.  And this says that this --
11  there's a couple things on this servicing
12  dashboard.  One thing it provides is it gives
13  the school name in the top right.
14     Do you see that?
15  A.  Yes.
16  Q.  So that's the school code that was
17  associated with the loan?
18  A.  That's the current school that the
19  customer was at, which may or may not be --
20  Q.  It may not -- could or could not be
21  the loan -- the school code associated with
22  this loan.
23  A.  Correct.
24  Q.  If you wanted to get the school code

Patricia P. Peterson                                    Page 191

1  associated with this loan, could you do it
2  through the servicing dashboard?
3  A.  I don't know if you can do it from
4  CARES.  I'm not sure.
5  Q.  Is it -- it's just not something that
6  the servicing department needs to do, or how
7  would they do it if they wanted to know the
8  school codes?
9  A.  I'm not familiar with their system,
10  this CARES system.  Worst case, they could
11  drop to CLASS to get the information.
12  Q.  Okay.  And then below it says, "1098-E
13  2016 eligible, yes."  Do you see that?  Bottom
14  kind of in the middle.
15  A.  Yes.
16  Q.  And this stuff down at the bottom is
17  the details for the selected loan, 50293,
18  504853, 88743, right?
19  A.  Yes.
20  Q.  That stuff is specifically -- is
21  specific to the one loan we're looking at, not
22  to the borrower, correct?
23  A.  Yes.
24  Q.  So that suggests that for this loan it

Patricia P. Peterson                                    Page 192

1  is 1098-E eligible, correct?
2  A.  Yes.
3  Q.  I think we saw earlier for private
4  loans that means it has to be a qualified
5  education loan.  Right?
6  A.  Yes.
7  Q.  So that means it was made to a
8  Title IV-eligible institution?
9  A.  Yes.
10  Q.  Now, let's look at the next page,
11  because now suddenly we're in a different
12  format.  So what is this?
13  A.  This is a payment history/declining
14  balance for this account, but I can't tell you
15  what loan it is.
16  Q.  Okay.  Do you know how this -- like
17  what -- how this was printed out, or you just
18  can't tell from what we have here?
19  A.  I wasn't a part of the documentation
20  preparation of this, but all things point that
21  it's the same loan.
22  Q.  Okay.  From the looks of it, it looks
23  like interest is accruing every month, but
24  would it suggest no payments are being made?

Patricia P. Peterson                                                    Page 209

1  mentioned earlier that you thought the current
2  procedure was when a borrower files
3  bankruptcy, you don't switch over to the
4  cosigner until the bankruptcy is complete.
5  **A. Correct.**
6  Q. That's the current policy. Was there
7  a prior policy? Because it looks like this
8  suggests loans are being switched over to the
9  cosigner upon filing.
10 **A. Yes. The previous policy was to do a**
11 **swap of the cosigner with the borrower.**
12 Q. And this policy is from -- the last
13 publish date on this is December 12th of 2016.
14 So would that suggest that you were still
15 swapping loans during bankruptcy as of
16 December 2016?
17 **A. No. I mean, I can't tell from here.**
18 **We have to look at the other procedures that**
19 **talk about the discharge. It's potential that**
20 **in the discharge processing they put a code to**
21 **have it going to the F57 for someone else to**
22 **process the name switch.**
23 Q. Let me show you another document. We
24 will mark this 12.

Patricia P. Peterson                                                    Page 210

1      (Peterson Deposition Exhibit
2  No. 12 was marked for identification.)
3      **BY MR. BURGE:**
4  Q. This is another form letter produced
5  in discovery. Do you recognize this document?
6  **A. I do.**
7  Q. What is this?
8  **A. It is a notice coming from our**
9  **collections areas that the account is going to**
10 **be reported to the credit bureaus because of a**
11 **delinquency.**
12 Q. When is this letter sent?
13 **A. I don't have the specific dates.**
14 **Before our credit bureau reporting? So which**
15 **is typically 60 to 90 days. A few**
16 **dependencies on the different programs, but**
17 **generally, 60 or 90 days past due.**
18 Q. Okay. And so with this letter, if we
19 don't have -- as near as I can tell, lots of
20 Navient letters have a specific code for the
21 letter. Correct? There will be P something
22 or M something or L something. I don't know
23 what the code is for this letter, but if this
24 letter is sent on an account, a code for the

Patricia P. Peterson                                                    Page 211

1  letter would be entered into the
2  correspondence history in the account.
3      Correct?
4  **A. No.**
5  Q. Okay. So how is the fact that this
6  letter was sent to, in this case,
7  Mark Markson, although that's a form name, if
8  this letter is sent, how is that noted on the
9  account?
10 **A. There is a note on the account, but it**
11 **doesn't necessarily have a code associated**
12 **with it. There should be a note that says a**
13 **letter was sent. I can tell you it hasn't**
14 **always had a note put on there, so you may**
15 **find in examples through the years that we**
16 **don't necessarily have -- we consider this a**
17 **supplemental collection notice that doesn't**
18 **come off of our main systems.**
19 Q. It is a form letter, though, right?
20 This is a letter that -- this wasn't like a
21 one-off that somebody drafted up. This is a
22 letter that's sent -- it's drafted to be able
23 to be used multiple times, correct?
24 **A. Yes.**

Patricia P. Peterson                                                    Page 212

1  Q. And if somebody chooses to send this,
2  it populates the information for the borrower
3  in the fields and then sends out looking like
4  this, correct?
5  **A. Yes.**
6  Q. And to the extent that it's not
7  reflected on the account, that would only be
8  by user error. The procedure is, if followed,
9  the correspondence should reflect that the
10 letter was sent, right?
11 **A. What I'm telling you is the procedures**
12 **have not always had a corr documented when a**
13 **letter was sent out. Last many years the**
14 **procedures would say this, but I can't tell**
15 **you all the way back to 2005 that our**
16 **procedures said we need to document these**
17 **supplemental letters. I don't know that.**
18 Q. Since -- how long -- I mean, this
19 letter is dated January of 2009. Do you think
20 the procedures required that correspondence
21 be -- letters be reflected in the files since
22 2009?
23 **A. It will be close.**
24 Q. We could look at Navient's procedures

Patricia P. Peterson                                    Page 213

1   and determine when the procedures changed such
2   that all letters had to be documented in the
3   files, correct?
4   **A.  I'm not sure if that's listed in the**
5   **procedures that specific information.**
6   Q.  Okay.  So you said that at some
7   point -- you believe that at sometime in the
8   past it was not required that all letters be
9   reflected in the correspondence file.
10  Correct?
11      MR. FARRELL: She said
12  supplemental letters.
13      **BY MR. BURGE:**
14  Q.  Supplemental letters.
15  **A.  I'm saying I don't think we had a**
16  **policy that said one way or the other always.**
17  **We haven't always had a procedure that says**
18  **anytime you send a supplemental letter**
19  **document the system.  That has been something**
20  **that's been added into our procedures for the**
21  **last five to tenish years.  It hasn't always**
22  **been there.**
23  Q.  Okay.  We could look at your
24  procedures and determine when that was added,

Patricia P. Peterson                                    Page 214

1   correct?
2   **A.  Possibly.**
3   Q.  If it's in the procedures now and it
4   wasn't in the procedures before, then at some
5   point it must have been added to the
6   procedures.
7       MR. FARRELL: I'll stipulate to
8   that.
9       **BY MR. BURGE:**
10  Q.  I don't want to argue with you about
11  this, but if it seems like if you have
12  procedures that are in it now and not in it
13  before --
14  **A.  Yeah, it's just not as simple as did I**
15  **have it in the procedures and didn't, because**
16  **it could have been in one set of procedures**
17  **that got rewritten into another document, or**
18  **it could have just not existed.  So that's why**
19  **I'm hesitating.**
20      **Yes, you could piece back the**
21  **information to say at what point in time did**
22  **we add it in there.  Yes.  I just don't know**
23  **if it's as simple as looking at two documents,**
24  **one that says it existed and one that says it**

Patricia P. Peterson                                    Page 215

1   doesn't.  That's my point.
2   Q.  Let's talk about the procedures real
3   quick, because you will note that all the
4   procedures, we looked at a bunch of them, they
5   have this last publish date on the top.
6       Right?
7   **A.  Yes.**
8   Q.  That is the date that the particular
9   version of the procedures we're looking at was
10  published, correct?
11  **A.  Yes.**
12  Q.  And so I will represent that, for many
13  of these procedures, we have many, many copies
14  with different last publish dates.  Some of
15  them we have we might have 150 of the same
16  procedures with different last publish dates
17  over, say, the last seven or eight years.
18      So with those, to the extent
19  that there is a procedure that covers letters,
20  we could work back through the last publish
21  dates and figure out when there was a
22  requirement that the supplemental letter be
23  sent to the borrower.
24      Right?

Patricia P. Peterson                                    Page 216

1   **A.  Yes.**
2   Q.  Now, why do you refer to this as a
3   supplemental letter?
4   **A.  Because it is not coming from a direct**
5   **letter coming out of our servicing system.  So**
6   **it doesn't come directly out of FDR, CLASS.**
7   **It supplements our correspondence.  It isn't**
8   **necessarily sent to a hundred percent of our**
9   **customers, unlike what might be coming off of**
10  **the servicing system.  We may target a certain**
11  **population of customers that would get this**
12  **letter.**
13      **As an example, if a customer has**
14  **already been reported to the credit bureau, we**
15  **may choose not to send this because it doesn't**
16  **influence that customer as much as a customer**
17  **that's never been reported.**
18  Q.  How can you tell this doesn't come out
19  of the servicing system?  What is it about it?
20  **A.  One, I know the letter.  The other**
21  **part of it, it does not have the letter code**
22  **down at the bottom of the letter like one of**
23  **the other letters we were looking at earlier.**
24  **Like Exhibit No. 9 has a letter code down at**

Patricia P. Peterson | Page 217

1  the bottom.
2  Q.  What is the letter code in Exhibit 1?
3  A.  L055.
4  Q.  You're right.  Okay.  Let me show you
5  another letter that I think does have a letter
6  code.  We will mark this Peterson 13.
7     (Peterson Deposition Exhibit
8  No. 13 was marked for identification.)
9     BY MR. BURGE:
10  Q.  Do you recognize this document?
11  A.  Yes.
12  Q.  What is this document?
13  A.  Delinquency notice for the customer.
14  Q.   And this, if you see at the bottom,
15  has that letter code.  I have a hard time
16  making it out here.  Maybe it's like a D?
17  A.  Looks like it might be D023.
18  Q.  This is a letter that comes directly
19  out of the servicing system?
20  A.  Yes.
21  Q.  And this is one that is sent to any
22  borrower who is delinquent?
23  A.  Yes.
24  Q.  And when this letter is sent, it's

Patricia P. Peterson | Page 218

1  reflected in the correspondence in the file --
2  A.  Yes.
3  Q.  -- as the D023?
4  A.  Yes.
5  Q.  Okay.  Do you know if the content of
6  this letter has changed over time?
7  A.  More than likely, yes.
8  Q.  Okay.  But Navient would have copies
9  of what this letter looked like each time it
10  was -- at the given time?
11  A.  Yes.
12  Q.  Now, the disclosures at the bottom
13  which says, "Important Disclosures," "This is
14  an attempt to collect a debt.  Information
15  obtained will be used for that purpose," do
16  you know if that language has been in the --
17  each version of the document?
18  A.  For what period of time?
19  Q.  Dating back to, say, 2005.
20  A.  It was added at some point.  I don't
21  know if it was prior to 2005 or after 2005.
22  Q.  But at some point it was added.  The
23  purpose of this letter is to collect on a
24  debt, correct?

Patricia P. Peterson | Page 219

1  A.  Yes.
2  Q.  And that has been the purpose of the
3  D23 letter dating back at least to 2005.
4  A.  Yes.
5  Q.  Now, this document, what is the -- the
6  event that causes this document to be sent is
7  an account switching over from current to
8  delinquent?
9  A.  It's a certain number of delinquency
10  days.  Without looking at another document, I
11  couldn't tell you what date we triggered this
12  letter.
13  Q.  Somewhere probably between 15 and 60?
14  A.  Again, without looking at the -- I
15  don't know which letter D023 is in the cycle.
16  Q.  Okay.  But it's sent out some number
17  of days after a loan goes delinquent, correct?
18  A.  Yes.
19  Q.  Is it sent out automatically or does
20  somebody have to make a decision to send it
21  out?
22  A.  Automatically.
23  Q.  It's sent out automatically for any
24  loan you're still actively servicing,

Patricia P. Peterson | Page 220

1  regardless of whether or not the borrower
2  previously had a bankruptcy?
3     MR. FARRELL: Object to the
4  form.
5     THE WITNESS: Correct.
6     BY MR. BURGE:
7  Q.  I show you a document which I will
8  mark Peterson 14.
9     (Peterson Deposition Exhibit
10  No. 14 was marked for identification.)
11     MR. FARRELL: You took
12  Exhibit 14 out of your folder labeled
13  "Exhibit 13."
14     MR. BURGE: 31 in fact.
15     MR. FARRELL: Oh.  Is it 31?
16  I'm looking at it upside-down.
17     MR. BURGE: These have no
18  meaning, unfortunately.
19     BY MR. BURGE:
20  Q.  So do you recognize this document?
21  A.  Yes.
22  Q.  What is this document?
23  A.  Again, a training reference for our
24  call agents.

Patricia P. Peterson                                    Page 233

1  follow once you get notice that a bankruptcy
2  has ended either in dismissal or discharge.
3      Correct?
4  **A.  Yes.**
5  Q.  So after you go through a number of
6  steps, you then get to step 7, which is to
7  send the L180 letter unless the private loan
8  will be discharged.
9      Correct?
10 **A.  Yes.**
11 Q.  And so once you've determined --
12 you've gone through the steps and you have
13 got -- the bankruptcy is over, you then send
14 that L180 letter to the borrower, correct?
15 Unless you conclude that the private loan is
16 going to be discharged.
17 **A.  Yes.**
18 Q.  Now, I want to take a look at what
19 that L180 letter looks like.  So mark this as
20 Peterson 16.
21     (Peterson Deposition Exhibit
22 No. 16 was marked for identification.)
23     **BY MR. BURGE:**
24 Q.  I'll ask you if you recognize this

Patricia P. Peterson                                    Page 234

1  document.
2  **A.  Yeah.**
3  Q.  Okay.  It doesn't have the L180 letter
4  I think maybe because the way it was produced,
5  but do you recognize this to be the L180
6  letter?
7  **A.  Yeah.**
8  Q.  Okay.  And the information it provides
9  is: "We have been notified that your
10 bankruptcy case has been concluded.  Since the
11 loan shown above was not discharged through
12 your bankruptcy, you are responsible for
13 repaying the remaining balance of the loan
14 according to the terms of the promissory
15 note."
16     See that?
17 **A.  I do.**
18 Q.  This is what you send to the borrower
19 once they finished their bankruptcy and you're
20 putting them back into repayment, correct?
21 **A.  Yes.**
22 Q.  And you described this as an attempt
23 to collect on a debt?
24 **A.  No.**

Patricia P. Peterson                                    Page 235

1  Q.  This is just notifying them that they
2  need to start making payments?
3  **A.  Yes.**
4  Q.  Let me show you another document.
5  This was not produced in this case, but it was
6  publicly filed in another case.  Mark it as
7  Peterson 17.
8      (Peterson Deposition Exhibit
9  No. 17 was marked for identification.)
10     **BY MR. BURGE:**
11 Q.  I think it pretty closely tracks the
12 language of Peterson 16.  Do you recognize
13 this document?
14 **A.  It looks to be the same document, just**
15 **a different version.**
16 Q.  Slightly different form.  But this
17 would also be that L180 letter, right?
18 **A.  I can't tell from here.**
19     MR. FARRELL:  Jason, I'm going
20 to tell you, not because I'm trying to do this
21 but just so you know, you can read through the
22 blackout.  If you hold it at the right angle,
23 I can read the blacked-out information.
24     MR. BURGE:  This whole thing's

Patricia P. Peterson                                    Page 236

1  subject to a protective order.
2      MR. FARRELL:  I'm just letting
3  you know.
4      MR. BURGE:  Hopefully this will
5  make it easier if we ever have to submit it to
6  the court or anything.  Agreed.  I don't think
7  any of it's secret.  You can look up the case
8  number and see who it is.
9      MR. FARRELL:  Wanted to let you
10 know in case you were intending for that to be
11 permanent blackout.  It's not.
12     MR. BURGE:  Understood.
13     **BY MR. BURGE:**
14 Q.  If you look on the right side in these
15 kind of small -- you see in the far right is
16 an "L180"?
17 **A.  Okay.**
18 Q.  That suggests this is the L180 letter?
19 **A.  Okay.**
20 Q.  Maybe this is just a different form
21 that was used on or about December 2nd of
22 2015?
23 **A.  Yeah.  Our letters got reviewed very**
24 **frequently.**

Patricia P. Peterson     Page 237

1 Q. Sure. This has similar language to
2 the last one. Starts with the exact same
3 first sentence: "We've recently been notified
4 that your bankruptcy case has concluded."
5     See that?
6 A. Uh-huh.
7 Q. Slightly different. Says here that
8 language kind of similar to what we saw in the
9 call centers. "The bankruptcy doesn't always
10 discharge student loans, and because your loan
11 shown above wasn't discharged, you remain
12 responsible for paying the entire remaining
13 balance."
14     See that?
15     And then function, that's
16 basically the same as the L180 letter produced
17 here, right? Same message being delivered?
18     **MR. FARRELL:** Object to the
19 form.
20     **THE WITNESS:** The intended
21 message, yes.
22     **BY MR. BURGE:**
23 Q. And this one has some language at the
24 bottom that this is an attempt to collect a

Patricia P. Peterson     Page 238

1 debt and information obtained will be used for
2 that purpose.
3     See that?
4 A. I do.
5 Q. And that's 'cause -- that language was
6 put in there because this L180 letter was an
7 attempt to collect on a debt?
8     **MR. FARRELL:** Object to the
9 form.
10     **THE WITNESS:** No. That's a
11 legal -- we get guidance from legal whether we
12 should include this type of language in our
13 letters or not.
14     **BY MR. BURGE:**
15 Q. Presumably, in December of 2015
16 Navient got guidance from legal that it should
17 include this is an attempt -- I don't know
18 what you were specifically told by legal.
19     **MR. FARRELL:** Don't answer the
20 question. You can confirm that this is a
21 letter that has that language on it. If the
22 decision to put the language on there is
23 legally driven, if that's your understanding,
24 then don't go any further. The letter says

Patricia P. Peterson     Page 239

1 what it says.
2     **BY MR. BURGE:**
3 Q. Maybe I can get at it this way
4 without -- I don't want to know what your
5 lawyers told you. Don't tell me what your
6 lawyers told you. But this letter back in
7 December 2015 specifically said on it: "This
8 is an attempt to collect a debt," correct?
9 A. Yes.
10 Q. And the substance of the letter, that
11 paragraph that starts: "We have recently been
12 notified that your bankruptcy case is
13 concluded," that's the same substance in both
14 letters, right?
15 A. Generally, yes.
16 Q. Let me show you a document which I
17 will mark Peterson 18.
18     (Peterson Deposition Exhibit
19 No. 18 was marked for identification.)
20     **BY MR. BURGE:**
21 Q. I'll ask you if you recognize this
22 document.
23 A. I don't recall this document, but I
24 recognize how it's used.

Patricia P. Peterson     Page 240

1 Q. I really just want to call your
2 attention to one thing about it. If you take
3 a look at the second page, there's a reference
4 to some correspondence codes. See that? And
5 letter codes?
6 A. Yes.
7 Q. And these are the codes that would be
8 entered into the correspondence when these
9 events happened and these letters are sent,
10 correct?
11 A. Will you restate that?
12 Q. These are the correspondence codes and
13 the letter codes to be entered into the
14 correspondence file when these events happen
15 or when these letters are sent.
16 A. Yes.
17 Q. And L180, the letter we just looked
18 at, is described as the bankruptcy letter to
19 borrower filed on or after October 8, '98?
20 A. Yes.
21 Q. Now I want to look at some
22 correspondence histories. So I show you --
23 I'm going to give you two documents at once,
24 but then we're going to go through each of

Patricia P. Peterson                                    Page 249

1  Q.   And here it's filed on or after
2  October 17th, 2005.  See that?
3  A.   Yes.
4  Q.   Do you know the significance of that
5  date?
6  A.   From a cheat sheet.
7  Q.   I'll just represent I don't think --
8  we can probably stipulate to this -- that's
9  the day the bankruptcy -- I'm not -- BAPCPA,
10  the day that BAPCPA became effective.
11      And so that what this is saying
12  is that on March 27th an L180 letter was sent
13  to Evan Brian Haas, correct?
14  A.   Yes.
15  Q.   And this is the ordinary course of how
16  a discharge would be handled.  If you
17  determined the loan is not dischargeable, they
18  answer the fact that a discharge is received,
19  they make a determination that it's not
20  dischargeable and they send an L180 letter.
21      Correct?
22  A.   Yes.
23  Q.   And if you look after that L180 letter
24  is sent, starting on page Bates labeled 71,

Patricia P. Peterson                                    Page 250

1  phone calls resume to the borrower, correct?
2  A.   Yes.  45 days later.
3  Q.   So May 3rd he's phoned and there's
4  some sys call attempts after that.
5      Okay.  Now I want to turn to the
6  CLASS correspondence history.  How does this
7  differ from the FDR correspondence history?
8  A.   They serve generally the same purpose,
9  noting and documenting what's happening on the
10  account.  Just completely different format,
11  different codes.  Obviously different look.
12  Q.   Sure.  So at the very top of the first
13  page, we looked at this a little earlier with
14  a different form, there's a reference to
15  11 loans.
16      See that?
17  A.   Yes.
18  Q.   And a number of them are the Stafford
19  loan or the Signature loan, right?
20  A.   I don't see a Signature loan.
21  Q.   Who's the PL again?
22  A.   It's a plus sign, but it looks like
23  the graduate program.  The student must have a
24  federal -- federal program, we call it a

Patricia P. Peterson                                    Page 251

1  Parent loan, but it's for a grad student.  So
2  Grad Plus program.
3  Q.   So you've got the -- these are all --
4  are these all federal loans?
5  A.   With the exception of the bottom one,
6  which is the Bar Study.
7  Q.   You understand that's the loan that's
8  at issue in our case.
9  A.   Yes.
10  Q.   And now I'll note for the CLASS
11  correspondence history here, if you look at
12  like the second page, it's 256 at the bottom,
13  there's a reference at the top, it says,
14  "loans all."
15      You see that?
16  A.   Yes.
17  Q.   So that is getting the correspondence
18  for all 11 of his loans, correct?
19  A.   Yes.
20  Q.   But you could theoretically set that
21  to be just loan No. 11 and you'd only get the
22  correspondence history for loan No. 11.
23      Correct?
24  A.   You could, but you'll still pick up

Patricia P. Peterson                                    Page 252

1  many of these -- explain what CLASS does.  If
2  correspondence is entered under the "all," it
3  will appear on every single loan.  If it's
4  entered under a loan number, so if you
5  remember the X that you put on there, if you
6  go into the screen and enter it as X for just
7  the one loan, then you will see it when you
8  look at the "all," but you will also see it
9  when you look at that loan, but you won't see
10  it when you look at a different loan.
11  Q.   So there's some correspondence that
12  applies to all loans and some correspondence
13  that are loan-specific?
14  A.   Yes, but it's dependent on how the
15  agent accesses this screen when they put their
16  notes in.
17  Q.   And so when you look at using this
18  information, which is marked for all, is there
19  any way to tell for any given correspondence
20  entry whether it's referencing loan 11 or any
21  of the other ten loans?
22  A.   Not by looking at this.
23  Q.   Let's take a look -- if you scroll
24  ahead to -- scroll ahead to at the bottom it's

| | |
|---|---|
| Patricia P. Peterson                    Page 321 | Patricia P. Peterson                    Page 323 |

**Page 321**

1  October 18th, '05, and after, then you proceed
2  to step 3, correct?
3  **A.  Yes.**
4  **Q.**  So now you go into the field and the
5  first question is to look at the 1098-E field,
6  correct?
7  **A.  Yes.**
8  **Q.**  And that 1098-E field is whether the
9  loan is eligible to receive a 1098?
10  **A.  Yes.**
11  **Q.**  That's what that field means, correct?
12  And so it looks like there's at least four
13  possibilities:  Y, Q, blank, and N.
14  See that?
15  **A.  Yes.**
16  **Q.**  So I'm assuming Y is yes, it is
17  eligible for 1098.  Correct?
18  **A.  Yes.**
19  **Q.**  And N is no, it's not eligible for a
20  1098.  Correct?
21  **A.  Yes.**
22  **Q.**  What is Q and blank?
23  **A.  Q is we need some additional**
24  **information from the borrower to determine**

**Page 322**

1  **whether it should be a "yes" or a "no."**
2  **Q.**  Okay.  And what is blank?
3  **A.  I don't know if -- we don't have a**
4  **disposition on it.**
5  **Q.**  Okay.  So the way these procedures are
6  applied, you take a look at the 1098-E field
7  and if it is Y, Q, or blank, then the loan is
8  placed back into repayment.
9  See that?
10  **A.  Yes.**
11  **Q.**  So that's the determination, based on
12  Navient's procedures, that the loan is
13  non-dischargeable, correct?
14  **MR. FARRELL:** I know I have said
15  this before, and I'm not going to say it
16  again, but I want to make 100 percent clear,
17  so there's never any confusion, she is not
18  here to testify what is or is not
19  dischargeable as a matter of law.  She's here
20  to determine how Navient's procedures tell
21  somebody from Navient's business purposes to
22  decide whether to treat something as
23  dischargeable or not.
24  So with that caveat, that

**Page 323**

1  understanding, go ahead.
2  **THE WITNESS:** Yes.
3  **BY MR. BURGE:**
4  **Q.**  And at that point Navient begins again
5  collecting on the loans?
6  **A.  Yes.**
7  **Q.**  Now, it's your understanding, and we
8  looked at that earlier, you should only be
9  eligible for a 1098 if you went to a Title IV
10  institution because you have to have a
11  qualified education loan.
12  Correct?
13  **A.  Correct.  Sorry.**
14  **Q.**  So if somebody is 1098-eligible, if
15  they have that Y, that's a sign that they went
16  to a Title IV institution.
17  **A.  Yes.**
18  **Q.**  Now, the other side of 3 is if the
19  1098-E field is marked "no," then you continue
20  to the next step.
21  Right?
22  **A.  Correct.**
23  **Q.**  It's called 3(b).  Then you ask
24  whether the flag has ever been changed.  If

**Page 324**

1  the flag was changed from Y or Q, then the
2  loan is not dischargeable.
3  Why is that?
4  **MR. FARRELL:** Object to the
5  form.
6  **THE WITNESS:** I don't know why
7  this step was added in here.
8  **BY MR. BURGE:**
9  **Q.**  Who creates these policies?
10  **A.  This procedure is put together by the**
11  **training department on the servicing side that**
12  **supports the claims area.**
13  **Q.**  Who put together this particular
14  procedure?
15  **A.  I don't know.**
16  **Q.**  Who heads up the servicing department
17  claims side?
18  **A.  Josh Courter.**
19  **Q.**  Josh Courter.  Did you talk to
20  Josh Courter to prepare for this deposition?
21  **A.  Not directly.**
22  **Q.**  You understood one of the topics -- I
23  hate to keep beating on this -- was Navient's
24  analysis of the dischargeability of consumer

Patricia P. Peterson                                          Page 325

1    education loans.
2        Correct?
3  **A.  I don't know the answer on blank.  I**
4  **can answer the rest of your questions.  I**
5  **don't know the answer on blank.**
6  Q.   If we wanted to get that answer, we
7  would have to talk to Josh Courter?
8      MR. FARRELL: Object to form.
9      BY MR. BURGE:
10 Q.   Or you would have to talk to
11 Josh Courter.  Somebody would have to talk to
12 Josh Courter?
13 **A.  Yes.**
14 Q.   So why would the 1098-E flag be
15 changed?
16 **A.  In the case of the Q, if it's a Q, we**
17 **ask the customer to provide information that**
18 **tells us whether or not the loan, the proceeds**
19 **were to be used for their student loan or to**
20 **pay for school education.**
21 Q.   Okay.  And so if the flag was
22 originally Q and then the person says, I used
23 it to pay for education but not at a Title IV
24 school, wouldn't you then change the flag from

Patricia P. Peterson                                          Page 326

1  Q to N?
2  **A.  The customer can't tell us change**
3  **the -- where this money was disbursed.**
4  Q.   So Q is you know it's a
5  Title IV-eligible school, but you're not sure
6  if they used the money correctly to be an
7  eligible loan.
8  **A.  We know it's a Title IV school.  And**
9  **we need the customer to tell us the**
10 **cost-of-attendance piece of it on whether or**
11 **not this was used for their schooling.**
12 Q.   So that's when you'd have a Q, and if
13 they tell you that it has been used for their
14 schooling, then you change it to Y.  If they
15 tell you it hasn't, then you go to N?
16 **A.  That's right.**
17 Q.   Is Q for direct-to-consumer loans, or
18 would that apply also where you pay the school
19 directly?
20 **A.  That I'm not sure.**
21 Q.   But I guess the point is if it's not a
22 non-Title IV school, it should never have a Y
23 or Q, it should always have an N.
24     Correct?

Patricia P. Peterson                                          Page 327

1  **A.  Correct.**
2  Q.   Okay.  Then -- so if it's a
3  non-Title IV school, you're going to have a
4  1098-E, and then you're going to skip ahead,
5  and then the question is what's the school
6  type code.  And you look at that second place,
7  and here, if it's an A or B, you go -- if it's
8  a C or D, then it's discharged.  If it's an A
9  or B -- what happens if A or B?  "Corr MY66
10 and GY35," what does that mean?
11 **A.  If the school type is A or B, it means**
12 **it's a Title IV and it not eligible for**
13 **write-off.**
14 Q.   So what that means basically is it's
15 non-dischargeable and it goes back into
16 repayment?
17 **A.  Correct.**
18 Q.   So then once you determine it's
19 dischargeable, in that C or D situation it
20 says -- if you have determined it's
21 dischargeable, specifically do not send the
22 L180 letter.
23     Do you see that?
24     MR. FARRELL: Object to the

Patricia P. Peterson                                          Page 328

1  form.
2      BY MR. BURGE:
3  Q.   It's right in the middle of the fourth
4  bullet point.
5  **A.  I'm just reading.**
6      **Yes.  Right.**
7  Q.   So in that situation, you don't send
8  the L180 letter and you sent an email saying
9  write-off.
10 **A.  Yes.**
11 Q.   Otherwise, you go back into repayment
12 and you proceed to step 4.
13 **A.  Yes.**
14 Q.   And that's where -- and step 4 says,
15 "If the loan is in bankruptcy status and the
16 loan is not dischargeable, you place the loan
17 back into repayment to continue servicing,"
18 and you refer to those bankruptcy
19 discharge/dismissal procedures?
20 **A.  Yes.**
21 Q.   So we have got roughly 43,000 names of
22 people on that list who have school types C or
23 D in the second space.
24     MR. FARRELL: 43,000 names or

Patricia P. Peterson                                      Page 341

1  wanted to ask this one because it has
2  something the others don't. If you take a
3  look at top of page 2, it's 62895 on the
4  bottom, it actually has a little definition of
5  the school-type field where it says the first
6  character will indicate the type of school and
7  the second character will indicate eligibility
8  for discharge, Title IV eligibility.
9      See that?
10 **A. Yes.**
11 Q. And that's your understanding of what
12 the A, B, C, D is. It's that Title IV
13 eligibility, eligibility for discharge, right?
14 **A. Yes.**
15 Q. And according to that, C or D are the
16 two columns that are eligible for discharge.
17 A and B that are not eligible for discharge,
18 right?
19 **A. Yes.**
20 Q. I'm going to skip this one. What is
21 SLMF?
22 **A. Sallie Mae Financial.**
23 Q. Okay. So if I have an SLMF document,
24 that's an older document, probably replaced by

Patricia P. Peterson                                      Page 342

1  a Navient document?
2  **A. Probably. Or RKL Financial.**
3  Q. I'm actually going to show you this
4  just because it's an earlier version -- what
5  are we on, Peterson?
6      **THE VIDEOGRAPHER: 33.**
7      (Peterson Deposition Exhibit
8  No. 33 was marked for identification.)
9      **BY MR. BURGE:**
10 Q. Earlier version I think of something
11 we just looked at from Sallie Mae Financial.
12 That Career Training and self-insured loans
13 document. This will one from all the way back
14 in January of 2009. This has the same --
15 there's some procedures that are slightly
16 different.
17     So take a look at part 2,
18 10/18/05 and after. See that?
19 **A. Yes.**
20 Q. The Career Training and self-insured
21 loans. Here again, you start with the 1098-E
22 field, but if it's a Y, you place it back into
23 repayment. But here, if it's an N, a Q, or a
24 blank, then you move forward with the school

Patricia P. Peterson                                      Page 343

1  type analysis.
2      Do you see that?
3  **A. Yes.**
4  Q. So it looks like under these
5  procedures, a Q could be dischargeable,
6  whereas under the more recent procedures, a Q
7  is not dischargeable.
8      See that?
9  **A. I see it, yes.**
10 Q. But these are the older procedures
11 that would have belonged to Sallie Mae
12 Financial. What you have now are the
13 procedures that are under the -- what you have
14 now is the more modern Navient procedures we
15 looked at a second ago, correct?
16 **A. Correct.**
17 Q. And I show you a document marked 34.
18     (Peterson Deposition Exhibit
19 No. 34 was marked for identification.)
20     **BY MR. BURGE:**
21 Q. This is a policy entitled, "Bankruptcy
22 Write-Offs." This is the policy used for the
23 actual write-off of the dischargeable loan.
24     See that?

Patricia P. Peterson                                      Page 344

1  **A. The procedure?**
2  Q. Yes, the procedure. Sorry.
3      You will notice the first step
4  there is: "Verify the loan is eligible for
5  write-off by confirming it's a private loan
6  and reviewing the 1098-E eligibility school
7  code and cosigner information."
8      See that?
9  **A. Yes.**
10 Q. And that kind of in a nutshell
11 describes what we have been looking at for
12 probably 45 minutes which is the way that
13 Navient instructs its agents to determine
14 whether a loan is dischargeable or
15 non-dischargeable is based on the 1098-E
16 eligibility, the school code, and the cosigner
17 information.
18     Correct?
19 **A. Yes.**
20 Q. And then assuming you determine it's
21 dischargeable or eligible for write-off, you
22 follow these procedures to write it off?
23 **A. Correct.**
24 Q. Okay. I want to take a look at the