## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 7** |
| **HILAL K. HOMAIDAN,**<br>f/k/a Helal K. Homaidan, | **Case No. 08-48275 (ESS)** |
| **Debtor.** | |
| **In re:** | **Chapter 7** |
| **REEHAM YOUSSEF aka Reeham**<br>**Navarro Youssef aka Reeham N. Youssef,** | **Case No. 13-46495 (ESS)** |
| **Debtor.** | |
| **HILAL K. HOMAIDAN on behalf of**<br>**himself and all others similarly situated** | **Adv. Pro. No. 17-1085** |
| **Plaintiff,** | |
| **v.**<br>**SALLIE MAE, INC,**<br>**NAVIENT SOLUTIONS, LLC,**<br>**NAVIENT CREDIT FINANCE**<br>**CORPORATION** | |
| **Defendants.** | |

## <u>DECLARATION OF THOMAS M. FARRELL</u>

I, Thomas M. Farrell, declare under penalty of perjury as follows:

1.    I am a partner in the law firm McGuireWoods, LLP, counsel for the Navient

Defendants.  I submit this Declaration in support of Navient's opposition to Plaintiffs' Motion for

a Temporary Restraining Order.  This Declaration is based in part on my personal knowledge and

in part on a review of documents and information developed in the course of this case.

2.    In January 2019, Navient produced to plaintiffs a spreadsheet (NAVHOM01115514) with information on approximately 322,000 loans serviced by Navient. It is my understanding that plaintiffs have used this spreadsheet as the starting point for their analysis of various issues in this case relating to class certification and their requests for provisional relief.

3.    This spreadsheet was intended to capture information on private student loans (meaning those that were not issued or guaranteed by any governmental unit) for attendance at Title IV institutions. The spreadsheet, however, was not limited to "Tuition Answer" loans or to loans where the proceeds were disbursed directly to borrowers (as opposed to their schools). Rather, the spreadsheet includes many loans where proceeds were disbursed to the schools and for which the schools certified "cost of attendance." It is my understanding that, on those loans that were disbursed directly to borrowers, the lender received representations from the borrowers to the effect that the loans proceeds were within the "cost of attendance," as reflected in the Youssef and Homaidan loan documents that are before the Court, or equivalent representations of similar import.

4.    The spreadsheet was not limited to those loans for which 11 U.S.C. § 523(a)(8)(B) would be the only grounds for a finding of non-dischargeability. Rather, the spreadsheet includes many loans that were issued under programs funded in whole or in part by governmental units or nonprofit institutions.

5.    The spreadsheet was intended to capture information on Title IV, private loans on which Navient had received indications that one or more obligors had filed for relief under the United States Bankruptcy Code. The spreadsheet, however, was not limited to loans on which one or more obligors had actually received bankruptcy discharges. Pacer research conducted at the

direction of McGuireWoods since production of the spreadsheet has revealed that it contains tens of thousands of loans on which no obligors have actually received bankruptcy discharges.

6.    The spreadsheet does not contain any information about "cost of attendance." There is no way to tell from the spreadsheet itself whether any of the loans listed on it where disbursed in amounts that exceeded "cost of attendance."

7.    It is my understanding that it is not possible to determine from the IPEDs data that has been referenced in this proceeding the actual "cost of attendance" for any particular student. Nevertheless, McGuireWoods has reviewed efforts to apply IPEDs data across the loans listed on the spreadsheet. The results reveal that there are tens of thousands of loans on the spreadsheet that were disbursed in amounts less than the "cost of attendance" reflected in IPEDs data for the applicable schools and academic years.

8.    The spreadsheet includes loans issued under 80 different loan programs and loan product codes. Well over 100,000 of the loans on the spreadsheet were not "direct to consumer" loans as I understand plaintiffs to use that term in this case. Rather, as I understand it, those loans were issued with school certifications that they were qualified education loans.

9.    Thousands of loans on the spreadsheet (if not more) appear to have been issued under programs funded in whole or in part by governmental units or nonprofit institutions. Some of these loans appear to have been "direct to consumer" loans, as I understand plaintiffs to use that term.

10.    According to records in this case, the aggregate outstanding balance for all loans on the spreadsheet exceeds $3 billion.

11.    In *Crocker v. Navient*, a case that pended in the United States Bankruptcy Court for the Southern District of Texas, an interim order was put in place that precluded Navient from

engaging in collection activities on certain student loans while the case was being litigated. That order did not preclude any borrower from making, or Navient from accepting, voluntary payments. Nevertheless, while the order was in place, thousands of borrowers who had been making loan payments before issuance of the order stopped making payments on their loans.

12.    Borrowers on just the Tuition Answer loans on the spreadsheet attended over 3,000 different schools.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 9th day of May, 2022.

Thomas M. Farrell

159540900_1